THE COMMONWEALTH OF PUERTO RICO, Petitioner, *v.* SUPERIOR COURT OF PUERTO RICO, EMINENT DOMAIN DIVISION, PEDRO SANTOS BORGES, JUDGE, Respondent; PLANTA DE CAL HICACO, INC., ET AL., Interveners.

C-66-36

—O—

Opinion of MR. JUSTICE HERNÁNDEZ MATOS, in which MR. CHIEF JUSTICE NEGRÓN FERNÁNDEZ and MR. JUSTICE SANTANA BECERRA concur, setting forth the grounds for denying the motion for reconsideration.

San Juan, Puerto Rico, June 27, 1969

Petitioner requested the reconsideration of our decision affirming the order of the Eminent Domain Division of the

Superior Court, which determined that the State had no title of ownership to the small islands of Hicacos and Ratones, object of condemnation, and that on the date the action was brought, the same belonged to codefendant Best Builders, Inc.

It states that this Court erred (a) in concluding that the adjustment was made; (b) in determining that the condition concerning the cultivation of the land was substantially performed, and (c) in considering the subsequent purchasers as third persons in good faith, against the evidence of events outside the registry.

The interveners have objected to the motion for reconsideration. They, in turn, maintain, in synthesis, that the proceeding for the adjustment must be considered closed and that the same "constitutes a ratification of the title conveyed by Leandro Fort" to Juan Lavaggi; that the State did not establish any title to the small islands; that the subsequent purchasers are third persons for having bought without there appearing from the registry the compliance, with extinctive effects, with the resolutory condition and that "the land object of this proceeding has been acquired by usucapion," requesting a re-examination of the present doctrine of usucapion against the State.

First, we shall summarize all the previous registration entries of the small islands Hicacos and Ratones, which compose rural property No. 104 in the municipality of Fajardo. They commence on February 28, 1883, date of the first entry by virtue of a *título de amparo* granted by the Crown of Spain to Leandro Fort Torres, and end, on December 12, 1962, date when the deed of sale to Best Builders, Inc., was presented for registration, covering an uninterrupted status in the registry of effective ownership during 79 years and 9 months. Then, we shall discuss the specific mortgage effects of the subsequent conveyance entries against the resolutory condition appearing in the first entry. Next, the effects of the

acts not of record, recited in this opinion and, finally, the question of prescription and its effects on the title involved.

I

## Registration Entries

*First entry*, February 28, 1883. By this first entry the small island Hicacos is recorded by *título de amparo* dated February 12, 1872, in favor of Leandro Fort Torres, and, according to the deed and the registry:

". . . subject to the indispensable self-imposed condition to have it at the disposal of the Government at any time it is required of him and the essential condition of cultivating one tenth of the land within the period of one year, one fourth of it within four years, and half of it within ten years, for the benefit of agriculture, under penalty of *revocation of the grace and reversion of this property to the State in the event of failure to comply with the said* condition and with the obligation that not later than two months after the date of the issuance of the title deed he shall commence to cultivate the lands granted, in which case he shall not be disturbed in his possession, nor shall his ownership be questioned, and he must pay land tax." (Italics ours.)

*Second entry* of ownership, dated March 4, 1887. In this entry it is stated "It appears free from any encumbrance whatsoever." Record is entered of the sale of the small island Hicacos by Leandro Fort Torres to Juan Lavaggi and Ignacio García, in equal parts. This entry states, in part: "By virtue thereof Juan Lavaggi and Ignacio García record in their favor the ownership of the property of this number which they acquired by deed of purchase."

*Third entry*, dated September 30, 1901. Record is entered in favor of Rita Alonso Rivera, widow of Juan Lavaggi, and of the four brother and sisters, José Ignacio, Heriberta Nicolasa, Josefa Cirila, and Aurelia Braulia García Becerril, "undivided and in equal parts of Juan Lavaggi's share in this property," and by testate inheritance from the latter, who

died on February 4, 1901. In this entry it is repeated that the property "appears free from any encumbrance whatsoever."

*Fourth entry*, dated October 1, 1901. Record is entered of the sale executed by co-owner Rita Alonso Rivera of her full share in the property to the four brother and sisters García Becerril.

*Fifth entry*, dated October 11, 1901. Record is entered, by testate inheritance, in favor also of the four brother and sisters García Becerril, of the undivided half of the small island Hicacos, which belonged to their father, Ignacio García, who died on March 7, 1890, record having been denied "with respect to the so-called 'Ratones,' because it did not appear recorded in the name of the predecessor in title."

*Sixth entry* of ownership. This registration entry literally states:

"Rural:—Small island called 'Hicacos' described in the first entry in the same manner as in the document presented. It appears free from any encumbrances whatsoever. José Ignacio, Heriberta, Josefa, and Aurelia Braulia García Becerril are the owners of this property according to the preceding entries and under such title they sell it, together with three other properties, to their fellow-neighbor, Jorge Bird Arias, for the total price of five hundred dollars, plus one hundred dollars for a cart and a yoke of oxen comprised in this property, total amount which they acknowledged to have received. By virtue thereof record is entered of this property in favor of Jorge Bird Arias, by deed of purchase. The document comprises three other properties of which record has been denied of the one called 'Ratones,' because it does not appear recorded, the others appearing where the marginal note indicates. The presentation and other details appear from extensive entry number 6, at folio twenty of this volume. Humacao, October eleven, nineteen hundred one. Fees No. 7 Arl. 2 pesos 70 cts. (Sgd.) Toro Ríos".

*Seventh entry*, on the same date, October 11, 1901. This entry is recorded for the purpose of curing the material defect committed in recording the preceding entry number

six, which failed to state that rural property No. 104 "is composed of the small islands 'Hicacos and Ratones' and, the title still being in the registry, the Registrar describes it again as follows: 'Rural: Small islands called "Hicacos" and "Ratones," described in the first entry in the same manner as in the document presented.' " Below, the text of the sixth entry is repeated, that is, the details of the sale of the property in fee simple by the four brother and sisters García Becerril, in favor of Jorge Bird Arias, comprising therein the small island Ratones, whose conveyance appeared erroneously denied in the fifth and sixth entries.

*Eighth entry of ownership. Entered on January 8, 1954, after the Sixth and Seventh entries of ownership in favor of Jorge Bird Arias had been in full force and effect for over 52 years.* It appears from this Eighth entry that the title holder Bird Arias died testate on July 3, 1950, leaving as his successors, his wife, two children, and a grandchild; that the judicial administration of his inheritance was decreed and in the course thereof the Superior Court, San Juan Part, ordered the sale, at public auction, of the two small islands with its lime plant and outbuildings, annexes, and machinery, and another property for the minimum price of $115,000; that the auction sale was held on October 16, 1952, the two small islands being adjudicated for the amount of $115,000 paid in cash, in favor of Pilar Bird Veve, who also paid in said auction sale "$54,683.10 for the personal property." Record of the ownership of the rural property was entered, "by deed of purchase at public auction" in favor of Mrs. Bird Veve, this property No. 104 being assessed at a value of $11,000 in the distribution of the total price of the auction.

*Ninth entry of ownership.* Recorded on January 12, 1954. In the description of the property it is stated that: "comprised therein [Hicacos] are the following buildings: Two powder magazines for gunpowder, dynamite and explosives, one made of concrete and the other made of wood and zinc; three

zinc-roofed frame houses; one quarterage for laborers, concrete water tanks; a concrete wharf with wooden floor and steel rails; a one-and-half kilometer stretch of permanent railway. Free from encumbrances." It appears therefrom that Pilar Bird Cerra and her husband, Rafael A. Veve, convey the property to the corporation "Planta de Cal Hicaco, Inc.," for the amount of $11,000 which they receive in shares of the purchasing corporation, in whose favor ownership in fee simple of the property is recorded.

*Tenth and last entry*, according to the Certificate reported, recorded on April 29, 1954. Record is entered of a mortgage deed over this property executed by its owner, Planta de Cal Hicaco, Inc., to secure the payment of a note to the bearer, payable on demand, for the principal amount of $40,000, with interest at the rate of 6% annually, issued by the owner-corporation on April 9, 1954, the mortgage security being extended to $7,000 for additional credits. For the purpose of the execution of the mortgage deed, this property was assessed at $31,000.

In the Eleventh paragraph of the aforementioned Certificate issued on January 10, 1963, the Registrar finally states that "in relation to this property there is pending for dispatch the following document presented at 8:15 a.m., at entry number one hundred and twenty-eight of day book number one hundred ninety-three, dated December twelve, nineteen sixty-two—the condemnation was filed on January 14, 1963: . . . ."

Right after, in said certificate, there appears copied the text of public document No. 180, deed of sale executed in San Juan on December 7, 1962, before Notary R. Elfrén Bernier, by which the corporation Planta de Cal Hicaco, Inc. —title holder of the property according to the registry—sold it to Best Builders, Inc., for the amount of $900,000, of which $25,000 were paid at the act of the sale, and the remaining $875,000 were to be paid in five annual installments of

$175,000 each, deducting from these installments the amount of the mortgage of $40,000 to which the Tenth entry of the property refers. In that deed it is also stated that the area of the property "as it appears in the Registry of Property is forty-five and forty-four-hundredths cuerdas, but according to the survey performed it has an area of one hundred sixty-nine and thirty-five-hundredths (169.35) cuerdas."

In the aforementioned certificate there appear textually the different marginal notes of said ten entries. None of such marginal notes refers, in any manner whatsoever, to the performance of the resolutory condition imposed in the *título de amparo* executed in favor of Leandro Fort Torres, on February 12, 1872, which caused the first entry.

Neither in the text of the nine entries subsequent to the first one, nor in the aforementioned deed of sale in favor of Best Builders, Inc., is it stated, expressly or impliedly, or is it annotated or mentioned or indicated in any manner whatsoever, the extinctive compliance—that they failed to cultivate the land—or the consolidating noncompliance—that it was cultivated in the manner specified in the record of the resolutory condition. However, in the nine entries subsequent to the first one, sometimes it is stated "It appears free from any encumbrance whatsoever," other times "No encumbrances of any kind whatsoever," or "No encumbrances."

Therefore, there is in the registry a successive and continuous series of ownership entries in relation to the small islands Hicacos and Ratones, which appear duly linked together, each act of conveyance or encumbrance being derived from the will of the title holder or title holders in the record. That perfect sequence of successive title holders of the ownership does not appear, nor is interrupted in the registry by any record, annotation or mention of any act whatsoever of reversal or annulment of the original *título de amparo* or reversion of the title in favor of the Crown of Spain, of the

Government of the United States, or of the People of Puerto Rico.

## II

### MORTGAGE EFFECTS OF THE CONDITION

Likewise, during those 79 years and 9 months, the *indispensable* condition imposed by the Superior Board of Adjustment of Unappropriated Lands upon the gratuitous concession of the *título de amparo* of 1872 in favor of Leandro Fort Torres, concerning the cultivation of the small islands, *under penalty of revocation of the grace and reversion of this property to the State in the event of nonfulfillment of said condition* has remained unaltered, according to the registry. It does not appear from the registry, nor is it stated therein that its efficacy has been cancelled, reversed, resolved, waived, or annulled; nor that it has been fulfilled or not fulfilled. The term of pendency of such resolutory condition has not ceased or *disappeared from the registry.*

In his work II *Derecho Hipotecario* 275 and 276, Editorial Bosch, Barcelona (1954), Roca Sastre states:

"The specific mortgage effects of the registration of an act containing a *resolutory* condition, and as long as performance thereof is pending, are generally those of any ordinary registration, although with the contingency limitation represented by the resolutory condition which acts as an encumbrance and affects the third-party purchasers. However, since a double recorded title is also produced, there may be recorded in the registry not only the dispositive acts of the record owner subject to the resolutory condition (although with the threat of the possible fulfillment of the same, with its retroactive effects in general), but also the dispositive acts of the persons favored by the condition, which are likewise subject to the contingency that such right be extinguished, in the event the resolutory condition is not fulfilled.

"Aside from these particulars, the right recorded under resolutory condition produces the mortgage effects characteristic of every recorded perfect right.

"b) Once the suspensive or resolutory condition (*existente condicione*) has been fulfilled, or the suspensive or resolutory condition (*deficiente condicione*) has not been fulfilled, the term of pendency (*pendente condicione*) ceases and the state of uncertainty disappears, and thereby, one of the two ownerships remains firm or consolidated, and the other extinct and ineffective.

"The effects produced on these assumptions are the concern of the Civil Law, although they transcend to the Mortgage Law, and, therefore, the new situation created, that is, the consolidating or extinctive result produced by said fulfillment or nonfulfillment of both kinds of conditions must be recorded in the books of the Registry."

## III

### PRESCRIPTION OF THE RESOLUTORY ACTION

In its eighth conclusion of law the Division of Eminent Domain determined that said resolutory condition had prescribed in the year 1886, on the ground that "the resolutory action prescribes after four years." The People alleges that such determination is erroneous. We agree. Our Civil Code does not prescribe any period of prescription for resolutory actions. It is true that its § 1251 provides that the action asking rescission authorized by law must be brought within four years. But such period is not applicable for the exercise of resolutory actions, but the general one of 15 years prescribed by § 1864 in case of personal resolutory actions.[1]

In general terms, the Spanish doctrine is inclined to believe that since the right to resolution implies a valid cause for extinguishment of a contract, it must be included, consequently, within the rights of modification or of formation, not subject to prescription, although the Spanish jurisprudence does not admit this principle in its entirety, considering that

---

[1] See judgments of the Supreme Court of Spain, of October 14, 1914, November 14, 1927, and September 24, 1930. 8-II Manresa, *Comentarios al Código Civil Español* 596 (5th ed. 1950); XX Scaevola, *Código Civil* 946.

the personal resolutory action is subject to the general term of prescription of fifteen years prescribed by § 1964 of the Spanish Civil Code, § 1864 of ours.

But this case does not deal with a resolutory action which operates in personam or merely obligatory. It deals with a recorded resolutory action which operates in rem, in a fashion similar to the *rei vindicatio*, which, in that case, may annihilate or dissolve the right or act of acquisitive affected thereby.[2]

Since the resolutory condition recorded, with respect to the parties and third purchasers interested in the juridic business subject to the condition, constitutes a constant threat of possible loss, expiration and definitive extinguishment of the ownership and other property rights acquired, and produces a double title and an uncertainty for the conveyance of real property during its period of pendency, and after its fulfillment the possibility of litigations, the real resolutory action which generates said extinctive fulfillment should not be considered perpetual or imprescriptible.

---

[2] The People of Puerto Rico has brought several actions for revendication grounded on extinguishment, expiration or inefficacy of the original grants of unappropriated lands made by the Spanish government. See: *People* v. *Dimas et al.*, 18 P.R.R. 1019 (1912); *People* v. *Riera*, 27 P.R.R. 1 (1919); *Trigo* v. *People*, 51 P.R.R. 216 (1937); *People* v. *Rojas*, 53 P.R.R. 115 (1938); *The People of Puerto Rico* v. *Livingston*, 47 F.2d 712 (1931).

In the aforecited volume II of his work, at p. 284, Roca Sastre comments:

"After a resolutory condition is fulfilled, the person favored thereby becomes the title holder in a resolutory action by which he may demand the effectiveness of the resolution with the consequent restitution or transfer of the right involved; and also, he can bring an action against third persons or subsequent holders of the right subject to resolution, since the resolutory action operates in rem, because the performance of the resolutory condition produces retroactive effects or *ex tunc*, as it has been examined in another part of this work. This effect of the resolutory action affects third-party mortgagees, provided the corresponding condition is recorded."

Pursuant to §§ 1830, 1832, 1836, 1861, 1863, and 1869,[3] of our Civil Code, the resolutory action with regard to real property prescribes after 30 years from the day on which it could have been instituted.

This being a resolutory condition, on a term, if it had not been performed in each term of cultivation, the resolutory action prescribed on April 12, 1903, on April 12, 1906, and on April 12, 1912, assuming it had not been extinguished by reversion of the title of 1891 to the State.

## IV

### VALIDITY OF THE ADJUSTMENT

Did the adjustment in favor of Lavaggi and García and their heirs take place? We stated in our opinion that as a result of an investigation performed in 1890 by the Spanish State in relation to the cultivation of the small islands, on August 29 of that year, the gratuitous concession of the original *título de amparo* made in 1872 was resolved, the reversion of the ownership of the small islands to the Spanish

---

[3] "Section 1830.—Ownership and other property rights are acquired by prescription in the manner and under the conditions specified by law.

"Rights and actions, of any kind whatsoever, also are extinguished by prescription in the same manner."

"Section 1832.—Rights and actions shall extinguish by prescription to the prejudice of all kinds of persons, including judicial persons, in the terms prescribed by law."

"Section 1836.—All things which are the object of commerce are capable of prescription."

"Section 1861.—Actions are prescribed by the mere lapse of time specified by law."

"Section 1863.—Real actions with regard to real property prescribe after thirty years.

"This provision is understood without prejudice to the prescriptions relating to the acquisition of ownership or of property rights by prescription."

"Section 1869.—The time for the prescription of all kinds of actions, when there is no special provision to the contrary, shall be counted from the day on which they could have been instituted."

Crown was decreed, subsequently granting the final adjustment in favor of Lavaggi's heirs.

We recited all the proceedings which, in that sense, took place at the administrative level until the time when the interested person was finally required to deposit the amount of one hundred dollars with the City Hall in Fajardo, to pay for the survey and assessment of the small islands. In the documentary evidence offered by the State, there does not exist any order, decree, writ, or official dispatch to which authenticity and obligatoriness can be attributed as an act or disposition of competent officers duly authorized at that time to intervene in the matter of that adjustment and which may lawfully establish that the transaction of the adjustment was not completed. Part of the documents in the old public records is illegible.

As the only evidence in the sense that the same was not carried out, the State refers to a certain handwritten note on the title page of the old record No. 108 of the *Negociado de Bienes del Estado de la Administración Central de Contribuciones y Rentas*, which reads:

"REVERTED.—The then occupants García-Lavaggi Partnership are granted the right to adjustment, but the latter was not carried out. P.R.R."

This note is not dated. It is unknown to what or to whom do these capital letters, "P.R.R.," refer. There does not appear from the portion of the record presented the name of any officer or authority to whom such letters could be properly attributed as his initials. Other remarks appear on the title page in different handwritings.

The fact that the Spanish government did not recover the material possession of the small islands, and, on the contrary, that the heirs of Lavaggi and García had publicly retained the material possession and continued with the exploitation of those small islands for over a decade and until they sold

them to Jorge Bird Arias; the fact of having recorded them in fee simple in their name as such heirs; the fact that the State did not request, in any manner whatsoever, the cancellation in the registry of the record of ownership in favor of Lavaggi and García by resolution of the former *título de amparo* of 1872, and that a new record of the small islands be entered in its favor, by way of reversion, pursuant to art. 16 of the Mortgage Law; the fact that there appeared in different places of the old record the remarks of several officers in the sense that Jorge Bird Arias was in possession and was the owner thereof and "acquired them in good faith," and finally, the fact that the People of Puerto Rico, after May 1, 1900, when the Foraker Act went into effect and until January 14, 1963, never claimed any property rights to the small islands, constitute circumstances adverse to the theory that the adjustment was not concluded. All that, in absence of authentic evidence to the contrary, induces us to believe that in the adjustment procedure the ordinary course of business transactions was followed, that the law and regulations applicable thereto were observed, and that such transaction was performed with ordinary zeal. Definitively, in the light of those circumstances, we conclude that by virtue of the legal validity of said adjustment the heirs of Lavaggi and García also acquired a pure property right to the small islands, not subject to any condition whatsoever, and of which they could freely dispose.

Inasmuch as the Spanish Crown conveyed again, unconditionally, the ownership of both small islands, and since the same became, definitively, the private property of Lavaggi and the heirs of García, the Spanish Crown could not convey any property right to the same to the Government of the United States by the Treaty of Paris of December 10, 1898, nor the latter to Puerto Rico by the Organic Act of 1900, nor by the Act of 1917.

Our assertion that there was a substantial performance by Lavaggi of the condition of cultivation imposed is amply supported by the evidence in the old record presented by plaintiff, to which we referred in our opinion. We do not have to exert ourselves to show that these being meagerly productive small rocky isles "embedded in the solitude of the sea like those bare rocks rising on the coastline where rock goats are dehorned," to attain the cultivation of 20 cuerdas of the maximum of 22.72 required by the concession of 1872, constituted a substantial performance of the condition.[4]

The condition did not indicate the branch of farming that should be carried out in the 45.44 cuerdas granted. If only 15.15 of them could be cultivated "for the benefit of agriculture," even though only coconut palm trees were planted,

---

[4] The report of Manuel Martínez Mora, Inspector of Public Lands, appearing in the repeatedly mentioned record offered in evidence by The People, states in part:

"Approximately one third of the area of the small island [he is referring to 'Hicacos'] may be devoted to truck gardening, preferably to the planting of coconut palms. This part of the soil is composed of gray sand over a limestone subsoil. Its vegetative properties are rather good considering that the rain water accumulates there in the detritus produced by the decay of the leaves of the trees which grow on the higher lands.

"Two thirds of the area of the small island is uneven land, but of slight elevation. It is composed of a thin layer of vegetable mold formed from the organic detritus, as its dark color indicates; soil which is retained in the rough surface of the subsoil, which is composed of compact limestone of cubic crystallization and which has a consistency appropriate to be cut into ashlar stones for construction purposes. Said rock, when calcined, produces superior quality lime used for the fermentation of the *guarapo* in the processing of the sugarcane, and for any kind of masonry work."

There also appears from the record what we stated, concerning this matter, at p. 332 of our opinion:

". . . by presenting before the General Commissioner of the Treasury, . . . under public oath, the juridical fact of having tried, he [Lavaggi] as well as his partner Ignacio García, 'to cultivate said small islands without obtaining fruits because of the fact that the land was dry and too sterile, these areas having suffered heavy droughts rendering them unproductive, the only possible cultivation being a small amount of pasture at certain times of the year . . .' "

the evidence produced for the purpose of the adjustment established that 20 cuerdas were planted in Guinea grass and Para grass which fed a herd of cattle of a sugarcane plantation and that in the rest of the small island Hicacos a limekiln was operated, it is proper to conclude that there was a substantial performance of the condition of cultivation.

It is obvious that in view of that reality, the colonial authorities in charge of the administrative determination as to whether the condition of cultivation had been performed, applied a mathematical view for the decision of the matter. Apparently, the same conclusion would have been reached even if it had been established that 22.71 cuerdas had been cultivated instead of 22.72 cuerdas as required by the *título de amparo*.

We believe that the condition of cultivation was designed to be imposed, generally, on farmers who received gratuitous grants of fertile, productive, arable and other tillable lands; not on fishermen and other inhabitants of reefs, keys, small islands, atolls, sandbanks, and dry, unirrigated arable land. The geographic names of the small islands are "Cayo Icacos" and "Cayo Ratones". So it appears from several of the tax receipts presented.

The condition imposed was practically unfulfillable, the contingency upon which it was based was almost unattainable. It could be considered, in this case, as a "futile condition", of deficiency in the condition, which produces effects opposite to the performed condition, and that, in case of resolutory conditions, the juridical business encumbered thereby is considered pure and shall produce its proper effects, considering as definitive those already produced, when the threat of their resolution disappears as to them.[5]

---

[5] See *Monografía sobre las Condiciones*, written by the Spanish jurist, Alberto de Rovira Mola, in IV *Nueva Enciclopedia Jurídica* 876 (Seix ed. 1952, Barcelona).

# VI

## CONDITION OF THIRD PARTIES

The State maintains that in our opinion we agreed with it as to its contention that the Division of Eminent Domain had committed error in determining that ·Planta de Cal Hicaco, Inc., and Best Builders, Inc., were third parties in the Registry, a condition which they specifically invoked in the fourth defense of their answer.

It relies on the fact that in our opinion we referred to proof outside the Registry concerning the investigation conducted in 1890 by the Spanish Government where it was discovered that neither Leandro Fort Torres nor his immediate successors, Lavaggi and García, "had fulfilled the requirements of the second condition" and that, for that reason, the State decreed the reversion.[6]

(a) Leandro Fort Torres was a party in the concession of the *título de amparo* subject to the encumbrance of the resolutory condition. It may be affirmed, from the evidence appearing in the record, that he did not perform, during the eleven years he was in their possession, the condition of cultivation, although in the *título de amparo* itself it is stated that he had cultivated four cuerdas. He could not be considered, of course, third party in the light of art. 27 of the Mortgage Law which went into effect on May 1, 1880.

(b) Juan Lavaggi and Ignacio García, represented by José de Celis Aguilera, purchased the small islands by public

---

[6] It appears from Exhibit 3 of The People that the Superior Board of Adjustment and Sale of Unappropriated Lands of Puerto Rico, with the attendance of its four Spanish members, decreed the reversion of the small islands to the State on August 26, 1891, the Puerto Rican members of the same, Pablo Ubarri, Francisco de P. Acuña, and José de Celis Aguilera being absent; they did not attend the next session either. In those meetings of the Board, de Celis Aguilera could not act since he had acted as verbal agent for Lavaggi and García in the deed of sale of the small islands when they purchased them from Leandro Fort Torres—Exhibit 4, Plff., photocopy 83.

deed of May 18, 1883. In the second clause of said deed, it was stated in part:

"Second: That he sells the three small islands aforedescribed with all its entrances and exits, uses, rights, and servitudes to said Ignacio García and Juan Lavaggi represented by José de Celis Aguilera, *under the same terms and conditions* granted [to Leandro Fort Torres] for the price agreed upon of . . . ."

At the time of that deed the *título de amparo* of 1872 in favor of Fort Torres was already recorded and the resolutory condition also appeared recorded. If they acquired "under the same terms and conditions granted" to the former, they are impliedly admitting that the vendor had not performed the condition of cultivation and that they bound themselves to perform it. They did not perform it either, and that resulted in the revocation of the concession and the reversion of the title on August 29, 1891. These events eliminate them as third parties in the Registry.

On March 4, 1887 when the deed of sale in favor of Lavaggi and García was recorded, it was not stated in the record in any manner whatsoever that they acquired "under the same terms and conditions granted to them." Of course, by the first entry they already had clear and exact knowledge of the nature and possible resolutory effects of the condition of cultivation in case of fulfillment.

They and their heirs were parties in the process of investigation of the fulfillment of the condition and of the revocation which produced the reversion to the State. They enjoyed a protection in the Registry which their predecessors in title did not have.

It is true that later they acquired a pure title of ownership by virtue of the adjustment which was subsequently made, as we correctly concluded in our original opinion. But the title by adjustment was not recorded in the Registry, and there never appeared in the Registry any notice of any kind

whatsoever concerning the investigation, revocation or reversion, as we have stated in another place.

(c) Jorge Bird Arias purchased from the four García Becerril brother and sisters the two small islands by public deed executed on October 5, 1901. He recorded them in fee simple on October 11, 1901 by the sixth and seventh entries. See on page 632, the full text of the sixth entry. (He acquired in good faith, by proper and onerous title, from the persons who appear recorded as title holders thereof in the Registry, and having the right to convey them, according to the third, fourth, and fifth entries, where it is stated that the property "Appears free from any encumbrance whatsoever", or "No encumbrances of any kind whatsoever.")

On the date of the sale the status outside the Registry shows that the vendor-brother and sisters enjoyed the material possession of both small islands since the respective deaths of their predecessors in title. On that day the Registry revealed that a successive performance of title documents has been kept, at least in the Registry, during the preceding 29 years: From the Spanish Crown to Leandro Fort Torres; from the latter to Juan Lavaggi and Ignacio García; from the latter to their aforementioned heirs. As we have repeatedly stated, it did not appear from the Registry, in any manner whatsoever, that the former title holders, or any one of them, had not performed the obligation to cultivate, and much less did it appear that the title had been reverted to the Spanish Government.

However, on that date of October 5, 1901, by virtue of the information in the first entry it was stated *erga omnes*, precisely, clearly, and expressly, that Leandro Fort Torres recorded the present title in fee simple to the small islands, his property right being subject to the contingency of the resolutory condition, and that, likewise, the conditional right or resulting expectancy was recorded in favor of the Spanish State, that is, that first entry announced the existence of two

titles, one, that of the holder, who became the owner of the thing, although under the resolutory threat derived from the resolutory condition if it was performed, and another, in favor of the transferor, in the event the condition was fulfilled, and whose ownership had, therefore, a conditional or preventive nature.

This *conditio iuris* in the manner of an encumbrance which was a part of the cause or integral element of the contract recorded, which was called the indispensable condition of the *título de amparo* recorded, determined the property right granted, and affected directly the subsequent holders to the same extent as Leandro Fort Torres. In the juridical reality outside the Registry, it had been destroyed in 1891, by the effects of the reversion and the subsequent adjustment, but since said resolutory condition of cultivation was not cancelled then, and since it still appeared in 1901 as pending performance or nonperformance, at least in the Registry, the purchaser, Jorge Bird Arias, appeared, in his condition of new title holder of the small islands, subject to the extinctive or consolidating effects thereof.[7]

But in relation to the resolutory condition at the time Bird Arias purchased, was there any concordance between the content in the Registry and the juridical reality? There was not. When, on August 29, 1891—almost ten years before Bird Arias bought—the Superior Board of Adjustment and Sale of Unappropriated Lands declared the concession of the small islands revoked or resolved and decreed the reversion of the ownership thereof in favor of the Spanish State, the resolutory condition was extinguished *ipso jure*. The threat of extinguishment of the *título de amparo* which had appeared in the Registry on February 28, 1883, acquired a sense of reality. The preventive ownership of the Crown of Spain was transformed into ownership in fee simple in its favor. A short

---

[7] See what we said in our decision in the case of *Trigo* v. *People*, 51 P.R.R. 216, 234 (1937), in relation to this point.

time later the small islands are conveyed by adjustment to Lavaggi and to the heirs of Ignacio García, in a perfect form, their title not being subject to any resolutory condition. In that new state of law and in the course of a new political sovereignty, the small islands are sold to Bird Arias and the latter acquired them from whom, according to the Registry, had the authority to transfer them.

In October 1901 Bird Arias could not be juridically bound to comply with a requirement of the former *título de amparo* which had been taken away by the reversion of the title of August 1891, even though it remained in the Registry. As we said in *Fajardo Sugar Growers Ass'n* v. *Kramer*, 45 P.R.R. 337, 368 (1933):

". . . recorded a property which he did not possess; that although the plaintiff acquired the title on which it relies in 1909, or more than 20 years ago, it never took possession of the swamp land either. The registry of the property was not created for the purpose of recording therein nonexistent rights. It is true that it protects third persons, but always starting from the basis that something real does exist."

In *People* v. *Riera*, 27 P.R.R. 1 (1919) the State brought an action of ejectment against Juan D. Riera alleging that without a legal title he was in possession of a certain parcel of land in Ward of Puerta de Tierra, in San Juan, which belonged to The People under a grant made to it by the Government of the United States of North America, which acquired it from Spain by virtue of the Treaty of Paris on December 10, 1898. Riera answered alleging that the Spanish government, by public deed of September 27, 1897 had sold the property to Manuel J. Gestera, that subsequently, successive transfers of title to the parcel had been made until defendant acquired it; that the original purchaser as well as the subsequent purchasers had recorded their titles, that he was a third person protected by law who had acquired the property from a person who appeared in the Registry as the

owner of said real property unconditionally and without any defect. The action terminated in a judgment sustaining the complaint as to the restoration of the property and from that judgment defendant took appeal.

There we decided that the title of ownership of the first purchaser, Manuel J. Gestera, had been executed by officials of the government having no lawful authority to do so, therefore rendering it null, and also null because when Gestera filed his petition for a title to the parcel he was not a possessor who had cultivated it for at least two years prior to April 17, 1892, indispensable condition required by the Royal Decree of February 1, 1894.

Since such causes of nullity do not appear from the Registry, we considered Riera third person protected by § 34 of the Mortgage Law, notwithstanding the nullity of the recorded title of the first purchaser. Among other things, at pp. 10, 11, and 15 of the volume aforecited, we said:

"It is contended that one who purchases from a person who appears in the registry as the owner must not only examine the records of that office in order to ascertain whether they show clearly any invalidating defect if he wishes to avail himself of the benefits which article 34 of the Mortgage Law bestows upon third persons, but also must search the records of other offices for the purpose of examining the documents referred to in the registry in order to learn from them whether any invalidating defect exists.

"We understand that said article 34 is clear and conclusive that the invalidating defect must appear clearly in the registry itself in order to affect the interests of a third person. The statute expressly so declares; therefore unless it be sought to violate its provisions and overthrow the object of the legislators in its enactment, it cannot be held that an invalidating defect not appearing in the registry should affect a third person because he would have known of it if he had gone to other offices to examine the documents mentioned in the registry. This would also be adding to the statute something that it did not contain. The legislators intended that only the defects appearing in the registry

should prejudice a third person, and if they had desired that defects appearing elsewhere, but in documents mentioned in the registry, should have a like effect, they would have said so.

"But this was not in fact the intention of the lawmakers and their reason is easily understood by remembering that their primary object in enacting the Mortgage Law was to facilitate territorial credit and for that purpose guaranteed to third persons that they would not be prejudiced by invalidating defects which did not appear clearly in the registry. If, contrary to the law's provision, the records of the registry were not sufficient to protect third persons, territorial credit would be destroyed, for persons desiring to make real estate contracts would have to go from office to office and from town to town, however distant and inaccessible, to search for and examine all documents, records and proceedings that may have been mentioned in the registry in order to safeguard themselves against invalidating defects in the recorded titles of owners and their predecessors in interest. If that had been the purpose of the law there would have been no need to enact said article 34.

".          .          .          .          .          .          .          .

"In brief, then, as it is in the registry of property and not elsewhere that the grounds for the nullity or rescission of instruments or contracts should be shown in order that they may affect a third person whose title is recorded, and as in this case the defect invalidating Gestera's title does not appear from the registry itself, appellant Riera is protected by article 34 of the Mortgage Law against that invalidating defect."

Since then this view in relation to the third-party mortgagee has prevailed in our decisions.[8] In the *Kramer, supra,* and *Trigo* v. *People,* 51 P.R.R. 216 (1937) cases, in which the fundamental circumstances are quite different from those in *Riera,* we did not forsake it, as The People seems to believe.

Assuming that in 1901 the recorded resolutory condition was in force, that circumstance, by itself, did not constitute

---

[8] *Annoni* v. *Heirs of Nadal,* 59 P.R.R. 638, 642–643 (1941); *Lizardi* v. *Caballero,* 65 P.R.R. 77, 84–87 (1945); *Cruz* v. *Heirs of González,* 72 P.R.R. 291, 299 (1951); *Rubio* v. *Roig,* 84 P.R.R. 331, 341–343 (1962); *Mundo* v. *Fúster,* 87 P.R.R. 343, 354 (1963).

an effective cause of nullity of the title of its predecessors at law. In addition thereto nothing appeared in the Registry which could legally prevent the lawful acquisition of the small islands.

Summarizing, when Jorge Bird Arias acquired and recorded his title in October 1901, he situated himself in a juridical position similar to that of defendant Riera, although subject, only apparently in the registry, to a threat of cancellation of his title, which could not possibly be made effective since August 29, 1891. We consider him a third-party mortgagee, condition which, of course, favored his heirs 49 years later.

(d) Pilar Bird and her husband, Rafael Veve, acquired at public auction held on October 16, 1952, ordered by the Superior Court, the property consisting in the two small islands Hicacos and Ratones and its buildings. At that time over half a century had elapsed of uninterrupted effective ownership thereof in the Registry in favor of the former owner, Jorge Bird Arias, and of the material possession of the real property by the latter and his heirs, without there appearing from the Registry any vice or cause of nullity of the title whatsoever. Their conjugal partnership was a third purchaser protected by the law.

(e) Planta de Cal Hicaco, Inc., and Best Builders, Inc., defendant corporations herein, on the basis of those antecedents in the Registry (reinforced by the accuracy or concordance between the Registry and the existing juridical reality in relation to the title and the fact of the material possession) are also third-party mortgagees whose respective and lawful condition as record owners should be maintained and protected.[9]

---

[9] Article 34 of the Spanish Mortgage Law in force, although it does not define it, confers to the third person in the Registry the following protection:

"Art. 34—The third person who in good faith acquires by onerous title any right from a person who according to the Registry has the right

## VII

### On Prescription Against the State

In the fifth special defense of their answer to the complaint the defendant corporations alleged:

"The peaceful, quiet, public possession, as owners, without interruption and continuously, with just title and good faith, by the owners of the property for over 80 years, excludes any natural or juridic person, including the Commonwealth, as record owner of any right whatsoever over both islands, . . . the defendants having acquired or consolidated by usucapion or by acquisitive prescription their ownership title."

---

to sell, shall be maintained in his acquisition after his title has been recorded, even though the right of the executing party should be subsequently annulled or terminated by virtue of causes not appearing from the Registry itself."

In his commentaries on that Art. 34, in Vol. I, pp. 440 and 441 of his aforecited work *Derecho Hipotecario*, Roca Sastre states:

"II. Scope of Art. 34 of the Mortgage Law.—

"The scope of this provision is to *maintain* at any risk, for the benefit of the third-party purchaser who meets the four requirements provided therein, the *acquisition* made by this third person, against the risks and invalidating consequences produced when the title of acquisition of the record owner who conveyed it, appears to be void by the effect of an action of nullity, of cancellation or of analogous nature, whose originating cause does not clearly appear from the Registry, or against an inaccuracy in the Registry.

"         .        .        .        .        .        .        .        .

"Art. 34 provides the following: the third-party purchaser who meets the four circumstances which the very provision establishes *shall be maintained in his acquisition* even though the record in the Registry is *inaccurate* or the act of acquisition or the transferor's right is *null* or is *terminated, revoked* or void, totally or partially, due to causes not appearing *expressly* from the Registry."

In § 192 of the proposed Mortgage Code in the House of Representatives of Puerto Rico introduced as House Bill No. 782, ordinary session of 1967, the third-party mortgagee is defined and protected as follows:

"A third party is one who, in good faith and by onerous title acquires any right from a person who, according to the Registry, has the right to convey it, and the former shall be maintained in his acquisition, after his right has been recorded, even though that of the executing party should be subsequently annulled or terminated by virtue of causes not appearing from the Registry."

Against this defense the State set forth:

"The defendants are also precluded from alleging that they acquired the property by acquisitive prescription or usucapion. It is undeniable that by express provision of § 9 of the Political Code of Puerto Rico title of ownership to real property belonging to the State cannot be acquired by prescription after the change of sovereignty."

The trial court, among other things, determined:

"From 1872 to the date of the condemnation—January 14, 1963—Leandro Fort Torres and his successors in title possessed the small islands publicly, quietly, and peacefully, as owners and without any interruption, having been protected in that possession by the State, to which, in different occasions they paid land taxes."

Is the thesis that after the change of sovereignty real property belonging to the State cannot be acquired by usucapion, correct? We decide that in relation to certain properties it is correct; but that in relation to others, it is not. Let us see.

In §§ 252 to 257 of the Second Book, our Civil Code, after declaring that "The word *property* is applicable in general to anything of which riches or fortune may consist," then classifies property by reason of their subject matter, purpose or nature thereof, to wit: common things[10] "are those the ownership of which belongs to no one in particular and which all men may freely use, in conformity with their innate nature, such as air, rain-water, the sea and its shores"; things of public domain, those intended for public use, as roads, canals, rivers, streams, and others of like nature: the property of public use in Puerto Rico and the towns thereof comprises the Commonwealth and local roads; the squares, streets, fountains and public waters, walks, and public works for general use,

---

[10] As to the concept of common things, see the interesting work by professor Pedro Luis Perea Roselló, "Res Communes Omnium," Burgos, 1964.

paid for by said towns or from the Treasury of Puerto Rico. As to the other property, § 256 provides:

"*All other property,* possessed by either The People of Puerto Rico or the municipalities thereof, *is common property* for the use of the general and municipal governments (bienes patrimoniales), *and shall be governed by the provisions of this Code.*" (Italics ours.)

The Code considers as property of *private ownership* the common property for the use of the Government of the People of Puerto Rico and the municipalities thereof (*bienes patrimoniales*) and the property belonging to private parties, either individually or collectively. Article 257. See Art. 24, Mortgage Regulations.

Property of public domain, comprising that intended for public use, is subject, mainly, to the juridical regulations provided in the Political-Administrative Code of Puerto Rico. See its §§ 5–9, and 393–426. See Arts. 25 and 26 of the Mortgage Regulations.

In *Government of the Capital* v. *Executive Council,* 63 P.R.R. 417, 440 (1944), we said that public property is used freely by the general public, but with respect to common property (*bienes patrimoniales*), the public does not have constant and general access thereto, notwithstanding there is nothing to preclude that the same be occasionally used by the public. This property, like any personal property, may constitute a source of revenue for the public funds, or is susceptible of producing revenue to cover responsibilities of the State; it is or may be subject to the human juridical commerce because it may be sold or leased, generally, by the Secretary of Public Works, in the manner provided by law. Section 135 of the Political Code.

As we held in *Housing Authority* v. *Sagastivelza,* 72 P.R.R. 262, 267–8 (1951), pursuant to the provisions of the aforecited § 256, in cases of condemnation proceedings, as the instant case, once the order of taking is issued, the

property or rights condemned become common* property (*patrimoniales*). And also, property acquired by the State by intestate inheritance—unclaimed property—through a distress proceeding for collection of land taxes or income taxes, for condemnation of property, and collection of any kind of credits belonging to the State, is also common property.

If all the common property (*bienes patrimoniales*) or the private property of the State "shall be governed" as provided by the above-copied § 256, "by the provisions of this Code," it is obvious that such property of the State is subject to those provisions which in said Code govern the principle of prescription.[11]

As a general rule our Civil Code provides that ownership and other property rights are acquired by prescription in the manner and under the conditions specified by law, and rights and actions of any kind whatsoever also are extinguished by prescription in the same manner. But it limits the objective scope of that manner of acquiring, to all things which are the object of commerce, which is equivalent to anticipating that

*EDITOR'S NOTE: In *Housing Authority* v. *Sagastivelza, supra,* the word *patrimoniales* was erroneously translated as "community."

[11] We have already decided it with regard to the common property of the municipalities, in *The Capital of P.R.* v. *Casino Español,* 56 P.R.R. 758, 774 (1940) and *Jiménez* v. *Municipality,* 70 P.R.R. 491, 494 (1949). In the latter case we said in part:

". . . considering as respects property held for public use or as respects common property, that is, property privately owned by the municipalities, the conclusion was reached that the latter are governed by the provisions of the Civil Code, which include those relative to prescription. It was also decided that as to the property owned by municipalities, prescription runs as against them and that since the painting involved in the suit was not among the things specified in the law as of public domain, nor similar thereto, prescription was applicable to the municipality. See §§ 255, 256, and 257 of the Civil Code, 1930 ed.

"There is no question here as to the fact that the lot object of the dominion title proceeding was a property privately owned by the municipality, and it being so, prescription runs as against it under the doctrine previously set forth. The lower court erred in not so holding."

the things which are not the object of commerce are not susceptible to prescription.[12] So that according to the Code, certain things have the nature or quality of being prescriptible and others do not. In its § 1865 we can find examples of actions declared imprescriptible.

In the same manner that the latter are irradiated from commerce by express provision of law, also for different reasons, there are things not subject to prescription, such as, among others, things of public domain, things of general public use, and the things and rights not susceptible of personal appropriation. Things whose conveyance is prohibited by law are also excluded from commerce, and, therefore, cannot prescribe.[13]

Section 1832 provides that rights and actions shall extinguish by prescription "to the prejudice of all kinds of persons, including judicial persons." Thus, it shall be understood "without prejudice to what may be established in this Code or in special laws with regard to specified cases of prescription," according to § 1838.

We only have knowledge of two legal provisions which forbid the acquisition by usucapio of certain and specific lands belonging to the State. They are established by §§ 9 and 405 of the Political Code of 1902. The former provides according to the Spanish text of the *Compilación* of 1941:

"*Artículo 9.—Usurpadores de terrenos, cómo se expulsarán. —Posesión adversa.—Si alguna persona so pretexto de algún derecho incompatible con la jurisdicción del Gobierno de Puerto*

---

[12] See §§ 1830, 1832, and 1836 of the Civil Code, the texts of which we inserted in footnote 3.

[13] XII Manresa, *Código Civil Español* 799 (5th ed. Editorial Reus, 1951); XXXII-I Scaevola, *Código Civil* 359, 361, and 364 (Editorial Reus, 1965); I-2 Castán, *Derecho Civil Español, Común y Foral* 839 (10th ed. Editorial Reus, 1962); I Borrell, *Derecho Civil Español* 294–300 (Barcelona, 1955); I Puig Peña, *Compendio de Derecho Civil Español* 502–505 (Nauta Eds., Barcelona, 1966); 2 Sánchez Román, *Estudios de Derecho Civil* 484, 2d ed. and Vol. 3 at p. 258 (Madrid, 1900); II De Casso and Cervera, *Diccionario de Derecho Privado* 3084.

*Rico, usurpare 'terrenos baldíos o no concedidos,' pertenecientes a Puerto Rico, el Fiscal del distrito judicial en que radican dichos terrenos informará de ello en el acto al Gobernador, quien dispondrá que el Attorney General adopte las medidas necesarias para expulsar al usurpador. 'No podrán adquirirse títulos a terrenos baldíos insulares por posesión adversa,' o contraria al título de otra u otras personas."\** (Énfasis suplido.)*

Section 405 aforecited provides, insofar as pertinent, "That no length of possession or occupancy *of land within the limit of any insular highway,* by an owner or occupant of adjoining land, shall create a right to such land in any adjoining owner or occupant or person claiming under him. ..." (Italics ours.)

The above-copied § 9 of the Political Code, in its last sentence, limits, in clear and precise terms, the prohibition to acquire titles against the State by adverse possession, to insular waste lands only.

Undoubtedly, such prohibition was established in said section to preclude the intruders on waste lands from alleging prescription as defense. In reducing its objective ambit to waste lands, such restricted prohibition could never be understood as one of general application to the common property (*bienes patrimoniales*) of the State.[14]

---

\* EDITOR'S NOTE: The English text of this section is as follows: "Section 9.—Intruders on lands, how they shall be removed.—Adverse possession.—If any person, under pretense of any claim inconsistent with the jurisdiction of the Government of Puerto Rico, intrudes upon *any of the waste or ungranted lands of Puerto Rico,* the Fiscal (District Attorney) of the judicial district in which such lands are situated, must immediately report the same to the Governor, who shall direct the Attorney General to take such proceedings as may be necessary to remove the intruder. *Title to insular lands shall not be acquired by adverse possession."*

[14] Between the English and Spanish texts of § 9 of the Political Code there is a fundamental discrepancy with respect to the scope or objective ambit of the prohibition. While in the Spanish text it is limited to *"terrenos baldíos insulares,"* in the English text it extends, in general, to all insular lands, when it states: "Title to insular lands shall not be acquired by adverse possession." .

If this last sentence of the English·text were taken into consideration

Our Civil Code does not contain any provision as to waste lands. Waste land is that land which belongs to the State, but which is not converted into pasture, nor is cultivated, it belongs to the public domain for the common enjoyment and

---

literally, completely independent of the other provisions of § 9, the prohibition to acquire title by usucapio would be applicable to any kind of insular lands, not only to the *"terrenos baldíos insulares* (insular waste lands) as the Spanish text indicates.

But in the decision of the problem of prescription in this case, we are constrained to prefer and consider only the Spanish text, applying the rules which for these cases are provided by § 13 of our Civil Code, in the following terms:

"Section 13.—Discrepancy between the Spanish and the English texts of any law, how determined. That in case of discrepancy between the English and Spanish texts of a statute passed by the Legislative Assembly of Porto Rico, the text in which the same originated in either house, shall prevail in the construction of said statute, except in the following cases: (*a*) If the statute is a translation or adaptation of a statute of the United States or of any State or Territory thereof, the English text shall be given preference over the Spanish. (*b*) If the statute is of Spanish origin, the Spanish text shall be preferred to the English. (*c*) If the matter of preference cannot be decided under the foregoing rules, the Spanish text shall prevail." Civil Code, 1930, § 13.

Section 9 of our Political Code was taken, in part, from § 42 of the Political Code of 1872, of the State of California, which reads as follows:

"§ 42. INTRUDERS ON PUBLIC LANDS OF THE STATE.

"If any person, under any pretense of any claim inconsistent with the sovereignty and jurisdiction of the state, intrudes upon any of the waste or ungranted lands of the state, the district attorney of the county must immediately report the same to the governor, who must thereupon, by a written order, direct the sheriff of the county to remove the intruder; and if resistance to the execution of the order is made or threatened, the sheriff may call to his aid the power of the county, as in cases of resistance to the writs of the people."

We say that it was taken in part because, as it may be observed, the last sentence of our § 9 was not a part of § 42 of California.

By provision of § 40 of the Foraker Act, which authorized the creation of the commission to compile and revise laws of 1901, and by Act No. 13 of January 31, 1901 said commission was empowered to compile, revise and codify a system of laws for Puerto Rico, which would include a Civil Code, a Political Code, a Code of Civil Procedure, and a Penal Code, which would be submitted to the Legislative Assembly *in both the English and Spanish languages.*

Said commission prepared the Codes, with the exception of the Code of Civil Procedure, and submitted them to the Legislative Assembly in 1902. A proposed Political Code in English and another in Spanish were

utilization, it does not produce any other fruits than those spontaneously and naturally produced by the land. See IV *Enciclopedia Jurídica Española* on the term "Baldíos."

The small islands of Hicacos and Ratones involved in this litigation are not "waste lands" nor "ungranted lands." Since 1872, when they were granted by *título de amparo*, they were used for cultivated pasture and for the exploitation of a lime industry for the processing of sugarcane, fertilizers, and constructions. If at any time, before the year 1872, they could have been classified as waste lands, they lost that condition many decades ago.

In the light of the foregoing, it cannot be validly upheld that, in all the cases and as a juridical rule of general application, prescription does not run against the Commonwealth of

---

submitted. Number CB-24 was assigned to both of them.

In preparing, in both languages, the proposed Political Code, the commission to compile and revise laws of 1901, on its own initiative, added (with the same texts which they respectively have today and which have remained unaltered) the last sentences of the English and Spanish texts of § 9.

We have not found any legal precedent in relation to those last sentences. The English text does not appear to have been taken from California, and even less the Spanish text taken from any law of Spain, where the common property (*bienes patrimoniales*) of the State may be acquired by usucapio. We do not know which one of the two was drafted first, or whether one is an incorrect translation of the other. However, it may be seen that there is greater harmony and correlation between the sense of each sentence of § 9 in the Spanish text, since both have the same and specific objective ambit: *"los terrenos baldíos insulares"* (insular waste lands) which cannot be noticed in the English text, in which the first sentence refers to "waste and ungranted lands," and the second, in general terms, to "insular lands."

The Political Code having originated in both languages in the legislative bodies of that time, the general rule of § 13 of the Civil Code is not applicable to settle the controversy; nor rule (a) because those final sentences are not a translation or adaptation of any statute of the United States or of any of its States; nor rule (b) because they are not of Spanish origin.

Rule (c), which provides that "If the matter of preference cannot be decided under the foregoing rules, the Spanish text shall prevail," is perfectly applicable to our case, for which reason the last sentence of the Spanish text of § 9 is the one applicable.

Puerto Rico. As we have said in another place, it shall not run against that property of the state which is not susceptible to ownership by particular persons, which is inalienable and which is not the subject of commerce as long as it is subject to the use or benefit of the public in general. But the rest of the property which composes its private property, subject to the exceptions established by law, is prescriptible pursuant to the rules of our civil law.

As we pointed out in footnote 11, we have repeatedly decided that property privately owned (*bienes patrimoniales*) by the municipal governments is prescriptible.[15] If, as the aforecited § 256 provides, all the common property "possessed by either the Commonwealth of Puerto Rico or the municipalities thereof . . . shall be governed by the provisions of this Code," which, as we said in *Jiménez* v. *Municipality, supra*, "include those relative to prescription," there is not, or there was not, any good reason to decide or to have decided that the common property of the State cannot be acquired by usucapio. Our Civil Code, in this sense, obliges the insular government as well as its divisions of local government.[16]

Now, let us examine the problem of acquisition by usucapio raised in this appeal, taking as the starting point the acquisition by Jorge Bird Arias in October 1901. There is no controversy whatsoever in relation to the following facts and circumstances:

---

[15] See, *People* v. *Municipality of San Juan*, 19 P.R.R. 625 (1913); *Miranda* v. *Mun. of Aguadilla*, 39 P.R.R. 422 (1929); *The Capital of P.R.* v. *Casino Español*, 56 P.R.R. 758 (1940); *Jiménez* v. *Municipality*, 70 P.R.R. 491 (1949).

[16] Our decisions to the contrary, and particularly, *Jiménez* v. *Municipality*, 70 P.R.R. 491, 494 (1949); *The Capital of P.R.* v. *Casino Español*, 56 P.R.R. 758, 769 (1940); *People* v. *Rojas*, 53 P.R.R. 115, 129 (1938); *Miranda* v. *Mun. of Aguadilla*, 39 P.R.R. 422, 424–5 (1929), and *People* v. *Municipality of San Juan*, 19 P.R.R. 625, 635 (1913), should not have, in any manner whatsoever, the recognition or authority of binding precedents insofar as it is decided therein, expressly or impliedly, that with respect to its common property—except waste lands—acquisitive prescription cannot be alleged against The People of Puerto Rico.

1. By public deed executed on October 5, 1901, Jorge Bird Arias bought the small islands Hicacos and Ratones from the four brother and sisters García Becerril, their title holders, as it appeared from the registry.

2. On October 11, 1901, that deed of sale was recorded in the Registry of Property of Humacao, without any defect whatsoever.

3. On October 5, 1901, the purchaser, Jorge Bird Arias, took material possession thereof, and actually, he enjoyed and had such physical possession, as owner, with just title, in good faith, publicly, peacefully, constantly, and uninterruptedly, until the date of his death, which occurred on July 3, 1950, that is to say, for over 48 years.

4. From October 5, 1901 to July 3, 1950, the People of Puerto Rico had knowledge or had rational means and sufficient reasons to know that such small islands were actually under the possession of Bird Arias, as owner, and it never performed any act nor took any step whatsoever which could interrupt, suspend, or extinguish such physical possession, despite having in its possession the report submitted by the Inspector of Public Lands on November 26, 1904, mentioned in footnote 4, in which said officer reported to the insular government, in clear and precise terms, that Bird had acquired them in 1901 by purchase and that he occupied and possessed them. Said report, presented in evidence by the State and marked Exh. 4, as far as pertinent, stated:

"The *present possessor* of the small island is Jorge Bird Arias, who acquired it on October 5, 1901 *by purchase* from the brother and sisters García Lavagi." [*sic*][17] Page 9.

. . . . . . . . . .

"Considerations. As to *these properties possessed by* the aforementioned Bird Arias and Noble,[18] the true right to the

---

[17] On January 24, 1903, a third small island called "Lobos" was bought by Bird Arias from Quintín Rodríguez.

[18] William Noble was the possessor, as owner, of 230 cuerdas of land situated in the same zone.

property shall be elucidated as it is proper, *because they acquired them in good faith,* and the titles they received have been *duly recorded in the Registry of Property of Humacao."* Page 33.

. . . . . . . .

"As to the properties *occupied* by Noble and Bird, this inspection understands that the result of the investigation performed should be officially notified to them in order that they may prove, by means of the original documents, the right they have to such lands." Page 36. (Italics ours.)

At the trial court plaintiff offered no evidence whatsoever of the action taken, if any was taken, by the government, as a result of the recommendations of the Inspector of Public Lands.

5. Bird Arias and his heirs were succeeded in the physical possession of the small islands by the subpurchasers Pilar Bird Veve in 1952, by the corporation Planta de Cal Hicaco, Inc., in 1954, and finally, by the corporation Best Builders, Inc., in 1962.

6. Land taxes on the small islands were paid to the State by their title holders in the registry and actual possessors; the Industrial Development Company, for whose benefit the two small islands have been condemned, lent to "Planta de Cal Hicaco, Inc.," the amount of $40,000 secured by a mortgage on the small islands and, while the possibility of bringing this action was being studied, the Industrial Development Company made the valuation of the small islands and it even drew a check (for $500,000) in favor of the clerk of the court, to be deposited as the price of the properties, in favor of the title holders thereof in the registry.

7. On January 14, 1963, after 61 years and 3 months had elapsed of continued actual possession exercised in the manner aforerecited by the very title holders to the small islands in the registry, the Commonwealth of Puerto Rico, "at the request of the Puerto Rico Industrial Development Company," brought an action for the condemnation of the small

islands and its industrial establishments for a symbolic compensation of $2, alleging that all those properties belonged to it.

As an unavoidable juridical consequence of said prolonged actual possession, starting on October 11, 1901, date on which the title was recorded in favor of Bird Arias, on October 11, 1911 the ordinary usucapio *secundum tabulas* was consolidated, the parallel situation in the registry being ratified by the possessory status of fact.

In case that the foregoing were not sufficient, and assuming that the People of Puerto Rico had been the true owner of the small islands according to the stipulations in §§ II and VIII of the Treaty of Paris and the provisions of § 13 of our Organic Act of 1900, and that Bird Arias had never had a just title to them, nor good faith in his possession as owner, on October 11, 1931 the extraordinary usucapio *secundum tabulas* was also consolidated in his favor.

As of this last date, by the acquisitive-extinctive virtue of the concurrence of time and possession, the certainty, finality, and legal validity of that acquisition of property were fully and definitively established "to the prejudice of all kinds of persons, including judicial persons," as § 1832 of the Civil Code reads; all its possible vices, defects, and imperfections were ratified, cured, and clarified, and whatever real actions which could have been exercised with respect to that real property by the People of Puerto Rico were ipso facto annulled, destroyed, and extinguished forever.

Thus purified, with the passing of time, the property right in fee simple to the small islands passed to Mrs. Bird Veve, and later to the corporation "Planta de Cal Hicaco, Inc.," and finally to Best Builders, Inc., who added another decade of possession to the half century of Jorge Bird Arias.

In this incident of reconsideration of our decision, the intervener-corporations emphasized their defenses of prescription of the action and acquisition by ordinary and ex-

traordinary usucapio, to the point of requesting us to re-examine the doctrine in relation to usucapio against property owned by the State, which we think we have already done.

It is proper to extend somewhat this opinion so as to determine the juridical efficacy of usucapio in relation to each small island of the two comprised in rural property No. 104 of the Municipality of Fajardo.

A—With respect to Hicacos, with its original area of 45.44 cuerdas, usucapio had juridical efficacy, ratifying the titles of Bird Arias and his predecessors in title. The five traditional requisites of ordinary usucapio: just title, good faith, uninterrupted possession, lapse of time specified by law, and prescriptibility of the thing, had been complied with before Bird Arias acquired in October 1901, and according to § 1957 of the Civil Code which governed here from January 1, 1890 until July 1, 1902, as said section was amended by the Military Order of April 7, 1899, which, with retroactive effect, reduced to 6 years the term of ordinary acquisitive prescription specified in said section. The acquisition by adjustment of the year 1892 constituted the just title. The ordinary usucapio was consolidated again in 1911, in the light of § 1858 of our Civil Code of 1902, which reestablished the term of 10 years, in the assumption that § 1858 were applicable to this case, notwithstanding the provisions of § 1839, by virtue of which the limitation statute in force at the time this action was brought, is the one applicable.

The extraordinary usucapio, taking into consideration exclusively Bird Arias' possession, and after the purchase made on October 5, 1901—before § 9 of the Political Code went into effect— is consolidated on the same day and month of the year 1931. It also had efficacy, consequence, and acquisitive effect on the excess of the area of Hicacos, amounting, according to a recent survey performed by plaintiff, to 94.56 cuerdas, over the original area of 45.44 cuerdas of the *título de amparo*. It does not seem that such great excess might be

understood as an accession, pursuant to § 303 of our Civil Code. In order to record such excess of area it is necessary to resort to the proper special proceeding.

B—Although the small island Ratones appears to have been joined to Hicacos, for the purpose of the agricultural and industrial exploitation, to which both have been submitted for a long time, and notwithstanding the fact that the trial court had concluded that since 1872 both small islands had been under the possession of Fort Torres and the subsequent purchasers, the truth is that this small island Ratones did not appear as object of concession in the *título de amparo* of 1872. The latter is limited to the small island Hicacos, then consisting of 45.44 cuerdas. In the text of the *título de amparo* the small island Ratones is only mentioned as a point of reference upon describing Hicacos, and in stating that the latter is situated between Cabezas de San Juan and the small island Ratones.

In the first four entries of rural property No. 104 of the Municipality of Fajardo, it appears that the same is constituted only by the small island Hicacos.

When the fifth entry was entered it was stated that record thereof was denied "with respect to the so-called 'Ratones,' because it did not appear recorded in the name of the predecessor in title." When Bird Arias requested record of his title, it was also denied in relation to the small island Ratones. However, in the seventh entry it is stated:

"Omission in the preceding entry—6th—to state that this property is composed of the small islands 'Hicacos' and 'Ratones' and the title still being in the registry, I describe it again as follows: Rural: Small islands ·called 'Hicacos' and 'Ratones,' described in the first entry in the same manner as in the document presented. It appears free from any encumbrance whatsoever."

But in the first entry of the year 1883, property No. 104 is only described as follows:

"Rural: Small island called Hicacos, planted in pasture, *situated between Cabeza de San Juan and another small island called Ratones,* three miles away from the port of Fajardo, in front of ward Cabezas of the municipality of said town. It is surrounded by the sea on the four cardinal points. Its area is forty-five and forty-four hundredths cuerdas."

It is not easy for us to accept that in the light of such description the fifth and sixth entries could be corrected for the purpose of establishing that property No. 104 was composed of the two small islands.

Extraordinary usucapio is the proper means to acquire the ownership of the small island Ratones. The ingredient of the just title was missing in order that, with respect to the same, ordinary usucapio be produced. And Hicacos, as well as Ratones, if it were accepted that after the change of sovereignty they became a possession, by grant of the Spanish Crown, to the People of the United States and later to the People of Puerto Rico, as common property (*bienes patrimoniales*) of the State, were subject, since March 1902 and under certain conditions, to commerce pursuant to § 135 of our Political Code itself, which until 1949, provided:

"Section 135.—The Commissioner of the Interior may, with the approval of the Executive Council, provide for the leasing for a period not exceeding fifteen years, and, with the consent of the Legislative Assembly, *for the sale of all lands heretofore,* or which may hereafter be *granted to the island of Porto Rico by the United States* or otherwise." (Italics ours.)

See Act No. 182 of May 5, 1949.

In a litigation concerning the title of a thing, in which the plaintiff alleges that it belongs to him by conveyance made to him, while the other party alleges to be the true owner and that he acquired it by different means authorized by law, we cannot think of any serious impediment to decide, if it were proper, that defendant is the real owner of the thing because of the different manners, reasons, modes, and titles, independent of each other, which mediated or intervened in the

acquisition thereof. If in order to decide a question in a certain sense there are different reasons, which are equally valid, it is preferable that the juridical finality and firmness of the decision rest on all of them. A judicial consciousness, free from prejudice, with the intent to judge everybody by the same standards, shall be contented and convinced that it has given to each one its own share, more reasonably when each of the legal principles on which it had relied, constitutes, by itself, an immovable support of its decision. Thereby, the application of the principle of res judicata is extensively expedited.

We have applied a set of provisions of our body of positive laws, acknowledged to be of public policy, in order to arrive at the conclusion that the order entered by the trial court and our decision upholding it shall not be disturbed on reconsideration. The doctrine that prescription in Puerto Rico never runs against the State should have been set aside a long time ago in relation to the municipal governments, as it has already happened, as well as in relation to the insular government. There are no valid reasons for this distinction, which constitutes an annulling threat to the fair sense and philosophy of that set of provisions, to subsist.

If actually there is a serious need which urgently claims for another state of law which effectively and fully would impose said doctrine of privilege favoring with an absolute prescriptive immunity the State, which can invade the private, commercial, industrial, agricultural activities, activities of public service to the community, and even become entangled in businesses of purchase and resale of real property, such state of law should be established by the legislative bodies. We believe there is nothing to the contrary. Many *continental states* have done so.[19] A simple change of § 9 of the Political Code would be sufficient.

---

[19] For American jurisprudence on this matter, see 55 A.L.R.2d 554–638. For jurisprudence concerning the question that the doctrine of *nulla tempus*

In *People* v. *Dimas et al.*, 18 P.R.R. 1019 (Del Toro, 1912), the State brought an action in ejectment of a parcel of reclaimed lands, former mangrove swamps which "formed part of the Government forest reserve." Making an indefinite reference to the year 1898 (instead of referring to July 1, 1902, when the prohibition concerning the acquisition of waste lands belonging to the State by adverse possession actually ·went into· effect, pursuant to § 9 of the Political Code), we said in the opinion:

"After this date it was not possible to acquire *the lands referred to in this suit* by prescription." (Italics ours.) Page 1039.

Then we copied some eight paragraphs of the opinion of the court of first instance, rendered by the then District Judge, Córdova Dávila. It is in the first one of them that the maxim *nullum tempus ocurrit regi* is inserted, and in the third, referring to it, it is stated:

"Even if the Legislature of the Island had remained silent, the right of ownership of The People over lands belonging to them would not prescribe now *under the application of the rule* obtaining in the States. The Legislative Assembly, *however, has enacted this principle* in the Political Code, section 9 of which *clearly and categorically* states that title to Insular waste lands cannot be acquired by adverse possession." (Italics ours.) Page 1039.

It will be noted that in the first sentence, the trial judge, assuming that the maxim would have been applicable to Puerto Rico, stated that "the right of ownership of The People over lands belonging to them would not prescribe."

But, in the second sentence, Judge Córdova Dávila obviously indicated the only action which, with respect to

---

*ocurrit regi* is not applicable to real property and to property rights of the United States situated in Puerto Rico, and that our limitation statutes benefit or prejudice the United States, see: *Baldrich* v. *Barbour*, 90 F.2d 867 (1937) and *People of Puerto Rico* v. *Fortuna States*, 279 Fed. 500 (1922). See the appendix or annex attached to this opinion.

this matter of prescription of ownership of State property had been taken by the highest local legislative body, in the following words:

".... The Legislative Assembly, *however*, has enacted this principle in the Political Code, section 9 of which *clearly and categorically* states that title *to Insular waste lands* cannot be acquired by adverse possession." (Italics ours.)

Thereby, he clearly indicated that the maxim, in its broadest sense, had not been adopted as statutory law in Puerto Rico.

This Court having concluded that this was an action to recover waste lands, it decided that upon enacting § 9 of the Political Code, decreeing that title to Insular waste lands could not be acquired by adverse possession, prescription had been interrupted and for that reason it was impossible to usucapt *"the lands referred to in this suit."*

We did not hold in that case that the aforementioned maxim ruled or was applicable in Puerto Rico, nor that, in general and absolute terms, all the property owned by the State was not subject to the rule of prescription established by our Civil Code. However, in several subsequent decisions, after merely referring to *People* v. *Dimas et al., supra*, we attributed to it a scope and authority as precedent, which it never had before, in the sense of establishing a doctrine or rule acknowledging such general and absolute prescriptive prohibition in favor of the State. In the light of the applicable law and of the peculiar facts and events involved in that case, we could not and cannot, in similar cases, decide so. The applicability of the only precept governing the matter— § 9, last sentence, Political Code—should have been kept within its exceptional objective limitation: only with respect to property owned by the State comprised exclusively within the term "Insular waste lands." Our office, as provided in § 26 of the Law of Evidence, in the construction of a statute, is simply to ascertain and declare what in terms and in

substance is textually contained therein, not to insert what has been omitted, or to omit what has been inserted.

For the foregoing reasons and, also, for the complementary reasons concerning the matter of the fiscal usucapio, which I mention in the appendix or annex attached to this opinion, as part of the same, the views on which I base my vote of "dismissal" as to the merits of the motion for reconsideration filed on October 30, 1968, are set forth.

—O—

## Index of Complementary

## Appendix

*Subject Matter*             *Page*

I—*Preliminary Remark*

Three fundamental undisputed juridical reasons, to imperatively dismiss the Motion for Reconsideration . . . .   673

II—*Scope of Prescriptibility Indicated*

Property owned by the State which cannot be acquired by usucapio; common property can prescribe, with the only exception, *clear and definite*, of waste lands, mangrove lands, unclaimed lands, and State forest reservations . . . . .   675

III—*Reasons to the Contrary*

1st. That Commissioner Mr. Rowe could have written, or could have been the author of the last sentence of § 9 of the Political Code of 1902;   676

2d. That the case of *The People* v. *Dimas et al.*, 18:1019, settles the problem of general prescription raised herein . .   676

IV—*On the Argument Concerning the Text of the Last Sentence of § 9*

(a) Footnote 14 . . . . . . . . . . . . . . . . . .   677

(b) Provision of Puerto Rican making. . . . . . .   678

(c) Circumstances and historical facts with respect to the Codes of 1902 . . . . . . . . . . . . . . . .   679

V—*On the Argument Concerning the Nonprescriptibility Against the State*

A. Usucapio in Roman Law . . . . . . . . . . . .   684

B. According to the Principal Ancient Codes . . . . .   691

C. According to the Civil Code of Spain of 1889 . . . .   694

D. Extension to Puerto Rico of the former Civil Code   700

E. The Military Government and the Federal Congress, amended and adapted the institute of prescription against the State . . . . . . . . . . . . . . . .   702

(a) General Order No. 1 and Judicial Order No. 82   702

(b) Section 8 of the Foraker Act . . . . . . .   704

(c) Prescription against the State authorized by the Law Commission, created by Congress in 1900 . . . . . . . . . . . . . . . . . . . .   708

F. Analysis and Inapplicability of § 9 of the Political Code

(a) Analysis . . . . . . . . . . . . . . . . .   712

(b) Its inapplicability to the present case . . . .   715

672

*Page*

G. Our limitation statutes favor an anti-privilege view
    1. Civil Code in force since 1890 . . . . . . . .    717
    2. Mortgage Law of 1893 . . . . . . . . . . .    717
    3. Revised Civil Code of 1902 . . . . . . . . .    718
    4. Political Code of 1902 . . . . . . . . . . .    719
    5. Code of Civil Procedure of 1904 . . . . . . .    719
    6. Act No. 76 of 1916 . . . . . . . . . . . .    720
    7. Act No. 104 of 1955 . . . . . . . . . . . .    722
    8. Art. II, § 7 of our Constitution of 1952 . . . .    724
H. Prescription Against the State in American Juris-
   prudence . . . . . . . . . . . . . . . . .    725
    (a) General negative rule with respect to the
       federal government of the United States; *its
       only exception concerning property situated in
       Puerto Rico* . . . . . . . . . . . . . .    725
    (b) Jurisprudence of the States cited by the opposi-
       tion, and its analysis showing its inapplicability
       to Puerto Rico . . . . . . . . . . . . . .    729
      (1) Adverse provisions concerning prescription
         against the State in the last three Constitu-
         tions of Louisiana . . . . . . . . .    729
      (2) The Revised Statutes of Texas expressly
         prohibit it . . . . . . . . . . . .    731
      (3) But Alabama, California, Kentucky, Mis-
         souri, New York, West Virginia, and other
         States admit it with respect to common
         property not used for specific public uses .    731
   Senate Bill No. 755, to eliminate the exemption from
   prescription of waste lands would have constituted
   an equitable legislation, extinguishing an annoying and
   anti-juridical situation and of antisocial privilege . .    764
Present Position of the State . . . . . . . . . . . . . .    764
Historical Remark . . . . . . . . . . . . . . . . . . .    766

COMPLEMENTARY APPENDIX CONCERNING

FISCAL USUCAPIO

I

### PRELIMINARY REMARK

This annex only complements the *matter on prescription* discussed in my foregoing opinion, stating the views on which I base my vote to deny the motion for reconsideration.

*LET IT BE REMEMBERED:* that I agree to the denial of the motion for reconsideration of The People, leaving standing the opinion of Mr. Justice Belaval, and our judgment of affirmance of October 10, 1967,* declaring the intervener, Best Builders, Inc., the only and legitimate title holder of the small islands Hicacos and Ratones, for the following reasons:

*First:* Because plaintiff, Commonwealth of Puerto Rico, has never had—nor did The People of Puerto Rico have—any title of ownership or any other property right to the small islands which in vain it alleged belonged to it and which for many years it acknowledged as defendants' property.

*Second:* Because it acquired title in fee simple and possession thereof by virtue of a contract of sale executed on December 7, 1962, between itself and the corporation "Planta de Cal Hicaco, Inc.," by public deed executed on that day, for the price agreed upon of $900,000, part of which was paid at that time. See pp. 634–636 of the foregoing opinion.

*Third:* Because said codefendant authentically holds, has and enjoys the status, condition or superior juridical category of third-party mortgagee, its proprietary rights being legally protected, strengthened, and guaranteed against everybody,

---

* COMPILER'S NOTE: *Commonwealth* v. *Superior Court*, 95 P.R.R. 328 (1967).

since the presentation of his deed of purchase in the Registry of Property—December 12, 1962.

In the same manner, privileged at law, that is, as third-party mortgagees, by respective deeds of sale, recorded without any defects whatsoever, since October 1901 (before § 9 of the Political Code went into effect), were its former owners, Jorge Bird Arias, Rafael Veve, Pilar Bird, and the corporation Planta de Cal Hicaco, Inc.—see pp. 644–651, foregoing opinion.

*Fourth:* By judicial authority of the following usucapios:

a) *The ordinary usucapio for six years,* with just title and good faith, established under § 1957 of the Spanish Civil Code which governed in Puerto Rico from January 1, 1890 until July 1, 1902, as that section was amended by General or Judicial Order of April 4, 1899, in conformity with §§ 344, 1932, and 1939 of the same ancient Code.

b) *The ordinary usucapio for ten years* as to persons present and for twenty years with regard to those absent, with proper title and good faith, prescribed under § 1857 of our Civil Code in force, which cured any vice or defect which could affect the deed of sale indicated.

c) *The extraordinary usucapio for 30 years,* without the necessity of title nor good faith, prescribed by § 1859 of the same legal body. According to the juridical reality and to the entries in the Registry of Property, the uninterrupted period of possession until the time of the litigation is *sixty-one (61) years,* counted from the acquisition and registration of the small islands in October 1901, by and in favor of Jorge Bird Arias, and

*Fifth:* By judicial authority of the extinctive prescription of the action for revendication (it is the one actually filed) brought on January 14, 1963 by the State against Best Builders, Inc., and Planta de Cal Hicaco, Inc., established by § 1861 of our present Civil Code.

By virtue *of any of the preceding five fundamental juridical reasons,* the motion for reconsideration should be necessarily denied.

## II

### *SCOPE OF PRESCRIPTIBILITY INDICATED*

*I ask* at *ante,* p. 653, in my opinion:

"Is the thesis that after the change of sovereignty . . . *property* belonging to the State cannot be acquired by usucapio, correct? (Italics ours.)

*I answer* in the same page:

". . . in relation to *certain* properties *it is correct*; but . . . *in relation to others, it is not.*" (Italics ours.)

Right after, therein, I proceed to set forth that, of all the property possessed by the State, *only that part declared or classified as "common property"* pursuant to § 256 of our Civil Code—that is, the property, fortune, or *private riches* possessed by the State—may be acquired or lost by usucapio, *with the special exception,* with respect to that common property *(starting July 1, 1902),* to the lands owned by the State classified as *"baldíos,"* as provided, *with prospective effect,* by our Political Code of 1902, in the last sentence of its § 9, Spanish text, in the following terms:

*"No podrá adquirirse títulos 'a terrenos baldíos' insulares por posesión adversa, o contraria al título de otra u otras personas."** (Italics ours.)

To emphasize and clarify further our position, we reproduce the second paragraph at *ante,* p. 659, in our opinion.

"In the light of the foregoing, it cannot be validly upheld that, in all the cases and as a juridical rule of general applica-

---

* EDITOR'S NOTE: Our translation for this statement is: Title to insular waste lands shall not be acquired by adverse possession or opposed to the title of other person or persons.

tion, prescription does not run against the Commonwealth of Puerto Rico. As we have said in another place, it shall not *run* against that property of the state which is not susceptible to ownership by particular persons, which is inalienable and which is not the subject of commerce as long as it is subject to the use or benefit of the public in general. But the rest of the property which composes its private property, subject to the exceptions established by law, is prescriptible pursuant to the rules of our civil law." (Italics ours.)

### III

## *REASONS FOR OPPOSITION WHICH COULD BE ALLEGED.*

The reasons which could be alleged against my opinion would be the following:

1st. With respect to the text which should prevail in the construction and application of § 9 of the Political Code of 1902, it is the English text, because Mr. Rowe, a member of the original Commission for the Codification of the Laws of Puerto Rico, who prepared the proposed codes of 1902, utilized for his work the Political Code of California and used the English language, and § 13 of our Civil Code provides that if the statute is a translation or adaptation of a statute of any State, the English text shall prevail over the Spanish text.

2nd. That the courts have decided this specific problem of prescription or nonprescription of public lands in favor of the State and that the controlling case for such decision in our island is *People* v. *Dimas et al.*, 18 P.R.R. 1019 (1912).

Both reasons are erroneous. Let us see why:

## IV

### ARGUMENT WITH RESPECT TO THE TEXT

#### (a)

In footnote 14 of our opinion we considered, rather lengthily, the problem of the irreconcilable discrepancy between the English and Spanish texts *as to the last sentence* of § 9 of the Political Code of 1902, in the light of § 13 of our Civil Code. We concluded that the Spanish text was the one that should prevail, in accordance with the rules of construction established by said § 13.

We repeat that the *last or second sentence* of the original English text of § 9 of the Political Code of 1902, which states: "Title to insular lands shall not be acquired by adverse possession," nor any other concerning the acquisition of public lands by adverse possession, whether waste or not waste lands, *was never a part of § 42 of the Political Code of 1872* of the State of California, which is copied in footnote 14. Said § 42 of that State did not contain any analogous expression or provision concerning the nonacquisition of public lands of the State by usucapio.

As it is correct, we must necessarily accept that the idea, notion or thought of endowing with such sentence of § 9 of the proposed Political Code of 1902—which Congress and our Legislature ordered to be drafted and approved in both the English and Spanish languages—was conceived for the first time in Puerto Rico and was added here to the part of § 42 of California, which was taken and adapted by the Commission for the Codification of the Laws of Puerto Rico of 1901.

In view of such reality, we must inescapably conclude, as we said in our footnote 14, that the English and the Spanish texts *of that final sentence* are not a translation or adaptation of any statute of the United States or of any of its States.

What is not stated, or written, in any language, cannot be translated, is not adaptable. Considering the problem serenely, it cannot be accurately affirmed that a sentence which was never written or stated in any original source whatsoever has been translated, incorrectly translated from, or adapted to such a text.

Adaptation means the methodical arrangement, coupling of related means, of the activities to its objectives, of life in general to the circumstances of the environment. It is to reconcile, accommodate or modify conditions in harmony with an environment other than its habitual one. It exists in the cases where an object, originally useless for certain uses, has been converted into an object useful or suitable for such uses by means of alterations.

In that part of § 42 of the Political Code of California, which was taken to draft *the first sentence* of the English text of § 9 of our Political Code of 1902, the adaptation made to accommodate it to the conditions and circumstances of the Island of Puerto Rico, consisted in changing the phrases or expressions "lands of the state," to "lands of Puerto Rico"; "the district attorney of the county," to "the Fiscal (District Attorney) of the judicial district"; "sheriff of the county," to "the Attorney General," and, also, in eliminating the part of the text of California, which provided:

". . . and if resistance to the execution of the order is made or threatened, the *sheriff* may call to his aid the power of the *county*, as in cases of resistance to the writs of the people." (Italics ours.)

The second and last sentence of § 9 of our Political Code, whose English and Spanish texts essentially disagree between themselves, *has no concordance whatsoever with the Political Code of California, nor was it taken therefrom, nor is a translation, nor an adaptation of any state or English-speaking American territory.* It was an autochthonous and original contribution, either of a Commission for the Codification of

Laws, which by law—Foraker Act—had to prepare two original drafts, *one in English and the other in Spanish*, of each Code, or of the men of our first Legislative Assembly, in which eminent jurists participated, illustrious and professional men of the prominence of Rosendo Matienzo Cintrón, José Guzmán Benítez, Francisco M. Quiñones, José Gómez Brioso, Santiago Veve, Cayetano Coll y Toste, and Ulpiano R. Colón. The preparation of said Codes was the responsibility of many men.

As we have previously stated, the second and last sentence of § 9 of the Political Code, governs, in part, a juridical institution, prescription, in a prohibitive sense, a matter of independent and extraneous to the finality of the first sentence, referring to the invasion, by intruders, of "waste or ungranted lands of Puerto Rico," according to its English text and to *"terrenos baldíos o no concedidos pertenecientes a Puerto Rico,"* according to its Spanish text:

Never—and we shall not get tired of affirming it, even if we seem boring—did this last sentence undergo any process of translation or adaptation. Which text was drafted first? We have not found any information to help us in answering the question with absolute certainty. We do not want to run the risk of guessing or making categoric statements blindly.

The circumstance that Commissioner Rowe was assigned the direction in the preparation of a Proposed Political Code, although it has its weight and worth, is not conclusive evidence that he was the inspirer, author or coauthor of the second sentence. Of course, the possibility that he was the inspirer of its English version we do not deny.

But we shall point out other facts and circumstances which occurred in relation to the drafting and approval of the Codes of 1902.

We must remember that the Congress of the United States itself, authorized the creation of a commission to revise the codes and laws of Puerto Rico, and the appointment of the

"clerks and other assistants" thereof, ordering, in part, textually, by § 40 of the Foraker Act:

"And said commission shall make full and final report, *in both the English and Spanish languages,* of all its revisions, compilations and recommendations, with explanatory notes as to the changes and the reasons therefor, to the Congress on or before one year after the passage of this Act." (Italics ours.)

And we must remember also, that the first insular legislature, in order to extend the term granted to the former commission, approved an Act (C.B. 13) on January 31, 1901 —see Sess. Laws, p. 145 (1901)—establishing another commission to compile, revise, and codify our system of laws, including a Civil Code, a Political Code, a Code of Civil Procedure, and a Penal Code. It was provided in said law, according to its English text:

"The *said proposed codes shall be in English and in Spanish.*" (Italics ours.)

In its § 3 it was also provided:

"The said commission is hereby authorized to employ *such necessary translators and assistants* as may be deemed necessary and proper for the performance of its work." (Italics ours.)

In Vol. I of the report of said commission, drafted *in both English and Spanish,* printed in 1901 by the printing office of the federal government, we find in part I a detailed recital of its preliminary work entitled "History of the Commission."

The commission permitted the participation in the work of revision and codification of all the illustrious citizenry of the country. Public and private hearings and conferences were held in many towns of the Island, and it "received a great number of written communications from judges, officials, and merchants throughout the island, all of which were briefed and taken into consideration by the commissioners in drawing up their final report." See p. 18.

From that "History of the Commission" at p. 16, we took the following paragraphs:

"Invitations for the first series of public and private hearings, according to the invitations of September 3, 1900, were sent to the following prominent men of Porto Rico: Messrs. Esteban Saldaña, Cayetano Coll y Toste, Manuel F. Rossy, Luis Muñoz Rivera, Fidel Guillermety, Tulio Larrinaga, Manuel C. Román, Herminio Díaz, Santiago Veve, Rafael del Valle, Manuel Egozcue, José Marxuach, Carlos M. Soler, Rafael Palacios, and Gerardo Soler.

"Each member of the commission was also entrusted with the question of the form of insular government and the organization of the educational system.

"In order to become familiar with the working of local government throughout the island, Commissioner Rowe devoted the month of October and a portion of November *to an extensive tour of investigation, visiting most of the towns and holding public and private conferences at which representatives of the local governments and leading citizens were heard.*" (Italics ours.)

According to the plan for the division of the work adopted by the Commission, Mr. Joseph F. Daly was assigned, among others, the preparation of the drafts corresponding to the organization of the courts, and to Dr. Rowe, among others, the one corresponding to the taxation and revenue. Notwithstanding English was their vernacular language, the proposed bills prepared with respect to such matters assigned to this North American Commissioners *were originally drafted in Spanish* and it is stated in that History of the Commission, at p. 28, as follows:

"It may be well to point out in this connection that the proposed judiciary act, inheritance and transfer tax law, and the judicial-fees act *were originally drafted in Spanish,* which will account for the preservation of many Latin and Spanish terms in the translation. In many cases it was found impossible to find English equivalents for terms used in the Spanish law, and it was therefore deemed best to preserve these terms in order to

avoid the confusion and uncertainty which would result from the use of English terms which failed exactly to correspond with the Spanish.

"With the exception of the revision of the organic act (the Foraker law), all the subjects entrusted to the commission are within the competency of the local legislative assembly, and unless Congress is prepared to enact a complete code of laws for the island, the revision of the *legal system will have to be carried out by the insular assembly.*" (Italics ours.)

The proposed Political Code, prepared under the direction of Commissioner Rowe, by his Puerto Rican advisors and assistants, with the advice and suggestions of so many eminent Puerto Rican jurists of Spanish juridic making, contained 778 sections, divided into 15 titles and one additional title. When it was submitted to the Insular Legislature of 1902—composed of an Executive Council of 11 members, 5 of them Puerto Ricans, and of a House of Delegates, composed of 33 Puerto Ricans and only one North American, Mr. Frederick Cornwell—*351 sections of the original proposed code were eliminated,* its original number of articles being reduced to 427. As to this, Professor Muñoz Morales states, at p. 210 of his work *"Compendio sobre Legislación Puertorriqueña,"* 1948 ed. U.P.R.:

"This proposal adapted in its structure to the Political Code of California of 1872, contains *778 sections* divided into 15 titles and one additional title with 40 sections intended for the insular and local civil service.

"(b) Text approved by the Insular Legislative Assembly of 1902:—When the aforementioned proposed code *was submitted to the Insular Legislative Assembly,* it was substantially accepted but it was amended pursuant to the Act approved on March 1, 1902 entitled Act to Establish a Political Code for Puerto Rico, which contains 392 sections divided into 10 titles and an appendix approved on the same date, which contains title XI, containing §§ 392 to 427." (Italics ours.)

*Among the sections of the proposed Political Code elimi-nated by said Legislature of 1902, there was No. 778, the last one in the proposal, whose Spanish text provided:*

"Art. 778. *El texto de este Código según consta redactado en inglés será considerado como el texto oficial."** (Italics ours.)

The circumstance is too significant to be ignored or not cited. It was a legislative body composed of Puerto Ricans and North Americans *which absolutely rejected such proposi-tion* and caused or preferred that the English text should not prevail over the Spanish.

All these circumstances obviously indicate to us how un-certain, unreliable, and risky it would be to affirm, in abso-lute terms, and without any reservations, that the Spanish text *of the last sentence of § 9* of the Political Code of 1902, is a translation, and, even less, a "poor translation" of its English text, when, by the Foraker Act and by our Act of 1901 (C.B. 13), the preparation of all the proposed codes in *both languages* was authorized and ordered.[1]

Notwithstanding our intensive investigations—we have examined several times both the Spanish and the English texts of the Political Code at the offices of the Executive

---

*EDITOR'S NOTE: The English version is: Section 778. The text of this Code as it appears drafted in English shall be considered as the official text.

[1] On several occasions we have decided problems concerning discrep-ancies between the English text and the Spanish text in relation to other sections of the same Political Code of 1902, originally and literally taken from the Political Code of California of 1872. Pursuant to Rule (a) of § 13 of the Civil Code, we decided that the original English version *of the section in question* prevailed. It so occurred in: *Coll* v. *Picó,* 82 P.R.R. 26, 31 (1960) in respect to § 291(i); *Sucn. Pedro Giusti, Inc.* v. *Tax Court,* 70 P.R.R. 109, 113 (1949) in relation to § 291(d); *New Córsica Centrale* v. *Gallardo,* 41 P.R.R. 665 (1931) with respect to § 290. We held, likewise, with respect to sections totally taken from other American codes. See: *Mestres* v. *Díaz,* 50 P.R.R. 354 (1936); *People* v. *Zayas,* 72 P.R.R. 17 (1951).

But we do not know of any precedent of ours involving a section constructed with sentences translated or adapted from American statutes and also with sentences of pure Puerto Rican origin, like the second and last sentence of § 9 of the Political Code.

Secretary—we are not in a condition, we repeat, to offer a positive and absolute answer or solution to the problem as to by whom, how, when, and where were the English and the Spanish texts *of the last sentence* of § 9 prepared, whose proper place should have been the Civil Code and not the Political Code.

Because this last sentence constitutes a rule of exception of the applicability of our historic limitation statute, very limited in its objective scope, which on the other hand, constitutes an affirmance of the plenary survival of this statute, insofar as it affects the common lands (*terrenos patrimoniales*) owned by the State, which are subject to commerce, when said last sentence is constructed and applied a *contrario sensu*, we must make up our minds to conclude that its Spanish text was conceived and drafted, either by a Puerto Rican lawmaker, jurist, assistant or clerk of the Law Commission.

In view of such situation, the mandate of § 13 of the Civil Code is of strict applicability in the sense that, when it is a question of a translation or adaptation of the statute of any state or of a statute of Spanish origin, as in this case, the *SPANISH TEXT SHALL PREVAIL.*

## V

### ON PRESCRIPTION AGAINST THE STATE

—A—

#### Prescription in the Roman Law

Citations may be found in the Digest and the Institutes showing that in the Roman Law public things belonging to the Roman People and the cities could not be acquired by usucapio.[2] Because of its historical value and because in the

---

[2] On this point we have consulted classic treatises of eminent professors on this matter like Teodoro Mommsen, *"Derecho Público Romano"*

Roman Law there were other prescriptive institutions which should also be considered, we shall make some commentaries in connection with the origin and evolution in Rome of that mode of acquisition.

It is generally accepted that the property of the Roman State could not be acquired by usucapio. But the most distinguished jurists versed in Roman law show that it was not always so, especially after Constantine I and the Code of Theodosius.

As to property, the private Roman law started with that of animals and slaves, and, in general, with that of personal property; common property started, on the contrary, from the right to land.

The private conveyance of property was verified mainly by means of a material change of possession, the vendor (former owner) and the purchaser (the new owner) concurring to the place where the thing was situated. In public law the change occurred by a mere act of the will of the community, or of its agent, that is, by assignment. The title of acquisition by occupation was exclusive of public law; *the title by prescriptive possession was exclusive of private law.*

*The taking of possession of public land by particular persons gave rise, for the community, to a credit analogous, because of its duration,* to the leases of later times, credit to which there is nothing similar corresponding to it in private law.

Since time immemorial, in public law there prevailed the effective, real juridic relations supported by custom and good faith; sale, lease, etc.

---

translation of P. Dorado, Madrid; Alvaro d'Ors, *Elementos de Derecho Privado Romano* (Pamplona, 1960); Pedro Bonfante, *Instituciones de Derecho Romano*, 8th ed., translation of Luis Bacci and Andrés Larrosa (Reus, 1965); I Ursicino Álvarez, *Curso de Derecho Romano*, Ed. *Revista de Derecho Privado*, Madrid, 1955; Guillermo Floris Margadant, *El Derecho Privado Romano*, Mexico, 1960; Juan Iglesias, *Derecho Romano* (4th ed., Barcelona, 1962).

The Roman Public Law did not know of *the claim, properly speaking;* as a general rule, the community did not sue nor was sued. In the sphere of private law the community acted as judge, and decided the controversies between particular persons, *and when it was a party thereto, its right was not placed in the same footing as that of particular persons, but it exercised justice by itself; if the particular person considered his right was encroached upon by the community, he had no other remedy than to rely on his own means.*

The *censor* was in charge of the public order, and had, or exercised its central regulation, its maintenance and exploitation, subject to certain restrictions tending to retain the property right of the State. He directed the utilization of the public land. Every piece of land comprised within the limits of the community was, at law, the property of the latter, provided it had not been marked off. The ordinary expenses of the nation were covered not with Roman taxes (*tributus*), but with the products of the common property. The latter, for this and other public reasons, could not be lost by usucapio against the State.

The ownership of the land was not sold. Only the utilization of the soil of the community was granted to the family (*datio asignatio*). Only the community itself could do it by special agreement of the comitia.

The first epoch of the Roman Law was the fruit of a restricted society, of simple and rustic life. The XII Tables, codified in 451 A.C., are the expression of said epoch. The tables acknowledged that private property could be acquired by a person who was not a title holder thereof, by usucapio, provided that he acted as owner and under conditions which the commentators summarized as follows: (1) *Res habilis;* (2) *titulus;* (3) *fides;* (4) *possessio* and (5) *tempus.* The possessory term was fixed at one year for personal property and 2 years for real property. But usucapio could not be

invoked by a foreigner against the interest of a Roman citizen. This mode of acquisition turned the bonitarian possessor—the possessor without a legal or valid title—into a quiritarian or legal possessor.

According to Bonfante—p. 290 *op. cit.*—in addition to things absolutely *extra commercium* the following were excluded from usucapio:

"1st. things stolen (*res furtivae*) and things violently taken from the possessor (*res vi possessae*). The vice of theft, which affects the thing which is in the hands of any person, is purged under the Atinian Law by returning the former to the potestas of the possessor, and likewise the vice of violent acquisition; 2d. the things received by the Magistrate as a gift against the prohibition of the *lex Iula repetundarum*: however, purgation was also admitted here; 3rd. by Novel 119, according to the prevailing opinion, the immovables acquired by a possessor in mala fide; 4th. the things of the State (*res fiscales*), of the sovereign, of the wards, and of minors, the immovable property of the church and the pius foundations; 5th. the things pertaining to the dowry (not only the fundus); 6th. the things concerning which alienation is prohibited."

Usucapio was only applicable to Italic lands. In the provinces the legal owner of all the immovables was the Roman State. The particular citizens only enjoyed a *possessio provincialis*, transmissible, but reversible and restricted by Rome if the social interest demanded it. In principle, provincial lands could not be usucapted. The Roman community in general did not transfer the property right of its property, although it transferred its possession, use, and enjoyment to the citizens.

However, emperors Constantine, Theodosius II, and Justinian simplified and unified usucapio and prescription to such a degree and extent that even the property of the State— *aerarium sacrum* or *fiscus regis*—were susceptible of being acquired or lost by this mode.

At pp. 132 and 133 of the aforecited work *"Elementos de Derecho Privado Romano"*, the learned professor from Compostela, Alvaro d'Ors, tells us with respect to this matter:

"§ 105. In the post-classic era the extent of the Roman citizenship produced also the equalization of the Italic lands, susceptible to biennial usucapion, to the provincial lands, to which decennial or vicennial prescription was applicable; it was inevitable that these two institutions be confused. *Prescription became a mode of acquisition, not merely negative, and precisely, the general one for all the immovables;* at the same time, usucapion was restricted to the movables. This situation was acknowledged by Justinian, who distinguishes:

"a) *usucapion,* for a term of three years, to acquire the ownership of personal property;

"b) *praescriptio longi temporis,* for a term of ten or twenty years as formerly, but subject now to the presence or absence of the owner in the same province (decreased in its extension since Dioclecian) for the acquisition of ownership to any kind of immovables; both modes, with the requirements of good faith and just title; both with the possibility of *successio* and *accessio possessionis;* both could be interrupted by the action (after the regime of the *litis contestatio clasica* has disappeared); but also, Justinian adopted another mode:

c) *longissimi temporis praescriptio,* extraordinary prescription without the requisite of just cause, established by Constantine with a term of forty years, decreased by Theodosius II to thirty, whose purpose was to protect, by extinction, from the actions of the owner, the persons who possessed a property without any title whatsoever, and, at the same time, to facilitate thereby an obligor to the laws of the Fiscus; Justinian supported it, but with the character of prescription for the acquisition of ownership when the possessor was in good faith although having no title, with the Theodosian term of thirty years, and *when the church or fiscus were prejudiced, of forty years."* (Italics ours.)

To the same effect the respectable Italian authority in Roman Law, Pedro Bonfante, at p. 287 of his aforementioned work, affirms:

"But in the Imperial Age this institution of usucapion, together with other defects. which the praetorian jurisprudence

could remedy in extreme cases, as was the short term inadequate to a vast society, revealed a grave gap, consisting in that it was a mode of acquisition of ownership which was only applicable to the Italic lands. Probably, in order to provide a remedy to this gap there was established, in the Imperial Age, by the agency of the Emperors or the Governors of the provinces, the institution of *exceptio* or *praescriptio longi temporis* or *longuae possessionis,* derived from the Greek law. This institute consisted in an exception granted to the possessor *against the person who claims to have a right over the thing* when the former had enjoyed the possession during ten years among persons present, that is, among persons residing in the same city (or in the same province after the admission of the subjects of the provinces to citizenship), and during twenty years among those absent. This institution was based rather than on the defendant's possession, on the inaction and prolonged silence of the plaintiff, which gave rise to the presumption of his absence of right. Pursuant to the rules of praetorian law it was required in theory, as a condition to *exceptio,* only the *possessio iusta* (acquired *nec vi nec clam nec precario*).

"In practice, although both institutions had a different character and different requisites, derived from the different basis on which they relied, they finally accomplished the same function and yet it seems that the possessor, after the lapse of ten or twenty years, was granted later on, in addition to the exception, an action for the recovery of the thing eventually lost. There remained only one difference, now unjustifiable, between Italic lands and provincial lands, particularly as to the time necessary for the acquisition. On the other hand, in the Orient, generally, there existed provincial lands only, for which reason usucapion, in this new field of the Roman law, was not applicable insofar as immovable things were concerned. The time was ripe for reform, and Justinian accomplished it. He clearly established the *longi temporis praescriptio* as a mode of acquisition of ownership and later on merged it with usucapion, also increasing the lapse of time with respect to movable things from one to three years and eliminating the differences existing between the two institutions. However, according to the conditions in the last era, the name *usucapio* was preferably used with respect to movable things, and the name *longi temporis praescriptio* with respect to immovable things." (Italics ours.)

Juan Iglesias, in his work *Derecho Romano* comments at p. 274:

"A rescript of Constantine[324] (See C. 7, 39, 2, which mentions the Constantinian Law. A summary of the rescript of Constantine has been preserved in Pap. Columbia Inv. 181 (Riccobono, Fontes, n. 464). *Cf.* Arangio-Ruiz, Negotia, n. 101, Parerga, p. 79 *et seq.*) introduces the *praescriptio longissimi temporis* or exception to repel any revendication action brought by the person who has possessed the thing during forty years even without title or good faith. Such prescription has an acquisitive and not merely defensive force, in the Justinian Law. In effect, Justinian provides that the possessor of a thing—including the thing stolen, but not the thing taken violently—during thirty years,[325] (Such term was the one established by Theodosius II for the prescription of all the *actiones perpetuae*. See C. Th., 4, 14, 1=C. 7, 39, 3.) or during forty years, *if it belonged to the fiscus, to the church,*[326] (According to some writers, but in C. 1, 2, 23 one hundred years are required for the things belonging to the Church.) *to a pious foundation, to the emperor or empress, acquires the ownership thereto.*

"For this acquisitive prescription title is not required, but only the initial good faith. The term starts to run from the time of the taking of possession, which is the time from which the revendication action against the possessor may be brought, which prescribes after thirty or forty years. As to the rest, the requisites of the former *longis temporis praescriptio* govern. It may still be noticed that this extraordinary prescription—such is the name nowadays given to it—functions with extinctive efficacy when the necessary conditions therefor are present, and, on the other hand, those required to produce acquisition are lacking." (Italics ours.)

From the foregoing it is inferred that after Constantine the Great, emperor from the year 306 A.D. to 337 A.D., the lands of the State could be acquired by extraordinary prescription, that is, *praescriptio longi temporis*, and that after Justinian, usucapion only governed with respect to movable property.

From the Middle Ages to the Renaissance the Justinian Roman Law became, little by little, thanks to the labor of the jurists of the university of Bologna and as a result of an aggregate of historical and social causes, as stated by Bonfante, the common law for all the Italian and Germanic peoples. But from the middle of the 18th Century it started to be superseded by the civil Codes, notwithstanding having constituted an essential part in the formation of the same.

Nowadays, according to the same Italian jurist, the true imperishable fame of the Roman Law is due: to its significance *in the interpretation* of the new Codes, to the perfect skill of its jurists, and to the fact that it is the only body of Laws which may be followed through a development which is more than millenarian, consequently offering the best field for the study of the organic laws of the juridical evolution.

—B—

*Prescription According to the Principal*
*Ancient Spanish Codes*

In the Laws of the Seven Partidas, approved in the 13th Century, prescription is regulated as in the Justinian-Roman Law. In title XXIX, "Concerning the Periods of Time by the Lapse of Which a Man Loses His Movable as Well as His Immovable Property" in the Third Partida, and in its Law VII it is provided that *things which belong (cosas patrimoniales)* to the cities and towns, and the immovables owned by the Church may be acquired by a prescription of forty years. Said law states:

"Law VII.—That neither the public places, nor roads, nor pastures, nor thrashing grounds, nor other like places which belong in common to the people, can be lost by prescription; and of other things.

"No public place, street, road, pasture or thrashing ground, nor other similar place, used in common by the inhabitants of

any city, town or castle, or other place, can be acquired by prescription. But things of a different nature, as slaves, flocks, cattle, or ships or the like, though they belong in common to any city or town, may nevertheless be acquired by a prescription of forty years. For notwithstanding they are held in common by all the inhabitants, yet they are not used in common by all of them, as are the other things before mentioned. If however the city, or town, or other place that had lost any such thing by the prescription of forty years, petition within four years thereafter, either the king or president, or judge of the place, praying that they may not be prejudiced by the time elapsed, and that they might not lose the thing thereby; the prayer of their petition ought to be granted; and the prescription of forty years will not prejudice them. But if they do not petition within four years next after the forty, they cannot do it afterwards; and he who held the thing will acquire it, by the forty years prescription."

According to Law VI, "That neither a thing sacred nor a free man can be acquired by prescription," of the same title and Partida, the following were excluded from prescription:

1. Things sacred, holy or religious

2. A free man

3. The "right to dispense justice"

4. Any "tribute, taxes, revenues or any other dues whatsoever belonging and usually paid to the king."

The Supreme Court of Spain, by judgment of April 16, 1880, construing the aforecopied Law VII, decided that among the things which this Law declares imprescriptible there *are not included* the properties owned by the State which, as a juridic person, is subject to prescription in the common law, *it being unlawful to attribute to it exceptions and privileges not granted by law.*

By mandate of Law IV, Title VIII—"Of Prescriptions" of Book XI of the *Novísima Recopilación,* the ownership of the cities and towns and *the things belonging to the Crown* prescribe by the immemorial possession, proved as required by the law of Toro. The text of this law, taken from the work

*"Los Códigos Españoles,"* Madrid, 1850, Vol. 9, p. 458, is as follows:

"Law IV.—The lapse of time necessary for the prescription of the ownership of the towns, and their civil and criminal jurisdiction, except the Supreme, and of the taxes and tributes belonging to the King (a).

"Law 2. tit. 27, of the Ordenam. de Alcalá; and Philip II, year 1566.

"By reason that certain persons in our kingdoms hold and possess certain cities, towns, and places, and civil and criminal jurisdictions, without a title granted by us, nor by the Kings our predecessors, and it has been doubted, whether the things aforementioned may be acquired against us or our Crown by lapse of time; we order and decree, that the immemorial possession, proved according to and as and with the requirements prescribed by the law of Toro; which is law 1. tit. 17. book 10, suffices to acquire against us and our successors whatever cities, towns, or places, and civil and criminal jurisdictions, and any other thing and part thereof, with the things annexed and pertaining to the ownership and jurisdiction; provided that the term for said prescription is not interrupted nor abandoned by Us, or by our mandate, or by other persons in our natural or civil name; but the Supreme civil or criminal jurisdiction, which the Kings have by majority and Royal Authority, which is to impart and enforce justice where the other lords and Kings do not, we declare, that it cannot be obtained or lost after said lapse of time, nor any other whatsoever: and likewise, what the laws provide, that the things owned by the Kingdom cannot be obtained by lapse of time, be it understood, with respect to taxes and tributes owed to Us. (Law 1. tit. 15 book 5. R.)"

It would be too tedious to enumerate the different legal provisions which from the *Siete Partidas* to the approval of the Civil Code of Spain of 1889 governed the way in which one "can gain the property of another or lose his own" by the lapse of time. Summarizing, it suffices to say that in the course of the evolution of the institute of prescription, 1, 3, 4, 10, 20, 30, 40, and 100 years, and immemorial possession were fixed as terms for prescriptive possession.

The term of 100 years was fixed taking into consideration that that was the maximum life expectancy of "the men who lived long."

The term of four years was fixed in the *Compilación de las Leyes de las Indias,* Tit. III, Book V, which provided that the new settlers of the Indies would become owners of the lands granted by the Royal Crown.

". . . by tilling them, raising cattle and planting trees, etc. . . . *they would acquire the ownership of the lands after four years of occupation and labor . . . .*" (Italics ours.)

We took this citation from Plaintiff's brief, p. 7, before the court of first instance.

—C—

*Prescription of the Property of the State
in the Spanish Civil Code of 1889*

Since the time when the Spanish Civil Code was originally approved, the first paragraph of its Art. 1932, has provided and still provides:

"The extinguishment of rights and actions by prescription upon the expiration of the periods fixed by law shall operate *against all persons, including legal entities.*" (Italics ours.)

Manresa, in his classic work on the Spanish Civil Code, Vol. XII, pp. 786, 787, 789, and 790, comments on the scope and origin of that first paragraph as follows:

"Our ancient laws considered, in order to make it effective or not, the conditions of the thing object of prescription and the circumstances of the persons who owned them. Thus, for example, Law 8th of tit. XXIX of the Third Partida, excluded the property belonging to minors and married women, although in declaring it so, it acknowledged that if after they have become of age, anyone would acquire any of their property by prescription, he can do so, and also it would be so in case that a married woman does not demand her dowry of her spendthrift

husband. Likewise, we could cite several other exceptions sanctioned by the former law for the consideration of said causes.

"On the contrary, the Code does not admit any of the exceptions which, by reason of the nature and condition of the things or of the circumstances of the persons, were formerly admitted, and among them, those relating to the common property of the State, object of particular acquisition from minors, from married women by reason of their unappraised dowry, and of the things taken or stolen. Formerly, all that property was not subject to ordinary prescription, although some were subject to extraordinary prescription, but since the publication of the new Code they are subject to prescription like all others, without any further condition than the legal possession thereof. And it could not be otherwise, since its authors had accepted the principle, converted into a positive provision by Art. 1.936, in the sense that all things which are the object of commerce are capable of prescription.

"Therefore, in the first paragraph of this article it is established in absolute terms, that the rights and actions shall extinguish by prescription in the terms prescribed by law *to the prejudice of all kinds of persons, including juridical persons.* This principle is applicable, indistinctly, to all persons who are owners of the properties object of prescription, whatever their circumstances, eliminating all the exceptions formerly admitted by reason of the person passively subject to prescription, since in failing to establish any special provision concerning them, they were submitted to the general rules of law. By virtue thereof, it is likewise applicable to adults as to minors, to the married woman as to the single woman, to the legally incompetent person as to the person who has full legal capacity.

"The drafting of the first of said provisions has caused some persons to incur error assuming that it only refers to the rights and actions, and that, therefore, its provision does not include material things, either of particular persons, Corporations, Partnerships, or other entities, but the error incurred by considering it so is quite manifest and evident, since such understanding is in contravention with the rule established by Art. 1.936, according to which all things which are the object of commerce are capable of prescription.

"The Code has established the aforementioned principle in absolute terms, separate from all purely personal privilege or irrespective of the condition of the persons, since it does not admit any of the exceptions which the ancient laws acknowledged, and not even the persons physically and legally incapacitated to manage their own properties are exempt from the effects of prescription.

"The terms in which said provision is drafted cannot be more clear and precise. According to them, prescription shall operate not only against particular persons but also against juridical persons, since breaking through the ancient molds and departing from certain Codes which still preserve vestiges of the privilege granted to the State, the Corporations, and other moral and juridical entities, to follow the ample view adopted in the Codes of France, Holland, and in that of Vaud, and some others, prescription is operative against said institutions and against public establishments and other juridical persons, without further limitation than that imposed also on particular persons, whenever the things or rights and actions object thereof are the subject of commerce. By virtue thereof, prescription shall only be inoperative against the passive subject thereof, whenever the thing upon which it operates is not subject to prescription pursuant to the law.'" (Italics ours.)

Scaevola, commenting on this Spanish Art. 1932 in his work I-XXXII *Código Civil*, at pp. 315–317 (Reus ed. 1965), also states:

"Some other provision, like Law 2, Tit. V of Book V of the *Espéculo*, establishes a term of one hundred years for the prescription of things of the King and of the Roman Church, and another of forty years for things belonging to other churches. . . . . . . . .

"Our Proposed Code of 1851, in its Art. 1.946 provided that 'The State and the juridical persons, comprised in Art. 33, are subject to prescription as to their properties or rights susceptible of being privately owned.' *Adhering to this view, of antiprivilege nature,* our Art. 1.932 in force was enacted, which likewise departs from the majority of foreign legislations, which still contain with one or more variants, the traditional system, and proclaims, as we have seen, the prescription of rights and actions

against all kinds of persons, whatever their condition or status of physical or juridical nature.

"The system of our Code is strictly logical and is consistent with the systematization and harmony that this article must have with the preceding Art. 1.931, insofar as there is a logical reason to infer lawfully that if prescription operates in favor of all kinds of persons and is applicable, as we have seen, for the benefit of minors and incapacitated persons, and in all kinds of juridical persons, likewise, all of them should, in forced reciprocity, suffer the effects of the former." (Italics ours.)

Another provision of the Civil Code of Spain which attains the maximum extent and objective comprehension, including all things of all natural and juridical persons, without any limitation whatsoever, provided they are the object of commerce, is its Art. 1.936, which also, from its origin, provides:

"Art. 1.936. *All things* which are the object of commerce are capable of prescription." (Italics ours.)

Manresa, referring to the application of this Art. 1.936, which is another provision extending the effects of the set of provisions on prescription, of remedial nature and of practical utility for the welfare and the social order, states, at pp. 799, 800, and 801 of the same volume XII:

"We shall not pause to criticize nor to examine said theories, because now, after the modifications introduced by the Code to our ancient law concerning this matter, said work would be useless, since we rely, for these commentaries, on the positive law in force; but it is well to indicate that our ancient laws considerably limited the scope or extent of prescription as to things subject thereto, by establishing innumerable exceptions, either absolute or relative, since some things were not subject to prescription for any term whatsoever and others required a lapse of time longer than the ordinary in order that they could be acquired or lost by prescription.

"Thus, for example, Laws 6, 7, and 29 of Tit. XXIX of the Third Partida established that things sacred, jurisdiction, taxes, property for the general benefit of the community and some

others were not subject to prescription, but not all of those exceptions were absolute, but rather they referred to ordinary prescription; the maximum lapse of time constituting the special requirement in order that prescription could operate as to them, for which reason it was known by the name of extraordinary prescription. According to said system the property of minors prescribed after the lapse of thirty years, and that of cities and towns, and the immovables of the churches, after the lapse of forty years, and the movables of the latter after the lapse of three years, with the exception of property belonging to the Roman Church, which could only be lost by prescription after the lapse of one hundred years, and as to common property they could only be acquired after immemorial time.

"Today, all this state of law has disappeared by virtue of the extent given by the Code to the provision set forth in the article in force, according to which all things which are *the object of commerce* are capable of prescription.

. . . . . . . .

"It remains only to indicate, in order to determine perfectly the scope and extent of the provision set forth in said article, that even the property excluded from prescription by law, in consideration of particular conditions of the persons to whom the same belongs, no matter how privileged they are, can become eventually prescriptible, provided they are placed, by their intervention or for any other cause, within the conditions which render them the object of commerce.

. . . . . . . .

"We doubt that in the future there might arise any question or difficulty whatsoever as to this matter, in view of the preciseness and clearness of the terms in which the law has established the rule which serves as a test to elucidate which are the things which may be subject to or object of prescription, and, therefore, we do not further dwell upon this point, because we consider useless any other consideration with respect thereto." (Italics. ours.)

Article 1938 of the Code of Spain establishes an exception absolutely necessary, which, according to the same commentator, is grounded on the special reasons which in certain

cases a different system establishes for prescription. This article provides:

"Art. 1938. The provisions of this title shall be understood to be without prejudice to anything which may be established in *this code or in special laws* with respect to special cases of prescription." (Italics ours.)

In the same juridical sense—in order to operate in favor or against all persons and to comprise and embrace all things —we find the following, the first general provision of the Spanish Civil Code, concerning the matter of prescription which, on purpose, we cite last:

"Art. 1930. Ownership and other real rights may be acquired by prescription in the manner and under the conditions specified by law.

"Rights and actions, of any kind whatsoever, are also extinguished by prescription in the same manner."

In relation to this article, the judgment of the Supreme Court of Spain of January 31, 1902, states that prescription cannot be extended to different cases, neither to extend it nor to restrict it.

Manresa, who acted as a voter in the first and fourth sections of the General Commission for Codification, which prepared and drafted the Civil Code of Spain of 1889, states at p. 785 of Vol. XII of his work, that in "consideration of the significance of the matter object of this title [the Code] has given special attention to the expression of the provisions of the same, striving for the greatest clearness of its language and the fullest conformance of its provisions with the general principles of law. . . ."

In the Spanish Arts. 338–345, property of public ownership or property privately owned were and are still defined; they provided that the property of the royal patrimony "is governed by its special law." Articles 342 and 344 (today 256 ours), provided and still provides, that patrimonial property or property privately owned is governed "by the provisions of

this Code, unless otherwise provided by special laws." In Spain, the former Patrimony of the Crown was later on called "National Patrimony" and is governed by the Act of March 7, 1940 and the Regulations of 1942. Its property belongs to the State and § 5 of said Act provides that said properties "are not alienable or prescriptible, and are not subject to any real lien or any other liability whatsoever."

—D—

### Extension of the Civil Code of Spain of 1889 to Puerto Rico

The royal decree of July 31, 1889 extended to Puerto Rico the Civil Code of Spain then in force in the peninsula. It went into effect on January 1, 1890, according to statements in *Torres et al.* v. *Rubianes et al.*, 20 P.R.R. 316, 323 (1914).

With the amendments and additions which, in the opinion of the civil division of the General Commission for Codification were necessary and pertinent, the Civil Code of Spain of 1889 went into effect here as a new edition of the original code containing, with respect to the matter of prescription, the same text and the same numbers of the original articles.

Thus the aforecopied Arts. 1930, 1932, 1936, and 1938 of the Civil Code of Spain of 1889 which were put into effect here on January 1, 1890, appear in its slightly amended edition without any modification or alteration whatsoever.

Under the provisions of said Civil Code of Spain, extended to Puerto Rico, the respective property rights to the two small islands were acquired, recorded, and possessed by:

1st. The four brother and sisters García Becerril, by way of testate inheritance from Ignacio García, who died on March 7, 1890. Fifth entry at *ante*, p. 632.

2nd. Rita Rivera Alonso and those four brother and sisters, by way of testate inheritance from Juan Lavaggi, who died on February 4, 1901. Second entry.

3rd. Jorge Bird Arias, by purchase through *public deed dated October 5, 1901*, which was duly recorded in fee simple, in the Registry of Property of Humacao, in its sixth and seventh entries, both *dated October 11, 1901.*

Our former Civil Code of 1890 remained in full force and effect in our island until July 1, 1902. It governed without any interruption whatsoever, and as amended by the Military Government and the Congress of the United States (§ 8, Foraker Act, 1900) during eleven and a half years, that is, until by the Final Provision of the revised Civil Code of 1902, it was provided:

"The Civil Code and all other laws or bodies of law . ... are repealed and left without force or effect, both as laws directly binding, and as supplementary law."

However, the Temporary Provisions of the revised Civil Code of July 1, 1902, provided, in part:

"TEMPORARY PROVISIONS

"The changes introduced by the reforms made in the Civil Code, which prejudice rights vested according to the previous civil legislation shall not have retroactive effect. To apply the corresponding legislation in cases not expressly defined in the revised Code, the following rules shall be observed:

"1.—The rights originating under the legislation previous to the revised Code from acts which took place while it was in force shall be governed by the previous legislation even though the said Code regulates them in a different manner or does not recognize them. But if the rights shall appear and be declared for the first time in the revised Civil Code it shall have a prospective effect, even though the act which produces it shall take place under the previous legislation. Provided that it be not in conflict with or prejudicial to another right borne or acquired through the operation of the said previous legislation.

"2.—Acts and contracts entered into while the former legislation was in force and which are valid under it shall have all their effects according to the same, without limitation of any kind."

—E—

*The Military Government and the Federal Congress amended the former Civil Code and ordered that it shall continue in full force and effect*

(a)

Professor Muñoz Morales states, in his aforecited work *"Legislación Puertorriqueña,"* at p. 24, that when the Military Government was established in Puerto Rico on October 18, 1898, and Major General John R. Brooke assumed the command of the Department of Puerto Rico, the latter, *in compliance with the orders of the President of the United States,* entered General Order No. 1, which in paragraph IX, provided:

"IX. The provincial and municipal laws, in so far as they affect the settlement of the private rights of persons and property will be enforced unless they are incompatible with the changed conditions of Porto Rico, in which event they may be suspended by the department commander. They will be administered substantially as they were before the cession to the United States. (See general orders for the Department of Puerto Rico for 1898 O. N. I.) See VI *Boletín Histórico de Puerto Rico* 86."

And the professor continues:

"By virtue of said formal statement *the former laws and, among them, the Civil Code* which we are considering now, *continued in full force and effect in Puerto Rico,* and this text was subject to all the amendments decreed by subsequent general orders of the military government until January 1900." (Italics ours.)

Among those orders is Order No. 82, of April 4, 1899, entered on recommendation of the then Secretary of Justice, Herminio Díaz Navarro, the English text of which, amending Art. 1957 of the ancient Civil Code then in force, with retroactive effect, states:

"Office of the Secretary of Justice

"Judicial Order

"The major general, on recommendation of the Department of Justice, has been pleased to order as follows:

"1. Article 1957 of the Civil Code is amended to read as follows:

"Ownership and other property rights in real property shall prescribe by possession *for six years,* as to persons present and absent, with good faith and with a proper title.

.         .         .         .         .         .         .         .

"7. This order *shall have retroactive effect."* (Italics ours.)

Paragraphs 2, 3, 4, 5, and 6 of said order also amended Arts. 391, 393, and 394 of the Mortgage Law.

In the compilation of said orders made by the printing office of the federal government in 1909, at p. 2477, the following note was set forth:

"Compiler's Note. This order was formally approved by General Henry in both languages, the two versions being published in the Gazette. *The English version being an evident translation of the Spanish,* the latter was selected for this volume." (Italics ours.)

We copy this note by reason of what we affirmed at *ante,* p. 684, with respect to the fact that many times the bills were prepared in Spanish, although under the supervision of American officers.

We have interpreted and applied the amendment of Art. 1957 on different occasions. See *Teillard* v. *Teillard et al.,* 18 P.R.R. 546 (1912) ; *García* v. *De los Angeles,* 13 P.R.R. 74 (1907) ; *Cobián* v. *The Registrar of Property,* 11 P.R.R. 88 (1906) ; *Ex Parte Tapia,* 6 P.R.R. 246 (1904). We decided in *Teillard* that the amendment had been substituted by Art. 1858 of the revised Civil Code which reestablished the original term of 10 years as to persons present and 20 years as to absentees.

Likewise, but by Military Order No. 162 of 1899, Art. 688 of the ancient Civil Code was amended, dispensing with the requirement of the stamped paper in the execution of a holographic will.

(b)

On April 12, 1900 the Congress of the United States approved the Foraker Act to provide a civil government for Puerto Rico. That first organic act provided in § 8:

"Section 8.—That the laws and ordinances of Puerto Rico now in force shall continue in full force and effect, except as altered, amended, or modified hereinafter, or as altered or modified by military orders and decrees in force when this Act shall take effect, and so far as the same are not inconsistent or in conflict with the statutory laws of the United States not locally inapplicable, or the provisions hereof, until altered, amended, or repealed by the legislative authority hereinafter provided for Puerto Rico or by Act of Congress of the United States; *Provided,* That so much of the law which was in force at the time of cession, April eleventh, eighteen hundred and ninety-nine, forbidding the marriage of priests, ministers, or followers of any faith because of vows they may have taken, being paragraph four, article eighty-three, chapter three, Civil Code, and which was continued by the order of the Secretary of Justice of Puerto Rico, dated March seventeenth, eighteen hundred and ninety-nine, and promulgated by Major General Guy V. Henry, United States Volunteers, is hereby repealed and annulled, and all persons lawfully married in Puerto Rico shall have all the rights and remedies conferred by law upon parties to either civil or religious marriages; *And provided further,* That paragraph one, article one hundred and five, section four, divorce, Civil Code, and paragraph two, section nineteen, of the order of the Minister of Justice of Puerto Rico, dated March seventeenth, eighteen hundred and ninety-nine, and promulgated by Major General Guy V. Henry, United States Volunteers, be, and the same hereby are, so amended as to read: 'Adultery on the part of either the husband or the wife.' "

*In general terms, the continuation* of the laws then in force in Puerto Rico was authorized with the alterations or

modifications made by that Organic Act of 1900, or as altered or modified *by military orders* and decrees then in force, and insofar as the same are not inconsistent or in conflict *with the statutory laws of the United States* or the provisions of said Organic Act not locally inapplicable.

In specific terms, §§ 83(4) and 105(1) of the former Civil Code, then in force, were amended by the *Congress of the United States*—bear this clearly in mind when we refer to the case of *People* v. *Dimas et al.*—by said § 8.

*It is Congress,* and no legislative body of Puerto Rico whatsoever, which *orders that our fundamental substantive laws shall continue in full force and effect,* among them the Civil Code of Spain, extended to Puerto Rico in the year 1899, which contains, within its articles, the institute of prescription *which governs the common and private property of the State* and of its towns and municipalities. On that occasion the Congress of the United States exercised the power vested by Art. IV, § 3, of the Constitution of the United States, as follows:

"The Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States. . . ."

But Congress does not only order, in general and specific terms, that the Civil Code shall continue in full force and effect in Puerto Rico, but also, it goes further in that Organic Act of 1900. By its § 40 it creates a commission to compile and *"revise the laws of Puerto Rico; also the various codes . . .* and to frame and report such legislation as may be necessary to make a simple, harmonious and economical government, establish justice, . . ." (italics ours) with the following specific mission:

"And said commission shall make full and final report, *in both the English and Spanish languages,* of all its revisions, compilations and recommendations, with explanatory notes as to the changes and the reasons therefor. . . ." (Italics ours.)

After it is provided in that § 8 of the Foraker Act that the laws of Puerto Rico shall continue in full force and effect, provided they are not in conflict with said organic act and so far as the same are not inconsistent or in conflict *with the statutory laws of the United States*, not locally inapplicable, it indicates the only sources or bodies with exclusive authority or power to amend, alter, revoke or repeal all or part of that legislation approved for Puerto Rico during the Spanish Sovereignty, that is to say:

". . . *the legislative authority hereinafter provided for Puerto Rico, or by Act of Congress of the United States.*" (Italics ours.)

The codes and laws, which continued to govern our destiny as a people and our public and private conflicts, could not and still cannot be altered, modified or repealed by mere rules of common law, by the so-called logic, nor by the common sense which are now invoked, seeking to discard nothing less than the institution of prescription, insofar as it affects the common and private property of the State. Not until it is rationally shown, not by capricious wittiness or subtleties, that all or part of the provisions on prescription in our Civil Code *"are inconsistent or in conflict with the statutory laws of the United States"* not locally inapplicable, we are bound to respect truly, consciously, and reliably, that juridical institution which promotes, preserves, protects, assures, and guarantees the public and private peace, the common patrimony of the State itself, the private property of its citizens as well, and all other things which are the object of commerce.

In view of the juridical development which our body of positive and private law has attained, it would not be possible for us to transform ourselves into a third Legislative House to make a complete change in our fundamental substantive law, or to change our fair and humane system of statutory

law, the provisions in our Code on prescription of the property of the State, for other rules; to change a system of prescriptive equality for one of displeasing immunities, privileges, inequalities, discrimination, prerogatives, and monopoly in favor of the State.

As Scaevola says, our Code *"adheres to an antiprivilege view"* and proclaims prescription against all kinds of persons, whatever their condition or status of physical or juridical nature. If pursuant to § 7 of the Political Code the State may acquire property by prescription, why, in view of the Law, cannot it "in forced reciprocity" (expression of that well-known commentator) be subject to the adverse effects of that same prescription?

Considering that the historic and traditional substantive or adjective immunity enjoyed by the minors, the mentally incapacitated or insane persons, the persons in prison, the married women, the property stolen and the property of the church, of the pious foundations, and even the municipalities of Puerto Rico has completely disappeared from our legislation a long time ago according to reiterated decisions of this Court, in case of prescription of actions to recover real property, *and, if with the exception of waste lands, there does not exist in Puerto Rico any law, statute or legal provision at all, which directly, or even indirectly, provides that the common or private property of the State cannot be usucapted, and* on the contrary, there are clear and precise legal provisions, like §§ 21, 256, 1830, 1832, 1836, and 1859 (and those *special laws on prescription against the State* which we shall mention further on), we do not conceive any solid, rational, lawful ground of moral, social, or legal nature, to revive the abominable privilege of prescriptive immunity which was enjoyed, in the course of history, by the property of the King, the Prince, the Emperor, the Church, and the feudal nobility.

(c)

*The Law Commission of 1901 Authorized Prescription*
*Against the State*

Despite the fact that the Law Commission created by Congress was composed of a majority of North American commissioners, the same recommended the approval of a proposed Civil Code prepared by Commissioner Hernández López. A joint committee of the House and the Executive Council rendered a report recommending numerous amendments to said proposed code. Said bodies having approved the same, together with the proposed Political Code, Penal Code, and Code of Criminal Procedure, on March 1 ,1902 those four codes were definitively approved.

Muñoz Morales, at p. 213 of his aforecited work, expresses his praise on the proposed Political Code, *originally drafted in both the Spanish and the English languages by mandate of Congress:*

". . . which proposed code, although adapted in its general form to the Political Code of California, *is not a faithful copy of the latter, and it conforms in detail to our insular legislation in the parts which were not necessarily modified by the change of regime.* And we can fairly say that said proposed code *was the best* and most conscientious piece of work presented by said Commission. . . ." (Italics ours.)

In its report the Commission stated, in part, that "the purpose of Congress was to bring the institutions of the island into closer harmony with the American system, but to do this without any sudden changes" and that it must be borne in mind that "the basis of the Spanish codes is the civil or Roman law," and that the latter could be considered also as the parent of common law; that "the legal system of the United States is quite *consistent with the preservation of institutions which have stood the test of time and experience*

*in some of the most advanced countries of Europe and South America."* (Italics ours.)

The Commission also states, in part of said report to Congress:

"The commission *was not appointed to sweep away the legal system of the island, but rather to preserve those native institutions which have given evidence of vigor and growth,* and to adapt them to the fundamental principles of American law." (Italics ours.)

But, as it will be seen, with respect to prescription what it did was a perfect task of textual conservation or subsistence of the articles on the matter in the Spanish Civil Code which governed here since January 1, 1890, with the only limitation or exception of objective scope, of making usucapio inapplicable, exclusively and solely, as to "insular waste lands" and as to "land within the limit of any insular highway," by virtue of §§ 9 and 405 of the Political Code. We have fully shown already that the sentence as to "insular waste lands" (*terrenos baldíos insulares*) is not a copy or adaptation of any continental statute whatsoever.

Furthermore, in its often cited report, the Law Commission of 1901 states, at p. 25 of the aforecited volume I, Parts I, II, and III of its commentaries on the proposed revision.

"Again, the civil and commercial codes of Porto Rico have been worked out with great care by a series of Spanish law commissions, and constitute a more advanced system of law than exists in any of the South American countries. The period of liberalism which prevailed in Spain after the revolution of 1869 witnessed a profound transformation in the system of law. A large body of jurists, who had received their training in foreign countries, mainly in Germany and France, began the revision of the antiquated system, based on the 'Siete Partidas,' the *Nueva* and *Novísima Recopilación* and the other earlier codes. A series of compilations, of which the civil and commercial codes and the mortgage law are the most important, gave a new basis to the

legal system of the mother country. Both Cuba and Porto Rico received the benefit of these changes, and *we thus find a system of civil law which in some respects may be considered superior to the other Latin codes."* (Italics ours.)

Contemplating those principles, the Law Commission of 1901 did not propose any fundamental alteration whatsoever to the institute of prescription already in the code, and even less the granting of prescriptive immunity to the State. It only proposed the creation of prescriptive exceptions as to insular waste lands by § 9 and to land within the limit of any insular highway by § 405 of the Political Code.

The following sections, taken verbatim from the former Civil Code of 1890, were included in the revised proposed Civil Code, approved by the Legislature of 1902 (one of its bodies having a majority of North American lawmakers):

"Section 328.—The property of public use in Porto Rico and the towns thereof comprises the insular and local roads, the squares, streets, fountains and public waters, walks, and public works for general use paid for by the said towns or from the Treasury of Porto Rico.

"All other property, possessed by either the People of Porto Rico or the municipalities thereof, is common property for the use of the general and municipal governments *(bienes patrimoniales)* and shall be governed by the provisions of this Code."

"Section 329.—Besides the common property for the use of the governments of the United States, of the People of Porto Rico and the municipalities thereof *(bienes patrimoniales)*, the property belonging to private parties, either individually or collectively, is of private ownership."

"Section 1831.—Ownership and other property rights are acquired by prescription in the manner and under the conditions specified by law.

"Rights and actions, of any kind whatsoever, also are extinguished by prescription in the same manner."

"Section 1833.—Rights and action shall extinguish by prescription to the prejudice of all kinds of persons, including judicial persons, in the terms prescribed by law."

"Section 1837.—All things which are the object of commerce are capable of prescription."

"Section 1839.—The provisions of this Title shall be understood without prejudice to what may be established in this Code or in special laws with regard to specified cases of prescription."

"Section 1858.—Ownership and other property rights in real property shall prescribe by possession for ten years as to persons present, and for twenty years with regard to those absent, with good faith and with a proper title."

"Section 1860.—Ownership and other property rights in real property shall also prescribe by uninterrupted possession of the same for thirty years without the necessity of title nor good faith and without distinction between present and absent persons, with the exception mentioned in Section 546 of the second article, Chapter I, Title VII of the Second Book of this Code."

"Section 1862.—Actions are prescribed by the mere lapse of time specified by law."

"Section 1864.—Real actions with regard to real property prescribe after thirty years.

"This provision is understood without prejudice to the prescriptions relating to the acquisition of ownership or of property rights by prescription."

From the former § 1932, the Commission eliminated the second paragraph which provided certain exception or reservation in favor of persons incapacitated to manage their property, of their right of action against their legal representatives if their negligence had been the cause of prescription.

We have copied the text of those sections in order that they may be in hand and taken into consideration as part of the positive or statutory law of Puerto Rico on prescription, in force when the change of sovereignty occurred and when the aforecited case of *People* v. *Dimas et al.* was decided in the year 1912, whose analysis we have left, on purpose, for the last.

—F—

*Analysis and Application [sic] of § 9. of the Political Code*

(a)

*Analysis*

In its last sentence § 9 of the Political Code provides:

"Title to Commonwealth lands shall not be acquired by adverse possession."*

The Civil and Political Codes were approved on the same date, March 1, 1902. Both of them went into effect on the next July 1st. The second one, after the change of sovereignty, contemplated the need of a reorganization *of the public administrative system* consistent with the American views and ideals.

Since said sentence of § 9 refers to the intrusion upon *waste lands* and specifies the persons who must take and execute "such proceedings as may be necessary to remove the intruder," we affirmed at *ante*, p. 657 of the proposed opinion circulated:

"Undoubtedly, such prohibition [that title to *waste lands* shall not be acquired by adverse possession] was established in said section to preclude the intruders on *waste lands* from alleging prescription as defense. In reducing *its objective ambit to waste lands,* such restricted prohibition could never be understood as one of general application to the [other] common property (bienes patrimoniales) of the State." (Italics ours.)

Said statutory provision being objectively restricted in its application, effects, and juridical consequences, solely and exclusively to a kind or type of common land owned by the State, implicitly, or a *contrario sensu,* it established that title

---

*EDITOR'S NOTE: The Spanish text reads as follows:

"*No podrá adquirirse títulos a 'terrenos baldíos' estaduales por posesión adversa, o contraria al título de otra u otras personas.*"

to all other common property owned by the State could be acquired by adverse possession.

Such prohibition is only applicable, according to the clear and precise terms in which it was conceived, to insular waste lands, now Commonwealth lands. The small islands claimed herein by the State ceased to be waste lands since a century ago. They had ceased to be waste lands for over thirty years, when § 9 of the Political Code went into effect. Such § 9 is a special provision, being operative exclusively with respect to waste lands. As a prohibitory provision constituting an exception to the general rule that all things which are the object of commerce are capable of prescription—§ 1836—which governs with respect to the common property of the State—§ 256—it should not be applied to cases not clearly comprised within its provisions, nor should it be extended by construction, nor beyond its clear provisions. *Dávila* v. *Torres*, 58 P.R.R. 880 (1941); *Barros* v. *Padial*, 35 P.R.R. 237 (1926); *Fuentes* v. *District Court*, 73 P.R.R. 893, 910 (1952). Section 26 of the Law of Evidence provides that in the construction of a statute or instrument, the office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, *not to insert what has been omitted, or to omit what has been inserted;* and where there are several provisions or particulars, *such a construction is, if possible, to be adopted as will give effect to all. People* v. *Abréu*, 67 P.R.R. 832 (1947); *The People* v. *González et al.*, 20 P.R.R. 553 (1914); *Matson* v. *Goico*, 18 P.R.R. 678 (1912).

A long time ago we said that it is a general principle of interpretation that two legislative provisions, one of a general and the other of a specific character, may subsist at the same time, although they may appear to be contradictory and although they may be parts of the same *or of different laws* notwithstanding the date of their approval, it being understood that provisions of a specific character qualify and constitute exceptions to the provisions of a general character.

*Coll* v. *Leake, District Judge,* 17 P.R.R. 823 (1911) ; *Wood* v. *Tax Court,* 71 P.R.R. 216 (1950).

As we have said, we are dealing here with provisions corresponding to different codes, *but approved and put* into effect jointly. One of them, the Civil Code, which is the general law, in its § 1838, provides:

"The provisions of this part shall be understood without prejudice to what may be established in this title *or in special laws* [in this case the last sentence of § 9 of the Political Code] with regard to specified cases of prescription" in this case the imprescriptibility of the waste lands of the Commonwealth of Puerto Rico. (Italics ours.)

The prohibitory provision of § 9 of the Political Code, as we have said, in restricting the nonacquisition by adverse possession, submits or subjects to the juridic scope of acquisitive or extinctive prescription, all the other *common property* of the State, other than the waste lands such as:

Cultivated or cultivable lands, those devoted to agricultural, industrial, residential, commercial purposes; those exploited for all kinds of businesses and activities; all real property other than land, such as buildings or installations; all personal or movable property; property acquired for the recovery or payment of taxes, in condemnation proceedings and escheat, in short, anything which, pursuant to § 256 of the Civil Code, may be classified as common property and is the object of commerce.

The prescriptive prohibition is not extended either by said last sentence to the property rights. The day, not remote, when the expansive force of population, commerce, and industry of our people shall have practically wiped out the scarce waste lands which the State still retains, of course, by the proper and lawful means established by law, said last sentence will be dead letter.

## (b)

### *Its inapplicability to the instant case*

The special and limited prohibition of acquisition by adverse possession of § 9 is a substantive provision of law. It creates, defines and regulates rights in favor of the State, granting it a privilege and a very special immunity against usucapion. It declares imprescriptible only its waste lands. It is not a question, not even remotely, of an adjective or procedural rule.

The *Political Code* itself, *in its* § *384* provides, and has always provided:

"Section 384. No part of it [of this Code] is retroactive, unless expressly so declared."

Our Civil Code, in its § 3, also provides:

"Section 3. Laws shall not have a retroactive effect unless they expressly so decree.

"In no case shall the retroactive effect of a law operate to the prejudice of rights acquired under previous legislative action."

We have seen—*ante*, p. 710—that in its Temporary Provisions our Civil Code (which is our general or common law), provides the following:

"The changes introduced by the reforms made in the Civil Code, which prejudice rights vested according to the previous civil legislation *shall not have retroactive effect.*" (Italics ours.)

We have already decided that nonretroactivity is an ordinary, well-recognized cardinal principle of statutory construction. *Rodríguez* v. *Miller*, 23 P.R.R. 551 (1916); *Báiz* v. *Racing Commission*, 63 P.R.R. 463 (1944).

Well, § 9 of the Political Code went into effect on July 1, 1902. Assuming that, actually and really, "insular waste lands" were involved, Jorge Bird Arias acquired the small islands by purchase on October 5, 1901, that is to say, about 8 months before the Political Code, with its § 9, as well as

the Civil Code, went into effect and were approved, and almost *one year prior to the approval of both of them.* His predecessors in title had possessed such small islands as owners, without interruption, cultivating them and devoting them to industrial purposes—a lime factory—since February 12, 1872, with lawful and just *título de amparo,* deed of sale, and title by descent. When, on February 12, 1902, 30 years of such possession had elapsed, §.9 *of the Political. Code with its last sentence had not been approved, and even less, put into effect.*

. The ordinary prescription of Art. 1957 of the old Civil Code, as amended by the judicial order of April 4, 1899 aforecopied, reducing the *term of prescription to 6 years* and the extraordinary prescription of 30 years established by Art. 1959 of the same old Civil Code, were then in force. Under the authority of both prescriptions, Bird Arias had also acquired right of ownership over both small islands, *a long time before both codes went into effect.*

In such case, even if § 9 had been expressly given retroactive effect, it could not affect the right of ownership in fee simple which he had already acquired under the authority of prior legislation, based not only on said prescription, but also on the force and juridical efficacy of the obligations set forth and contracted in a deed of sale and on the effects of titles by descent.

Moreover, the aforecited Arts. 1957 and 1959 continued in full force and effect concerning the prescriptive possession exercised by Bird Arias after July 1, 1902, by virtue of § 1839 of the Civil Code in force, which states:

"Prescriptions, which began to run before the publication of this Code [that of Bird and his predecessors in title], *shall be governed by the prior laws;* but if, after this Code became operative, all the time required in the same for prescription has elapsed, it shall be effectual, even if according to said prior laws a longer period of time may be required." (Italics ours.)

Prescription is governed by the laws in force *at the time prescription begins to run*. This is a basic and fundamental principle on this matter. *Rivera* v. *Registrar*, 25 P.R.R. 456 (1917); *Subirana et al.* v. *Collazo et al.*, 14 P.R.R. 507 (1908); *Cobián* v. *Registrar of Property*, 11 P.R.R. 88 (1906). We shall not forget that the prescriptive possession by Jorge Bird Arias begins with the purchase of the small islands (by public deed in relation to Hicacos) executed on October 5, 1901—prior to the approval and effectiveness of the revised codes of 1902—continues with its record in the registry on October 11, 1901, and continues, without interruption, until his death on July 3, 1950, that is, *a little less than half a century*, paying land taxes as owner to the People of Puerto Rico itself, which lent money to its title holder secured by mortgage on the small islands and its buildings.

—G—

*Our Anti-privilege Legislation on Prescription*

In the formation and evolution of our Puerto Rican Law on the matter of usucapio, the anti-privilege view set forth by illustrious Spanish commentators, has undoubtedly prevailed.

1. Thus we see that in the old Civil Code of 1890, which governed here until July 1, 1902, in the sections copied in the preceding pages 694, 697, 699, the acquisition of common property and of private property of the State and of its municipalities by prescription was sanctioned.

2. The Mortgage Law of 1893 and its Regulations provided for the admission to record and registrational protection of the acts and contracts affecting property and property rights of the State, which, by reason of being common or private property, are the object of commerce and of the real-estate business, and may be acquired or conveyed in the manner or modes provided by law, Arts. 2 (6) of the Mort-

gage Law and 24 of its Regulations. However, record and protection is especially denied to property and property rights.

". . . pertaining solely to the eminent domain of the State, the use of which is public, such as the shores of the sea, islands, rivers and their banks; roads and highways of all kinds, excepting railroads; streets, plazas, public promenades and waste lands of towns, provided they are not lands used in common by the residents; walls of cities and garrisons, ports and roadsteads and any other similar property, while of common and general use, and reserving the servitudes established by the laws on the shores of the sea and the banks of navigable rivers." Article 25, Mortgage Regulations.

Pursuant to Art. 26 of the same Regulations, if the purpose for which said property is to be used, or any part thereof, "should be changed and it should become the private property of the State," it can be recorded in the manner prescribed by Arts. 42 and 49 of the same Regulations.

Obviously, our Mortgage Law subjects the real property of the State which is not alienable, which is not the object of commerce, and which, by reason that it cannot be susceptible to personal appropriation, is not subject to or affected by prescription to a negative registrational treatment. It is property in a static situation, which is not affected by the dynamic flow of the steady real-estate business. For that property the Registry of Property lacks meaning, since this institution cannot become a mere inventory of the property or property rights of the State. It subjects the common or private property to affirmative treatment when a citizen acquires it by the modes prescribed by law, including the prescription credited and declared at law.

3. The revised Civil Code of 1902, which *Congress ordered to be prepared,* published and put into effect, reproduces all the articles of the old Code of 1890, concerning prescription, which affect all the common property and property rights of

the State. No alteration is made to said institution in the 1911 and 1930 editions, with the exception of a simple change in the enumeration of the articles. It provides in its § 275 that prescription is a manner or mode of alienating property.

4. Our Political Code of 1902 establishes in its last sentence of its § 9 only one exception regarding acquisition by prescription against the State, limiting and restricting the objective scope of such exception to the "waste lands" exclusively. We have already said that, *a contrario sensu*, applying said exception and the other contained in its § 405, it can be affirmed that the Political Code, in agreement with the Civil Code, both approved and put into effect simultaneously, authorizes in the matter of prescription, the acquisition, by adverse possession, of titles to all common lands (*terrenos patrimoniales*) or private property of the State, other than: (1) insular waste lands, and (2) land within the limit of highways and public roads.

If § 8 of the Political Code empowers the Government of Puerto Rico to acquire property from any citizen by prescription, there exists a correlative juridical situation of fundamental justice, by which it should lose it in the same manner.

5. Our Code of Civil Procedure of 1904 enacted § 40 to protect the rights of minors, insane, convicts, and married women, in the exercise of their actions, other than actions for the recovery of real property against the effects of prescription, by providing that the time of their respective disabilities "is not part of the time limited for the commencement of the action."

It acknowledged to them free immunity, in general terms, against the limitation statutes. But, specifically, it deprived them of the historical immunity which they also enjoyed during their disability and with respect to actions for the recovery of real property. Section 352 of the Code of Civil Procedure of California, from which our § 40 was taken, did not exclude from said protection the actions for revendication.

Still such absolute protection is maintained there without any limitation whatsoever as to the type of action.

Said Code of Civil Procedure provides temporary immunity against prescription, subject to certain conditions, to absent persons—§ 39—to alien subjects or citizens of a country at war with the United States—§ 42—; in cases where the commencement of an action is stayed by statutory prohibition or injunction—§ 44. Sections 41 and 43 grant certain prescriptive privileges in favor of the heirs in cases where their predecessors may have died before or after the commencement of the action. Like in California, these other immunities are granted here in all actions.

The fact that said adjective code has not acknowledged general immunity against usucapio of the common and private property of the State, which is clearly established in the Civil Code, although The People of Puerto Rico has often been plaintiff or defendant in our courts in revendication actions, shows, once more, the predominance of the anti-privilege view and the harmonious relationship among the fundamental bodies of our Civil Law in the matter of prescription. Neither the Rules of Civil Procedure of 1943, nor those of 1958, contemplated the revival of the antiprescriptive privilege, vestige of the era of the divine rights.

6. Act No. 76 "To Authorize Suits Against the People of Puerto Rico" was approved on April 13, 1916. It went into effect on the following July 1.

We think that it was adopted to obviate the procedural inconveniences as a consequence of the decision of the Supreme Court of the United States rendered on February 24, 1913, in *Porto Rico* v. *Rosaly*, 227 U.S. 270, which reversed *Rosaly* v. *The People et al.*, 16 P.R.R. 481 (1910).

We had affirmed a judgment rendered by the then District Court of Ponce, sustaining a revendication action concerning real property, from which appeal was taken by The People of Puerto Rico, codefendant therein, and the only ground

alleged in support of the appeal was "that inasmuch as The People of Porto Rico cannot be sued without its consent, and it appears that such consent had not been given in the present case, the district court acted without jurisdiction; wherefore, the judgment rendered by it was null and void."

Appeal from our judgment was taken to the Federal Supreme Court and the latter reversed, deciding that the government of Puerto Rico established by the Foraker Act of 1900, enjoyed the privilege of immunity from suit without its consent, as the federal government, the States, and the incorporated territories, since such privilege was an attribute of the sovereign power, notwithstanding that § 7 of said Organic Act had created a body politic under the name of The People of Puerto Rico, with governmental powers and with power to sue and be sued as such.

Pursuant to said Act No. 76 of 1916, The People of Puerto Rico, under certain conditions, waived the privilege of immunity from suit without its specific consent, by authorizing the then District Courts of Puerto Rico to entertain suits against it in actions for damages based upon contracts entered into after July 1, 1916, and in actions to recover real or personal property, or an interest therein, arising after its approval.

Its § 9 provides, in part:

"Section 9.—All actions against The People of Porto Rico shall be prescribed, if suit is not begun within one year after the cause of action arises, except that actions referring to real property shall prescribe in two years."

The People of Puerto Rico did not raise any objection to being sued for the recovery of real property acquired by usucapio against the State. It established an extinctive prescription of two years for actions to recover real property, after, of course, the date when the cause of action arises, that is to say, after the time The People of Puerto Rico should commit any hostile, adverse act, or any act disturbing the

right to ownership of the title holder, as decided in *Ramos* v. *People*, 70 P.R.R. 588 (1949).

7. Act No. 104 of June 29, 1955, repealed Act No. 76 of 1916. In this statute of 1955 the scope of the waiver of the privilege of the State not to be sued without its consent was greatly extended to almost all possible actions against the State. Revendication actions against the State are authorized and its § 8 provided that *"the statute of limitation governing under the laws applicable"* shall prevail for the exercise of such actions. (Italics ours.)

This means that § 1863 of the Civil Code granted, for the exercise of "real actions with regard to real property . . . 30 years." So that, that limitation period of two years of Act No. 76 of 1916 to exercise revendication actions was extended to 30 years, to the prejudice of the State itself and for the benefit of the title holder.

This situation created by the Act of 1955, permits the citizen to acquire again at law, by the ordinary prescription of 10 years or by the extraordinary prescription of 30 years, against the State, during the long period granted to exercise the action to recover in case of furtive or violent conversion of his property. That has been authorized by the State itself, of course, for causes of action arising after June 29, 1954, pursuant to the amendment to § 8 of Act No. 104, made by Act No. 30 of June 11, 1957.

Those arising before shall be governed by the limitation period of 2 years. All those *ancient* actions *were extinguished, in our opinion,* on June 29, 1956, according to the same amendment.

Thus, the statute of limitation, as to the negative or extinctive prescription of revendication actions, was adopted by the State by Act No. 104 of 1955, as amended in 1957.

With respect to the acquisitive prescription of real property against the State, it was precisely and clearly regulated by the corresponding articles of the revised Civil Code, as it

was modified in its 1911 and 1930 editions. Such kind of prescription need not be reproduced in 1916 and 1955.

The Civil Judiciary Committee of the Senate of Puerto Rico, in reporting about the scope of House Bill No. 1145, which became Act No. 104 of 1955, stated the following:

### "Scope of the Project

"Adhering to the federal pattern, this bill proposes to authorize suits against the Commonwealth of Puerto Rico, without the previous legislative authorization, in actions for damages, actions to recover real and personal property in which the amount claimed does not exceed $15,000. The bill also amends Art. 1803 of the Civil Code, in the sense that action may be brought against the government, even though the tort-feasor may have not acted as special agent of the State.

"The Committee believes that legislation of this nature is highly necessary and desirable in Puerto Rico, since the old view that the State could not be sued without its previous consent is being discarded. The intention has not been to grant unlimited authorization to sue the People of Puerto Rico, and said authorization has been limited to claims not exceeding $15,000."

In its report to the House, the Committee stated, in part:

"The Committee has studied this bill with great care, since it is a legislative measure of great significance for the citizenry and the State. The Committee heard the Secretary of Justice, the Comptroller, and a representative of the Secretary of the Treasury. *The measure contemplates the desire that the State may be sued whenever any citizen understands that he has a good and just cause of action and that the judicial power be the one to determine the validity and sufficiencies brought against the State.*" (Italics ours.)

So that, all the aforementioned former legislation effectively gives or tends to give equal treatment under the substantive law to the citizen against the State, as well as to the State against the citizen.

The system of privileges, immunities, and prerogatives of the State against the citizen, which supports it with the

product of his work and sacrifices, must be already understood as completely and absolutely discarded. The strangulation of the rights of private property by the juridical entelechy, which the State itself has created, should no longer be permitted.

8. The State, insofar as its common property is concerned, as well as the citizen with regard to his private property, should receive equal treatment under the substantive law when they are, or can be, active or passive subjects in the field of commerce, transactions, acts, and contracts executed for lucrative purposes. When it acts in said level, the State is not called "sovereign," it ceases to govern, it does not exercise supreme political powers anymore. Its common property is its private property and, when it is not devoted to the use of the public, the State can sell it, lease it, give it in use or usufruct, or submit it to the acts or contracts which it deems proper, subject, of course, to the modes, limitations, and restrictions provided by law. The so-called "original and ultimate right to all property, real and personal, within the limits of Puerto Rico" is nothing but a preferred right to acquire—not to appropriate or condemn—private property, "upon payment of just compensation which shall be fixed in the manner provided by law."

Under Art. II, § 7 of our Constitution, the right to the enjoyment of property—as well as the right to life and liberty —is recognized as a fundamental right of man, *and no person in Puerto Rico shall be denied the equal protection of the laws.*

Section 22 of our Civil Code provides:

"Civil laws *are equally applied to all without distinction of person* or sex, except in the cases otherwise specially provided in the law." (Italics ours.)

There is no juridical basis to establish a deliberate discrimination against the citizenry and in favor of the State, in

identical situation, in the matter of usucapio, in view of §§ 256 and 1832 of the Civil Code which (we repeat again) state:

"Section 256.—.    .    .    .    .    .    .    .

"All other property, possessed by either the Commonwealth of Puerto Rico or the municipalities thereof, is common property for the use of the general and municipal governments (*bienes patrimoniales*), *and shall be governed by the provisions of this Code.*"

"Section 1832.—Rights and actions shall extinguish by prescription *to the prejudice of all kinds of persons, including judicial persons,* in the terms prescribed by law." (Italics ours.)

Why can the State acquire my property by prescription and I cannot acquire, also by prescription, *its common property,* not comprised in the term "waste lands" or lands within the limit of highways?

The unusual thing in this case is that, as we have already said, neither The People of Puerto Rico, nor the Commonwealth, have lost anything by prescription. When § 9 of the Political Code went into effect, the former did not have any title whatsoever to the small islands. They had ceased to belong to the Spanish Crown since a long time prior to the sinking of the Maine.

—H—

*Prescription Against the State in American Jurisprudence*

We shall say something with respect to American jurisprudence on this matter.

(a)

Let us start with the federal jurisdictions, that is, with the acquisition of real property of the government of the United States by adverse possession or prescription. Since the different states lack power to adopt rules of prescription

against the real property of the federal government and to regulate the acquisition of federal property by that mode, it has been accepted that prescription does not run against property of the federal government during the time the latter holds title thereto.

But this rule has a clear exception. It refers to the property and property rights of the United States, situated in Puerto Rico, *where they have consented to be bound by the local statute of limitation.*

In the annotation of the case of *Goldman* v. *Quadrato*, 142 Conn. 398, 114 A.2d 687, 55 A.L.R.2d 549—cited at *ante*, p. 667 of our opinion—the following is stated at p. 563 of volume 55 A.L.R.2d:

"II. United States
"A. Acquisition of title against, generally
"§ 3. Public lands of United States, generally.
"Since the United States is not subject to the jurisdiction of a state, the state is without power to prescribe the time within which the United States shall assert its rights in order to preserve them, and it must be regarded as settled that state statutes of limitation do not apply to the federal government; consequently, no title to public lands of the United States can be acquired by adverse possession or prescription during the time the United States holds title thereto, unless, of course, as is sometimes the case,[2] (Where the United States, upon the cession of Puerto Rico to it by Spain, continued all laws in force, for a time, which had theretofore been in force in Puerto Rico, including a section of the Spanish Civil Code providing for acquisition of prescriptive title to land by possession for 10 years, the United States sanctioned acquisition of a prescriptive title against it during such period. Porto Rico v. Fortuna Estates (1922, CA1st Puerto Rico) 279 F. 500, cert den 259 US 587, 66 L ed 1077, 42 S Ct 590.) the United States consents to be bound by a limitation statute."

That is the main reason why we have been insisting and emphasizing the role *or fundamental participation played by the United States, through its President, its Military Govern-*

*ment, its Congress, its Law Commission, and its Executive Council,* for the continuation in full force and effect in Puerto Rico, of the fundamental substantive laws existing at the time of the change of sovereignty, including the Spanish Civil Code of 1889, the Mortgage Law of 1893 and its Regulations. That was a juridical consequence of the amendment to the Civil Code in 1899 in the matter of prescription—art. 1957— and of those made by Congress itself to the same Code by the Organic Act of 1900, and of its intervention in the preparation and approval of the Revised Codes of 1902, which left in full force and effect the Spanish institute of prescription, of anti-privilege view.

Pursuant to § 31 of the Foraker Act and § 34 of the Jones Act, all laws enacted by the Legislature of Puerto Rico would be reported to the Congress of the United States which thereby reserves the power and authority to annul the same.

In the aforementioned case of *People of Porto Rico* v. *Fortuna Estates,* 279 Fed. Rep. 500 (1st Cir. 1922), *The People of Porto Rico* brought a revendication action against Fortuna Estates. This corporation alleged that it had acquired the property object of the litigation under a just title and with good faith and that said title was consolidated by the ordinary prescription of ten years, established in § 1957 of the old Code, years which elapsed from July 31, 1889 to July 31, 1899.

"But the plaintiff contends that [the decision states at p. 508], inasmuch as the United States acquired its title by the treaty with Spain, proclaimed April 11, 1899, the prescriptive period was interrupted before the 10 years had elapsed, *as prescription will not run* against the United States. The defendants' answer to this is that the prescriptive period did not cease to run upon the cession by Spain to the United States; that, while Porto Rico was, by order of the President, under military control and occupation, a general order was issued November 4, 1898, continuing all laws in Porto Rico theretofore in force compatible with the military government; that by section 8 of the Foraker Act of

1900 (Com. St. § 3755), the laws and ordinances of Porto Rico were further continued in force; and that, as section 1957 was continued in force and unmodified until the Political Code of Porto Rico was adopted March 1, 1902 (section 9), the period of prescription was not broken and the defendants' title became good at the expiration of 10 years from July 31, 1889; that the United States, by continuing section 1957 in force, sanctioned the acquisition of a prescriptive title against it.

"The court below instructed the jury upon this question in accordance with the defendants' contention, and we fail to see wherein the instruction was not correct. We do not think that Crespin v. United States, 168 U.S. 208, 18 Sup. Ct. 53, 42 L. Ed. 438, and Hayes v. United States, 170 U.S. 637, 18 Sup. Ct. 735, 42 L. Ed. 1174, cited by plaintiff, are applicable, as in those cases the court, in reaching its conclusion, was limited by the language of the act creating the Court of Private Land Claims, while here we have the adoption of the provision of the Spanish Code continuing the right of prescription." (Italics ours.)

The judgment dismissing the complaint was affirmed. We see how the Circuit Court found correct the instruction to the federal jury in the sense that "the United States, by continuing section 1957 in force, *sanctioned the acquisition of a prescriptive title against it.*" (Italics ours.)

Furthermore, that court said: ". . . *here we have the adoption of the provision of the Spanish Code continuing the right of prescription.*" (Italics ours.)

In *Baldrich* v. *Barbour*, 90 F.2d 867 (1937), the situation was contrariwise. The United States alleged having acquired by prescription the lands known as "Luquillo Forest Reserve," which plaintiffs claimed. This allegation prospered, and, among other things, the opinion states at p. 871:

"In any event, it being admitted that the defendant has been in possession of the property described in the complaint for more than twenty years, we think that, under section 1858 of the Civil Code, the plaintiffs' rights in the land described in the complaint have been prescribed by the possession of the defendant for more than ten years."

If in Puerto Rico the usucapio established by our Civil Codes of 1889, 1902, 1911, and 1930, runs against or in favor of the United States—the sovereign of our sovereign—we cannot conceive any good reason to hold that it does not run against a political creation of the Federal Congress itself, the People of Puerto Rico, and its successor, the Commonwealth of Puerto Rico, whose codes established prescription since the year 1889. The People of Puerto Rico itself, governed by a system of statutory civil law, which has nothing to borrow from the Anglo-American law in the matter of prescription, is the first one which cannot act against its own statutory laws, which have created a firm state of substantive law which it should honor, and respect its juridical efficacy.

### (b)

We shall comment now, in particular, some of the case law of different states holding that therein prescription does not run against the State. Let us commence with the courts of Louisiana, cases of Slattery (*1902*); Bright (*1905*), and City of New Orleans (*1914*). It may be accepted that they hold that, in Louisiana, the property of the State, of whatever class or nature, cannot be acquired by adverse possession.

But the reason for said state of law is grounded on the fact that *the Constitutions* of 1898, 1913, and 1921, of the State of Louisiana, have expressly and definitely provided, in their General Provisions, §§ 193 and 19(16), the following:

*"Prescription shall not run against the State in any civil matter, unless otherwise provided in this Constitution, or expressly by law."* (Italics ours.)

In the cases repeatedly cited, reference is made to said constitutional prohibition.

In view of said constitutional provision the courts of that State, as of May 12, 1898, have been precluded from deciding that in Louisiana prescription runs against the State.

But what is very significant is the following: The Constitution of Louisiana of May 12, 1898, is its seventh constitution. Nine constitutions have been approved as of today, in the years 1812, 1845, 1852, 1864, 1868, 1879, 1898, 1913, and 1921. The first six did not contain said provision. The Law Commission of 1900, created by Congress, took from the revised Civil Code of Louisiana of 1870 *nothing less than 118 articles* and included them in our revised Civil Code of 1902. However, *it did not adopt the constitutional prohibition against prescription of the property of the State* which, a short time before, Louisiana had approved in its Constitution of May 12, 1898, and limited itself to adopt, in § 9 of the Political Code, a restricted prescriptive prohibition concerning waste lands, and nothing else.

But said Law Commission of 1901 did adopt and reproduce textually, in our Civil Code, the complete institute of prescription in force herein from January 1, 1890 to July 1, 1902, which, in clear terms, authorizes usucapio against the State.

Notwithstanding said categorical constitutional provision in Louisiana, its courts have held that prescription runs against the municipal corporations and the government boards. See: *New Orleans* v. *Salmen Brick*, 135 La. 828, 66 So. 237, and *Board of Comm.* v. *Toyo Kisen Kaisha*, 163 La. 865.

The Civil Code of Louisiana has 98 articles—3457 to 3555 —on the matter of prescription, but it contains nothing similar to our §§ 256 and 1832. The constitutional provision copied above is due, no doubt, to the endeavors and influence of Governor Claiborne to place Louisiana under the authority of the Common Law, such as this system of English law was applied in the other States.

*Harris* v. *O'Connor*, 185 S.W.2d 993 (1944) is a case decided by the Supreme Court of Texas, which favored the acquisition of lands under the old Mexican laws. The lands

were possessed under Mexican grants of the time prior to the Republic of Texas, and the officers and agents of the State of Texas thus acknowledged it. By merely reading the opinion it can be concluded that by virtue of Art. 5517 of the Revised Statutes of the State of Texas—Vol. 16 at p. 609, 1958 ed., Vernon Law Book Co.—it is provided, with regard to acquisition of property of the State, Counties, Cities, and School Districts, as follows:

"Art. 5517. [5683] [3351] Right of the state, counties, cities and
    school districts

"The right of the State, all counties, incorporated cities and all school districts shall not be barred by any of the provisions of this Title, nor shall any person ever acquire, by occupancy or adverse possession, any right or title to any part or portion of any road, street, alley, sidewalk, or grounds which belong to any town, city, or county, or which have been donated or dedicated for public use to any such town, city, or county by the owner thereof, or which have been laid out or dedicated in any manner to public use in any town, city, or county in this State. Acts 1841, p. 163; P.D. 4622–4; Acts 1887, p. 28; G.L. vol. 9, p. 826; Acts 1939, 46th Leg., p. 485, § 1; Acts 1953, 53rd Leg., p. 857, ch. 348, § 1."

Several states like Alabama, Kentucky, Missouri, New York, South Carolina, and West Virginia, have enacted limitation statutes for the recovery, by the State, of lands possessed by particular persons, and not being used for specific public purposes. We can say that in the other States the same legislative and jurisprudential policy is appearing.

The rights of servitude against lands of the State may be acquired by adverse possession, in California, Montana, Utah.

At p. 598 of said Annotation, it is stated:

"§ 29. View that property must be reserved for or dedicated to
   public use.

"In California the view has been taken that if land held by the state is neither reserved for, nor dedicated to some public use, title as to such land may be wrested from the state by ad-

verse possession. Richert v. San Diego (1930) 109 Cal. App. 548, 293 P. 673; Fresno Irrig. Dist. v. Smith (1943) 58 Cal. App.2d 48, 136 P.2d 382; Ortiz v. Pacific States Properties (1950) 96 Cal. App.2d 34, 215 P.2d 514.

"Thus, in Ortiz v. Pacific States Properties (1950) 96 Cal. App.2d 34, 215 P.2d 514, it was held that property sold to the state for nonpayment of taxes could be acquired by adverse possession, where it was neither reserved for nor dedicated to any public use and could be alienated."

In 1960, the State of New York adopted the preceding rule in Gottfried v. State, 201 N.Y.S.2d 649.

In 1964, the State of Oklahoma, in Sears v. Fair, 397 P.2d 134, also adopted the rule that where private rights of the State are involved, the statute of limitation is operative against it.

In 1967, Hawaii, where the rule that prescription does not run against the State governs, makes a distinction between mere trespassers squatting on lands belonging to the State and those not considered trespassers, who are possessors under some kind of title. The latter may acquire by adverse possession. In re Real Property, etc., 425 P.2d 83.

As it is stated in City of Bisbee v. Cochise County, 52 Ariz. 1, 78 P.2d 982, 984, the maxim "Nullum tempus ocurrit regi,"—time does not run against the king—referred to the latter, exclusively in his official capacity as representative or personification of the absolute sovereignty of the nation, and not to the King as an individual.

Even in England, under the Nullum Tempus Act (3 Geo. III c. 16), a limitation period of 60 years was fixed for the Crown to claim its rights.

The variety or set of systems, philosophies, principles, sources or origins of the Law of the 50 States of the American Union, concerning the thesis of usucapio against the State, cannot offer a firm, safe, solid point of support for our decision in 1969, favoring the continuation or restitution;

herein, of a state, or an era of privilege, monopoly, grace, advantages, and very special exceptions in favor of the State, which, as Manresa states—at pp. 37–38—were extinguished by the Civil Code of Spain of the last century.

Since a long time ago our Constitution, our codes, substituted the King and the absolute powers. The equality at Law, its efficacy against all, is what prevails.

We have a system of positive statutory law, "a mere advanced system of law that exists in any of the South American countries," as the Law Commission of 1901 stated. Shall we change it this year for the one governing in Texas, the next year for that of California, and the year after the next, for the one governing in Wisconsin, and thus experimenting, end by thinking, acting, governing ourselves by the Eskimo views on prescription of the State of Alaska? We know that the continental case law, as that of any State or country, is genuinely consistent with the structuration of the peculiar scale of valuation of each community. The history and experience of each State, of each system of law, must be taken into consideration before trying to adjust the World by means of abstract solutions, with terms so often used, such as "common sense, logic, and equity." The common sense, logic, and equity of many persons must be considered very carefully.

In accord with Holmes, we say, "The source of Law has not been logic; it has been experience; a page of history is equivalent to a volume of logic."

Our situation, in the matter under consideration, is that here we have a statute which, in clear and precise terms, states: "Rights and actions shall extinguish by prescription to the prejudice of all kinds of persons, *including judicial persons*, in the terms prescribed by law." (Italics ours.) Section 1832 Civil Code. The lawful manner, or authority to alter this legal provision, binding upon all kinds of persons, "including judicial persons," is expressly and precisely fixed

by the Congress of the United States, in § 8 of the Foraker Act, insofar as it states that our laws shall continue in full force and effect,

". . . until altered, amended, or repealed by the legislative authority hereinafter provided for Puerto Rico, or by Act of Congress of the United States."

This is repeated in § 57 of the Jones Act of 1917, and is reaffirmed in Public Law 600, § 4 of Federal Relations Act.

Laws, as provided in § 5 of our Civil Code, are repealed *by other subsequent laws.* Here, we have never permitted that they be repealed by the maxims of the Anglo-American common law already discarded. The State itself, since 1916, in Puerto Rico, has given its consent to be sued in revendication actions, it has fixed a limitation period therefor, adopting, as we have already set forth, for the actions it authorizes, by Act No. 104 of 1955, "The statute of limitation governing under the laws applicable. . . ."

The different modes to acquire, convey, and alienate real property situated in Puerto Rico *are those prescribed by the laws of Puerto Rico.* Section 10 of the Civil Code. As we said in *Colón et al.* v. *Reg. of Aguadilla,* 22 P.R.R. 344 (1915), and *Lókpez* v. *Sotelo,* 70 P.R.R. 475 (1949), in relation to this cardinal principle, the doctrines of the American courts on this matter can do no violence to its letter, nor to its spirit, and no person in Puerto Rico can acquire or lose rights to real property situated herein, except pursuant to our limitation statutes.

—I—

*Ratio Decidendi in People v. Dimas et al.,*
*18 P.R.R. 1019 (1912)*

The doctrine established in this decision of ours must be considered carefully in the light of its own context. Therein, we did not reach the general and absolute conclusion that,

after our Political Code went into effect, all lands belonging to the People of Puerto Rico cannot be acquired by prescription.

We have studied and analyzed patiently and carefully the old record of civil case No. 795, *The People of Puerto Rico*, plaintiff-appellee, v. *José Dimas Riera, Enrique Calvo Ríos, Wenceslao Bosch*, and *Honorato Andrés García*, defendants, and appellant the latter, year 1912, on revendication, coming from the former District Court of San Juan.

It is a typical case where § 9 of the Political Code, Spanish text, is applicable, and an equitable and humane application of the principle of third-party mortgagee. If said decision is analyzed carefully, in the light of the nature of the "waste lands" involved in the case, that would be the conclusion.

### Title of the Case

As an editorial curiosity, we point out that the title given to the case in Vol. 18 is not correct. It should have been The People v. Riera et al., since "Dimas" is only the middle name of José Dimas Riera, not his surname. See the case of *The People* v. *Riera*, 27 P.R.R. 1 (1919), which is another revendication case against the same person, with the name of "José D. Riera."

### Proceedings in the Trial Court

The judgment roll reveals that on February 10, 1910, The People of Porto Rico brought a revendication action in the then District Court of San Juan, Section 1, against José Dimas Riera, Enrique Calvo Ríos, and Wenceslao Bosch. It claimed in its complaint the ownership and full dominion right over a parcel of land situated in the ward Puerta de Tierra of San Juan, composed of 12,090 square meters, with the following boundaries:

*North,* lots belonging to Andrés Calvo, and others;

*South, the swamps bordering the narrows known as* San Antonio;

*East,* San Andrés Street;

*West,* lot owned by Marcos Caneja.

It also alleged that on October 8, 1906, Enrique Calvo Ríos instituted a dominion title proceeding in that District Court, stating that he had purchased said parcel of land from his parents, Andrés Calvo Hermida and María F. Ríos, *"who acquired it by reclaiming it from the swamps, of which it had formed a part,* and who had possessed it since 1883." After hearing the evidence offered by plaintiff, said court decreed that the title of Enrique Calvo Ríos to the property was established. It was recorded in the Registry of Property.

The People also alleged that with respect to that parcel the following transactions were made:

1. Enrique Calvo Ríos sold 40% thereof to Mariano Pesquera Goenaga;

2. Pesquera Goenaga, in turn, sold 17% thereof to Wenceslao Bosch and 7% to Martín Bellber;

3. Calvo Ríos, Pesquera Goenaga, and Martín Bellber, sold to José Dimas Riera, the following shares: Bellber, his 7%; Pesquera, his 16%; Calvo Ríos, one half of his share of 60%, that is, 30%, all amounting to 53%.

The final outcome being that "those owning the property at present, to the prejudice of plaintiff, are the three defendants in the following proportion:

José Dimas Riera, 53%

Enrique Calvo Ríos, 30%

Wenceslao Bosch, 17%."

The People prayed the court to declare it owner in fee simple of the property and to order its delivery and the cancellation of the corresponding entries in the Registry of Property.

.The complaint was signed by Attorney General H. M. Hoyt, 2nd.

On March 13, 1910, José Dimas Riera and Wenceslao Bosch appeared. By a demurrer they alleged: (1) That the complaint did not allege facts sufficient to constitute a cause of action, and (2) that "they have the standing of third parties as acknowledged by the Mortgage Law."

On March 14, 1910, the other defendant, Enrique Calvo Ríos, appeared and also demurred to the complaint because "it did not allege facts sufficient to constitute a cause of action against this defendant."

The demurrers having been heard by Judge Martin E. Gill, the latter overruled them in a decision of June 9, 1910, which is copied verbatim at 18 P.R.R. 1022–1024.

The emphasis given by Judge Gill, in said opinion, to the nature, quality, type, and class of the lands in litigation is noticeable, that is, he describes and defines them as *"public lands."**

José Dimas Riera and Wenceslao Bosch answered the complaint, stating that the property did not belong to the People of Puerto Rico; that they were the owners of their respective portions with just title and good faith and that they were recorded in the Registry of Property. They admitted the dominion title proceedings; they indicated that in that proceeding opposition was presented by the United States; that the United States and The People of Puerto Rico, after such opposition, carried out certain transactions as to the rights and actions which the former claimed over said lands.

The complaint was amended in June 1910, to further allege that in the first recording of the property it appeared that Enrique Calvo Ríos' predecessors in title, his parents Andrés Calvo Hermida and María F. Ríos, had "acquired it

*EDITOR'S NOTE: The Spanish term *"terrenos baldíos"* (waste lands) was erroneously translated in 18 P.R.R. 1023, as "public lands."

by reclaiming it *from the swamps of which it had formed a part*, and who had been in possession thereof since 1883 or 1885, and had it planted in grass." (Italics ours.) It was signed by Foster V. Brown, as Attorney General.

The amended complaint was answered by "José D. Riera" and W. Bosch. They alleged the defense of third-party mortgagees, the failure of the demurrer in the dominion title proceedings, and the prescription after a lapse of over 20 years, that is, from 1883 to 1906.

It was answered by Enrique Calvo Ríos on July 1, 1910; he denied the facts of the amended complaint; he alleged that he bought the property from his parents Andrés Calvo and María F. Ríos; that the latter possessed it as owners; that he instituted the dominion title proceedings which had been approved by "the Honorable Pedro de Aldrey, Judge of the District Court of this capital city, on May 31, 1907"; that his parents *had reclaimed those lands* and cultivated them; and that in the event The People would be entitled to recover the land, it should pay him $5,000 "invested in reclaiming the lands and improvement of the property object of the action"; he alleged prescription under the provisions of Art. 1957 of the Spanish Civil Code and the judicial order of General Henry of April 4, 1899, and "even by Royal Decree of April 17, 1884, *with respect to waste lands*, approved by His Majesty the King of Spain." (Italics ours.)

On December 22, 1910, Honorato Andrés García appeared and filed a motion requesting to be joined as defendant in the suit, since he had acquired by purchase from codefendant Enrique Calvo Ríos, on the preceding September 27, his undivided interest of 30% of the entire property. To his motion he attached an answer alleging six defenses, to wit, that he had acquired his interest with just title; prescription under the Regulations of 1884; ordinary prescription; the extinctive prescription of § 1864 of the Civil Code of Puerto Rico; the defense of res judicata by virtue of the decision in

the dominion title proceeding which had become litigious; that when The People of Puerto Rico believed to have acquired rights to the parcel of land, the latter was already under the lawful possession of the defendants. By amendment he alleged a seventh defense as third-party mortgagee. In his answer he brought a counterclaim for $5,000 for improvements on the property, "insofar as the interest of this defendant is concerned." He was joined as codefendant.

The suit went to trial before Judge Martin E. Gill. The judgment roll states:

". . . the aforesaid case has been duly filed and tried before Hon. Martin E. Gill, judge of said court, and has been submitted for decision to said Judge Gill after all the particulars and questions involved therein had been discussed exhaustively and elaborately. . . ."

Some time later, on June 14, 1911, Judge Gill died, "the matters in controversy in this action not having been passed upon definitely . . . but left awaiting a final determination."

By written stipulation of the parties, dated June 23, 1911, it was agreed:

". . . that the case aforementioned be transferred to . . . Section 1, presided over by the Hon. Félix Córdova Dávila, to whom authority is given to decide and render judgment upon the facts and questions involved therein upon consideration of the record of the case and the briefs filed therein as if it had been brought originally for trial before said Hon. Félix Córdova Dávila."

On August 2, 1911, Judge Córdova Dávila rendered a lengthy opinion and rendered final judgment in the revendication action by which he decreed:

1st. That The People of Puerto Rico should recover *30% of the property* possessed by the original codefendant, Enrique Calvo Ríos, and which he had transferred to codefendant, Honorato Andrés García;

2d. The dismissal of the amended complaint concerning defendants José Dimas Riera and Wenceslao Bosch, because they were third-party mortgagees and had acquired superior title over 70% of the remaining land, and

3rd. The dismissal of the counterclaim of $5,000 brought by said Enrique Calvo Ríos.

### Opinion of the Trial Court

The elaborate opinion of Judge Córdova Dávila is very long. We shall cite it verbatim, in part, and shall try to summarize it in part, too, interpolating our remarks.

We shall try to narrate it in all its aspects. In the first place, we shall point out the facts which, from the evidence introduced before Judge Gill, Judge Córdova Dávila considered proved:

"[1.] On September 6, 1897, Andrés Calvo, predecessor in title of his son, defendant Enrique Calvo Ríos, addressed a petition to the Treasurer of the Island, stating that 14 years before he had drained, with his own resources, a portion of mangrove marshes in the ward Puerta de Tierra, having an area of 8,470 square meters and fifty centimeters. Based on these facts and on the considerable expenditure of money to convert a portion of unproductive mangrove marshes into tillable land, petitioner, seeking to acquire title to said lands, by adjustment with the Treasury, petitioned the Treasurer that the proper orders be issued to accomplish that end, stating that he was willing to pay in cash the estimated value of said land, as this was the established practice and according to what the Treasury had been doing theretofore. A certificate issued in 1883 by the assistant superintendent of public works, in which this officer states that at the request of Andrés Calvo he had examined and surveyed a tract of mangrove marsh, situated in Puerta de Tierra, which Calvo had drained with his own resources and converted into tillable land, was attached to the petition. The area of the said portion agrees with that fixed by Calvo to the land referred to in his petition to the Treasurer.

"[2.] On September 22, 1897, these documents were sent as a report to the corresponding authorities, and from this date on,

we find nothing in the evidence in connection with the claims of Calvo, concerning the lands in question.

"[3.] On October 8, 1906, Enrique Calvo instituted dominion proceedings in the District Court of San Juan, to assert the title to 12,095 square meters of land situated in Puerta de Tierra, alleging that he had acquired them by deed of purchase from Andrés Calvo and his wife, who, in turn, had acquired them by their own effort, reclaiming it from the swamps of which it had formed a part, work which was performed during a period of time ending in the year 1883, and his possession relates back to such date.

"[4.] After the court decreed that the title to the afore-mentioned property was established in favor of Enrique Calvo, it was recorded in the Registry of Property, it being stated in said recording that Andrés Calvo and María Felícita Ríos acquired the well-deserved parcel of land by reclaiming it from the swamps of which it had formed a part.

"[5.] Subsequently, Enrique Calvo conveyed 40% of the total acreage of the property to Mariano Pesquera, who, in turn, sold to Wenceslao Bosch 17% and 7% to Martín Bellber; later on, Bellber, Pesquera, and Calvo, sold their shares to José D. Riera, in the following manner: Bellber, 7%; Pesquera, 16%; and Calvo, 30%; the final outcome being that those owning the property when this suit was instituted were José D. Riera, 53%; Enrique Calvo, 30%; and Wenceslao Bosch, 17%. Subsequent to the filing of this action, Enrique Calvo sold his interest in the realty to Honorato Andrés, who appeared and filed a motion to be joined as defendant, motion which was favorably decided by the court."

After accepting the preceding facts, the trial judge stated in his opinion:

"Defendants allege that The People of Puerto Rico has no title upon which to base a successful action of ejectment which necessarily demands as essential requirements the description of the property, authentic proof that the ownership under lawful title is in the plaintiff. The moving party in an action to recover must rely on the strength of his own title and on the clearness of his own evidence and not on defendant's lack of title or on the weakness of his evidence.

"In our opinion, The People of Puerto Rico has shown in this case the full identity of the thing claimed and, in part, the ownership thereof. We say that the ownership has been established in part, because we believe that plaintiff has lost its rights to recover the lands acquired by defendants Riera and Bosch, who, in our opinion, now hold a valid title under the provisions of the Mortgage Law. On this point we shall comment later on.

"Article 1 of the Regulations governing concessions to waste lands in Puerto Rico, dated April 17, 1884, states:

'All such waste lands, soils and grounds as have no legitimate private owner, or in other words, such as have never been conveyed to private individuals by gratuitous concession or by grant for a valuable consideration made by the competent officials, shall be considered as waste lands for the purposes of these regulations and according to Law XIV, Title XII, Book IV, of the Compilation of Indies.'

"From the evidence introduced in this case and from the allegations themselves, it appears that Andrés Calvo took steps to acquire the property in controversy by adjustment with the State. This fact fully proved, shows that at the time that Andrés Calvo took the first steps to acquire the lands in litigation, the latter had not passed to the private ownership, being, of course, waste lands belonging to the State, and subject to be appropriated pursuant to the Regulations aforecited. The petition addressed by Calvo to the Treasurer in 1897 for the purpose of acquiring these lands by concession, is a clear and conclusive admission that the same belonged at that time to the State."

Thereafter, reference is made to Art. VIII of the Treaty of Paris, between Spain and the United States and to the cession of property by the former to the latter, including buildings, wharves, barracks, forts, structures, public highways, and other immovable property which, "in conformity with the law, belong to the public domain," and as such, belonged to the Crown of Spain.

A citation is made from 32 Cyc. 651, as to the meaning, in the United States, of the terms "public property," "public lands," or "public domain." The opinion states that "the terms 'public lands,' or 'public domain,' are used customarily

in the United States to designate such lands of the United States, or only of the States, as are subject to sale or other disposition under the general laws and are not preserved or reserved for any special public power of the government. There is no statutory definition of the words 'public lands' and their interpretation may vary somewhat in different statutes passed for different purposes, hence they should be given such construction as agrees best with the intention of the Congress in their use. (32 Cyc. 775–776)."

The opinion makes reference to the state of law which ensues when a sovereignty cedes any territory to another and that the lands having no owners, because nobody has appropriated them, pass to the ownership of the grantee State. It is held that by the Treaty of Paris, the Organic Act of 1900, an Act of Congress of July 1, 1902, the President's proclamations and an agreement called "Lomley Feuille agreement," and a certain deed of exchange and conveyance executed between the federal government and the insular government, the lands in litigation belonged to The People of Puerto Rico. It is also held that all the property belonging to the Crown of Spain, passed, without any exception whatsoever, to the Government of the United States, in addition to those which, in conformity with law, belonged to the public domain.

With respect to the questions to be resolved, following the foregoing, the trial judge states:

"After having established the statement that, according to the evidence, *the lands in litigation,* which have not passed to the private ownership belong to the People of Puerto Rico, we must now state *whether these lands may be acquired by prescription, concession, or by any other mode,* and if so, whether defendants hold now a valid title which can successfully oppose the claims of the plaintiff." (Italics ours.)

The opinion of Judge Córdova Dávila, then, commences to decide the principal question raised.

In one of its paragraphs, he states: ". . . we declare that

the lands belonging to the State, prior to the final approval of the Treaty of Paris, were subject to prescription under the laws then in force." He states, citing Cyc., that according to the maxim *nullum tempus ocurrit regi*, rule of the English law, no title to Crown lands could be acquired by adverse possession, and that the doctrine prevails in the United States, and that prescription may be alleged against the United States whenever it is authorized by law. We remark, at pp. 727–728, that the situation, according to the case of *People* v. *Fortuna*, was different when real property located in Puerto Rico, where Congress adopted the statute of usucapio against the State, were involved. And the trial judge states that "The same principle applies in favor of the *States of the Union.* In the absence of a provision authorizing the prescription. . . ." (Italics ours.)

The preceding paragraphs are followed by the one appearing at p. 1039 of vol. 18 P.R.R. of our decision.

"Even if the Legislature of the Island had remained silent, the right of ownership of The People over lands belonging to them would not prescribe now [now is equivalent to August 2, 1911, date of the opinion and judgment] *under the application of the rule* obtaining in the States. *The Legislative Assembly, however, has enacted this principle in the Political Code, section 9 of which clearly and categorically states that title to Insular waste lands cannot be acquired by adverse possession."* (Italics ours.)

The first sentence of this paragraph refers to the maxim *"nullum tempus ocurrit regi."* Thereby, Judge Córdova Dávila obviously intimates that if such maxim of common law "obtaining in the United States," were followed or applied "now" (1911) in Puerto Rico, the property of the State could not be acquired by adverse prescription. But, in *the following second sentence of the same paragraph,* the trial judge himself states:

"The Legislative Assembly, however, *has enacted this principle* [it can be no other than the English maxim referred to in the preceding first sentence] in the Political Code, section 9 of which *clearly and categorically* states that title *to Insular waste lands* cannot be acquired by adverse possession." (Italics ours.)

What Judge Córdova Dávila thus stated is the same thing that, in identical words, we have been sustaining: That the Law Commission of 1901 and the Legislative Assembly, notwithstanding the statutes enacted and the decisions rendered in the States of the Union, following the English Common Law, never favored a complete, absolute, and general prohibition of prescription against the State, but rather that, as the trial judge stated therein, the "principle" of common law, or the essence thereof, was enacted *"clearly and categorically"* in § 9 of the Political Code, limiting and restricting the nonprescription to *"title to Insular waste lands" only*. The immunizing scope of the exception, as we can see, is very small.

We continue summarizing the opinion of the trial court. Judge Córdova Dávila continued, after citing Manresa, as to the nature of prescription which has not been perfected, stating that a fundamental change took place in the political laws of this country, especially those governing the conveyance and management of public property, and that "the lands ceded by Spain to the United States should be governed and regulated by the laws of this Island and not by the laws of the nation which ceded them."

This was said in 1911, when the Organic Act and all the Spanish laws which were enforced by the Foraker Act, and the codes of 1902 were in force. Of course, it is possible that he referred, logically, to all property ceded, which the United States reserved, Congress having stated in the Organic Acts of 1900 and 1917, that the laws which continued in force could only be

". . . altered, amended, or repealed by the legislative authority hereinafter provided for Puerto Rico *or by Act of Congress of the United States.*" (Italics ours.)

As far as we know, the maxim *nullum tempus ocurrit regi* has never been *"an Act of Congress of the United States,"* nor of Puerto Rico.

In *The People* v. *Dimas et al.,* Judge Córdova Dávila considered that by the year 1898 the ownership was not consolidated in the defendants, because the evidence, in his opinion, "satisfactorily proves that this possession dates from the year 1883." And he continues stating in his opinion:

"From this date until 1898, only fifteen years have elapsed, *a period of time which does not suffice, as has been shown, to acquire said lands belonging to the State by prescription.* These facts, satisfactorily established, show that the dominion title proceeding, prosecuted and approved in 1906, lacks legal validity." (Italics ours.)

Under Art. No. 2 of the Regulations of 1884, governing concessions to waste lands, cited in the opinion, when "waste lands or title from a competent authority" were involved, the following were considered as owners:

"Those who have no title but prove that they have been in uninterrupted possession of said lands for 20 years where the lands are under cultivation, and for 30 years where they are uncultivated, . . . .

"In order that lands be considered as under cultivation it is necessary to prove that they have been tilled during the last three years."

Let us remember that in the case of Hicacos, the *título de amparo* was granted on *February 12, 1872;* that, assuming that it was a case of waste lands, the 30 years expired on February 12, 1902, that is to say, before the approval of the Political Code, with its § 9, referring only to waste lands, and the new term of 6 years for the ordinary prescription of Art. 1957 of the Civil Code of 1889 being still in force.

With respect to the ordinary prescription alleged by the defendants, the trial judge stated thus:

"Defendants also allege, relying on ordinary prescription, the possession of the land claimed, for a period of over ten years in good faith and with just title. This allegation does not suffice to acquire, by prescription, lands which belonged and still belong to the State. The provisions of the former Civil Code on prescription, as well as those of the revised Civil Code, are not applicable when public lands are involved, because there exist special laws governing this matter, pursuant to the aforecited codes, whose §§ 1938 and 1839, respectively, in Chapter 1, Title 18, which deals with prescription in general, state as follows:

'The provisions of this Title shall be understood without prejudice to what may be established in this Code or in special laws with regard to specified cases of prescription.'

"The law applicable in the present case is the aforecited regulations governing the concession of waste lands in the Island of Puerto Rico."

Returning to the present case of Hicacos, if such Regulations of 1884 were applicable, because of the material possession commenced in 1872, then, the prescriptive possession should start to run from February 12, 1872, when it officially commenced under the *título de amparo* legally granted by the Crown of Spain, until January 14, 1963, when, for the first time, the State claimed the ownership of the small islands, resorting to an apparent condemnation proceeding.

Finally, Judge Córdova Dávila considered that defendants, Enrique Calvo Díaz and his grantee, Honorato Andrés García, were not protected by the Mortgage Law. The former instituted the dominion title proceeding without having the material possession of 30 years required by the Regulations of 1884, and without having obtained just title to the lands, and the latter purchased having knowledge of the suit.

However, codefendants José Dimas Riera and Wenceslao Bosch were considered by him third-party mortgagees.

*Appeal*

The People of Puerto Rico did not take appeal from the judgment of Judge Córdova Dávila, insofar as the dismissal of the complaint with respect to codefendants "José D. Riera" and Wenceslao Bosch, considered as third-party mortgagees, is concerned.

But Honorato Andrés García, the acquirer pendente lite, took appeal on September 6, 1911.

The appeal was argued in the Supreme Court on April 19, 1912, Mr. Eugenio Benítez Castaño representing appellant, and Mr. Charles E. Foote, prosecuting attorney of the court, for The People.

*Decision of the Supreme Court*
*18 P.R.R. 1019–1043*

The appeal was decided on December 21, 1912, and "the part of that judgment appealed from" was affirmed by majority, Mr. Justice Del Toro being the writer of the opinion, the then Mr. Chief Justice Hernández and Mr. Justice MacLeary concurring.

Mr. Justice Wolf dissented. Mr. Justice Aldrey did not intervene because, in the year 1906, he was the District Judge who granted the petition for the dominion title proceeding instituted by Calvo Ríos and which was declared void by the trial judge.

The first eight pages of the opinion—1021 to 1028—recite the facts of the case we have narrated. The questions raised in the appeal are examined in the opinion in the following order: 1st. Examination of plaintiff's title and then that of defendant Enrique Calvo Ríos; 2nd. the prescription of plaintiff's action; 3rd. whether or not it was necessary to bring an action for the nullity of the judgment prior to bringing the action of ejectment; 4th. whether or not there was res judicata because of the decision in the dominion title proceeding,

and 5th. whether or not appellant Honorato Andrés García's counterclaim lied.

—1—

The majority opinion states that "There is no doubt *as to the nature of the lands* of which the parcel, the ownership of which is controverted hereby, is composed. [P. 1029.] . . . was formed by the draining and reclaiming *of a section of the swamp. Manglar* is a grove of mangrove trees and the 'mangrove' is a tree which grows abundantly along . . . intertropical America." P. 1029. (Italics ours.)

At p. 1029, they continue with the description of the nature and classification of the lands in litigation, stating verbatim:

"The mangrove marshes in Porto Rico were considered once as forest reservations and whether considered as such, as tide lands or as *waste lands or commons,* the conclusion necessarily reached is that they were public property and could pass to private ownership only by the processes clearly provided in the statutes.

"Therefore, taking into consideration *the nature of the lands* which form the parcel in dispute, it necessarily follows that the title to said parcel was in the Government. Furthermore, as we shall see hereinafter, Andrés Calvo, the person from whom the defendants derived their rights, in applying to the Spanish Government for the title to the parcel of land by concession, expressly recognized the unquestionable title of the Government." (Italics ours.)

It is further stated in the majority opinion, that the mangrove marshes in Puerto Rico, by the very nature of the land itself, are "tide lands." And it is stated at p. 1031:

"And this would be the case still even though the language of the Treaty [that of Paris] had been less clear for it is a well-established principle that when a foreign State cedes lands to the United States, *the waste lands* and those having no owners pass to the ownership of the United States."

The opinion of the court states, and to this the writer of the opinion gives great emphasis, that by the Foraker Act there were ceded to Puerto Rico, among other properties, "all the harbor shores, docks, slips, and *reclaimed lands*, but not including harbor areas or navigable waters," and that the President, by the authority granted to him by the Act of July 1, 1902, did not reserve the "portion of reclaimed *mangrove lands, involved in this suit.*" P. 1032. (Italics ours.)

—2—

It is decided that Enrique Calvo and Honorato Andrés were not innocent third parties, because they had knowledge that said lands were formed by draining the mangrove marshes.

The evidence introduced in the dominion title proceeding approved and recorded in the Registry of Property on September 25, 1907 is analyzed, and the conclusion is reached that the material possession of the mangrove swamps by Andrés Calvo had commenced in the year 1883, as it had been determined by Judge Córdova Dávila, for which reason, when the dominion title proceeding was instituted in 1906, the material possession had only been enjoyed during 23 years, without title granted by the Crown of Spain, by the Government of the United States or by The People of Puerto Rico. Therefore, the order granting the title had no legal value.

In order to compare and contrast the particular attendant facts, events, and circumstances and, also, the statutory provisions or regulations applied in the case of *The People* v. *Dimas et al.*, with those surrounding this appeal, we shall reproduce below those paragraphs of Judge Del Toro's opinion, in *The People* v. *Dimas et al.*, which refer to the fundamental point of prescription:

"Admitting that the lands involved in this suit can be considered as waste lands, let us see whether Andrés Calvo had ac-

quired his title when he addressed himself to the Government under the special law governing the matter.

"It is evident that he had no concession from the Superior Board of Waste land Grants. Let us see whether he had acquired any rights by prescription.

"The possession of Andrés Calvo, according to his own petition and according to the conclusion reached by the trial judge after weighing the evidence introduced at the trial, dates from the year 1883, and it is very clear that from that date until September 6, 1897, the 20 years required by the Regulations in order to acquire title to lands under cultivation and still less the 30 years fixed by them for uncultivated lands had not yet expired. Hence it is necessary to conclude that according to the regulations invoked Andrés Calvo at that time had not acquired any right of ownership to the lands by prescription.

"And if we consider the case with regard to the general provisions of law governing prescription, it cannot be concluded accordingly that the defendants could have acquired a title by prescription.

"Prescription passing title is defined by Escriche as the means whereby one may acquire or become the owner of anything on account of having been in possession thereof during the entire period predetermined by law, and says, further, that in order that prescription may be effective, the following five requisites, speaking generally, are necessary: 1. just title; 2. good faith; 3. continued possession; 4. lapse of the period fixed by law; 5. the property must be subject to prescription. (4 Escriche, 639.) These are the principles which inspired the ancient laws as well as the Spanish Civil Code, the Revised Code, and the Judicial Order of April 4, 1899.

"Calvo knew that the lands he was reclaiming were public lands and the most that may be conceded in his favor is that he was doing so in the hope that some day the Government would give him a title to them. It cannot, then, be concluded that Calvo was in possession as owner and with just title to the lands in question. He himself stated in writing in 1897 that he was willing to pay in cash whatever value might be placed upon the land. One does not have to pay anything for lands to which one has full property rights.

"Therefore, whether this case falls within the provisions of Forest Regulations, the Regulations for the Concession of Waste

Lands, *or whether the general provisions concerning prescription are applicable thereto,* it must necessarily be concluded that Andrés Calvo never acquired a valid title to the reclaimed land nor, consequently, could he have conveyed it to Enrique Calvo; hence the judgment of the District Court of San Juan rendered in 1906 in favor of Enrique Calvo is of no legal value.

"It should also be observed that all the evidence bearing upon the ancient possession by Andrés Calvo relates to a tract of land measuring 8,470 meters, there being nothing clearly and precisely stated as to when the remaining number of meters to make up the 12,090 meters proven in the dominion title proceedings were reclaimed. The difference in area which amounts to over 3,500 meters must have been reclaimed subsequently to 1883.

"In determining the rights of the defendant in this case with reference to the question of prescription we can only take into consideration such facts as have transpired up to 1898, when the Spanish sovereignty of this Island ceased and the American sovereignty commenced. After this date *it was not possible to acquire the lands referred to in this suit by prescription.*" (Italics ours.)

In the majority opinion it was stated that after 1898 (it should have said: "after July 1, 1902"), prescription ceased to run. But that was said in relation to *the lands referred to in this suit.* Page 1039. That is to say, the commons, waste lands or forest reservations of which nature the parcel of land in litigation, which was a part of the *mangrove swamps* belonging to the State, partook.

In order to expatiate on that legal principle which constitutes the *ratio decidendi* of the opinion, we insert the aforecopied sentence in which Judge Córdova Dávila uses the phrase "under the application of the rule." It was not decided that such rule or principle was binding or applicable herein, in the absence of an express and special statute authorizing it, like the aforecited constitutional provision of Louisiana or § 5517 of the revised statutes of Texas, which we copied above.

But such application was not possible, because of the inescapable legal principle we adopted in subscribing to the second part of the paragraph of the trial judge which says:

"The Legislative Assembly, however, has enacted *this principle* [that of the maxim of the English common law] in the Political Code, section 9 of which *clearly and categorically* states that title *to Insular waste lands* cannot be acquired by adverse possession." (Italics ours.)

This Supreme Court never gave to § 9 of the Political Code in the case of *The People* v. *Dimas et al.* a general scope nor did it extend or elaborate further its ambit or scope of its applicability to lands properly ceded by the Crown of Spain, recorded in the Registry of Property since 1883, publicly and uninterruptedly devoted to pastures for the benefit of the agriculture of the country, containing structures and a lime and construction products industry, for a period of 26 years under the Spanish sovereignty and 65 years under the North American sovereignty.

So far no one has intended to show, nor is it rationally possible to intend it, that the small islands are waste or barren lands.

We shall not refer to the last points on res judicata and Calvo's counterclaim, because they bear no relation to the case at bar.

Neither Judge Gill, nor Judge Córdova Dávila, nor Judge Del Toro arrived, in their respective opinions, at the general and unconditional conclusion that "lands belonging to the people of Puerto Rico cannot be acquired by prescription." They did not dare because the state of the laws involved, Spanish, congressional, and Puerto Rican, would not have permitted it. They alluded to *"the lands referred to in this suit,"* as Judge Del Toro said. And they knew that in order to amend, alter, or revoke our Spanish institute of prescription adopted by the military government, the President, and the Congress of the United States, and continued in its

entirety by the Legislature of 1902, another Act was necessary and indispensable legally approved

". . . by the legislative authority hereinafter provided for Puerto Rico, or by an Act of Congress of the United States." Section 8, Organic Act of 1900.

And they knew that the precept of *nulla temporis ocurrit regi* had not been adopted, in general and broad terms, by any act whatsoever, but rather with very restricted scope, virtuality and efficacy to an area of Puerto Rico, not amountting to 1/25 of 1% of its territory, that is to say, to its *waste lands*, today consisting mainly of a few mangrove swamps and forest reservations. And Judge Córdova Dávila decided that it was so by provision of the "Political Code, § 9 of which *clearly and categorically states* that title to *Insular waste lands* cannot be acquired by adverse possession."

And precisely, that is and has been our position in this appeal. That, solely and exclusively, those lands which are the common property of the State, and which can positively be classified as *"waste lands,"* are not subject to prescription. The other *common property or separate or private property* of the State, which is the object of commerce, like the small islands Hicacos and Ratones, are subject to or under the immediate scope of our statute on prescription.

The decision in *The People* v. *Dimas et al.,* rather than being contrary to the thesis of fiscal usucapio, supports, defends, and upholds it. Taking into consideration its particular facts and circumstances, it cannot be considered as a proper precedent to attack our position, but rather to support it. The *"however"* is the key to the very juridical thinking of Judge Córdova Dávila, which we adopted.

As part of the "procedural history" of the case of *The People* v. *Dimas et al.,* we add that, on December 18, 1914, appellant Honorato Andrés García took appeal from our decision to the Supreme Court of the United States, signed

by the eminent jurist Eugenio Benítez, on that day. For the purposes of that new appeal, he filed a "Statement of Errors," alleging the commission of 17 errors by the majority of those who participated in the decision.

The appeal was not heard before the Federal Supreme Court, because on June 30, 1915 the parties signed a "certain transaction agreement," signed by the Attorney General of Puerto Rico and the Commissioner of the Interior, for one party, and by Luis Sánchez Morales and appellant Honorato Andrés, for the other party, by virtue of which, by one of its stipulations, the latter bound himself to desist, and he desisted, from his appeal, on July 2, 1915.

*Case Law Subsequent to The People v. Dimas et al.*

*The People* v. *Dimas et al.* establishes, ratifies, or rejects different doctrines, principles, maxims, and postulates, substantive or procedural, relating to several matters of law, such as: origins, sources and nature of titles on property belonging to the State; classification and characteristics thereof; congressional and presidential cessions and reservations; title or eminent domain of the State; specific title to mangrove swamps, waste lands, unappropriated lands, and forest reservations of the State; common property, public property, property of public domain, and property privately owned by the State; previous action for nullity of title and the revendication action; prescription against the State; the defense of third-party mortgagee against the State; efficacy of res judicata in judgments in dominion title proceedings; former modes and regulations to acquire real property from the State, etc.

During the 56 years of case law which followed said decision, that is to say, up to December 1968, the same has been cited, applied, or commented in relation to its various pronouncements in the following 18 cases:

(1) *The People* v. *Mun. of San Juan,* 19 P.R.R. 625, 635 (Del Toro, 1913); (2) *Pesquera* v. *Fernández et al.,* 22 P.R.R. 49, 63 (Del Toro, 1915); (3) *People* v. *Riera,* 27 P.R.R. 1, 4 (Aldrey, 1919); (4) *People* v. *Heirs of Valdés,* 31 P.R.R. 213, 222 (Hutchison, 1922); (5) *People* v. *Esteves,* 36 P.R.R. 369, 370 (Del Toro, 1927); (6) *González et al.* v. *Fumero et al.,* 38 P.R.R. 497, 510 (Texidor, 1928); (7) *Miranda* v. *Mun. of Aguadilla,* 39 P.R.R. 422, 425 (Hutchison, 1929); (8) *Fajardo Sugar Growers Ass'n* v. *Kramer,* 45 P.R.R. 337 (Del Toro, 1933); (9) *González* v. *Colón,* 49 P.R.R. 542, 543 (Córdova Dávila, 1936); (10) *Trías* v. *P.R. Leaf Tobacco Co.,* 50 P.R.R. 88, 91 (Hutchison, 1936); (11) *People* v. *Rojas,* 53 P.R.R. 115, 125 (Travieso, 1938); (12) *Rivera* v. *Heirs of Caraballo,* 56 P.R.R. 705, 716 (Del Toro, 1940); (13) *The Capital of P.R.* v. *Casino Español,* 56 P.R.R. 758, 770 (Del Toro, 1940); (14) *Moore* v. *District Court,* 59 P.R.R. 618 (Del Toro, 1941); (15) *People* v. *Del Valle,* 60 P.R.R. 180, 186 (Todd, Jr., 1942); (16) *Jiménez* v. *Municipality,* 70 P.R.R. 491, 493 (Todd, Jr., 1949); (17) *Mario Mercado e Hijos* v. *Public Service Comm'n,* 73 P.R.R. 541, 546 (Marrero, 1952); (18) *Heirs of Marrero* v. *Santiago,* 74 P.R.R. 763, 767 (Marrero, 1953).

Many of these cases attribute to the *Dimas* case a doctrinal scope which cannot be attributed to it.

### Some Cases Subsequent to Dimas

We shall say something about the cases of *The People* v. *Mun. of San Juan,* 19 P.R.R. 625 (1913); *Miranda* v. *Mun. of Aguadilla,* 39 P.R.R. 422 (1929); *People* v. *Rojas,* 53 P.R.R. 115 (1938); *Jiménez* v. *Municipality,* 70 P.R.R. 491 (1949).

The nature and characteristics of the properties involved in these four cases, with the exception, to a certain point, of the *Rojas* case, are not of the same nature and characteristics

of the mangrove swamps or waste lands object of litigation in *The People* v. *Dimas et al.* This decision is neither analyzed nor discussed therein, reference is merely made to it in the manner of a mere warning that we had already decided that "prescription does not run against the State." These simple allusions to that decision, of course, do not imply valid modifications or extensions of the *ratio decidendi* in the *Dimas* case.

If we had applied therein the original §§ 328, 329, 1831, 1833, 1837, 1839, 1858, 1860, 1862, and 1864, of our Civil Code of 1902, and § 9 of the Political Code as it was construed in the *Dimas* case, we would never have said, in absolute and general terms, that prescription does not run against the State in any case whatsoever. We incurred an inexcusable juridic error in, hastily, affirming it thus in those subsequent cases.

The Military Government established on October 18, 1898, by its General Order No. 1, authorized that "The provincial and municipal laws, insofar as they affect the settlement of the private rights of persons and property," should continue in full force and effect.

In the political order, the American sovereignty commenced with the Treaty of Peace, signed in Paris on December 10, 1898. In its Art. VIII it provided that the cession of the Island of Puerto Rico to the United States by Spain,

". . . *cannot in any respect impair the property or rights which by law belong to the peaceful possession of property of all kinds,* of provinces, municipalities, public or private establishments, ecclesiastical or civic bodies, or any other associations having legal capacity to acquire and possess property in the aforesaid territories . . . ceded, or of *private individuals, of whatsoever nationality such individuals may be.*" (Italics ours.)

And all this is stipulated and ordered in those historical documents, having knowledge that Puerto Rico lives under an advanced system of Civil Law, codified since January 1,

1890, and that among the legal modes of acquiring the common or private property of the State was usucapio, pursuant to the Civil Code of that year and to the different regulations to acquire unappropriated properties of the State.

And on April 12, 1900, the Congress of the United States and its President, by virtue of the constitutional authority vested on them over the territories, adopted, amended, and authorized that "the laws and ordinances of Puerto Rico now in force" shall continue uninterruptedly in full force and effect in the territory of Puerto Rico.

Among those laws is the Civil Code of Spain of 1890, with its institute of usucapio which is only derogated by the revised Civil Code of July 1, 1902, statute which adopts, totally and verbatim, the Spanish provisions of law on prescription against the common and private property of the State, with the special exception of the waste lands pointed out in the last sentence of § 9 of the Political Code, which was also effective on that same day.

And the limitation periods of the Spanish Civil Code continue in full force and effect after July 1, 1902, when prescription has started to run before said date and under its mandate, pursuant to § 1840 of the Revised Civil Code of 1902, which states:

"Section 1840.—Prescription, which began to run before the publication of this Code, shall be governed by the prior laws. . . ."

The temporary provisions of the new code secured and protected all the substantive rights arising under the previous legislation.

We have already seen how the Jones Act of 1917 protected such rights. Our Constitution establishes the right to the enjoyment of property as a constitutional provision and prohibits the gratuitous taking or damage of private property.

In the midst of all this, the last sentence of § 9 of the Political Code is enacted, which affirms our general limitation statute against the State, only excluding, clearly and categori-

cally, as Judge Córdova Dávila said, from said general rule, the waste lands which comprise the swamps, mangrove swamps, unappropriated lands, lands as have no legitimate private owner, and the State forest reservations.

Then we have the Circuit Court of Appeals, First Circuit, deciding the *Fortuna Estates* case, which we recited at pages 727–728, where it was decided, in the year 1922,

". . . the United States, by continuing section 1957 [ordinary prescription] in force *sanctioned the acquisition of a prescriptive title against it.*" (Italics ours.)

Let us state again, in view of the legislation afore-mentioned, that if this was decided by a court of a judicial hierarchy superior to ours, by American judges, against its own federal government, what right do we have to say that the limitation statute against the common or private property of the State disappeared with the change of sovereignty, when it was then that it acquired greater vigor, force and efficacy, upon its adoption by the Treaty of Paris, a Military Government, a Federal Congress, a Law Commission, and a Legislative Assembly of Puerto Rico?

After all, what we can correctly affirm is that, after July 1, 1902, title to *waste lands* owned by the State cannot be acquired by adverse possession, and that the lapse of limitation period *over waste lands* which commenced prior to said date, but not complete on July 1, 1902, was interrupted at law when *title to waste lands of the State* were declared by law not subject to prescription.

Let us return to the four cases previously cited, in which reference is mistakenly made sometimes to the case of *The People* v. *Dimas et al.*

In *The People* v. *Mun. of San Juan*, 19 P.R.R. 625 (1913), the fundamental question discussed and decided was whether the grant on *September 7, 1898* of a lot reserved for the War Department of the Spanish nation to the Municipality of

San Juan, by Captain General M. Macías, Governor General of the Island, was valid.

It was decided that the grant was not valid because the Governor General lacked legal authority therefor and "to determine this matter alone." The revendication action was decided against the Municipality of San Juan, but the Municipality was acknowledged as the owner of the building erected on the lot which belonged to the People of Puerto Rico:

The final decision was:

"Hence, in deciding the present action according to law the judgment appealed from should be affirmed in so far as regards the recovery of the lands granted by the Governor General of Porto Rico to the municipality of San Juan." P. 636.

Citing *The People* v. *Dimas et al.*, we said that "The grants were made in 1898 and in that same year the Spanish sovereignty ceased in Puerto Rico," and that after the new sovereignty took charge, "acquisition of ownership by prescription was not authorized either against the United States or against the People of Puerto Rico."

As authority therefor, we rely only on said citation of *The People* v. *Dimas et al.* We already know the nature of the land involved in the *Dimas* case, and what was stated therein about waste lands. We also know the decision, in 1922, in *Fortuna Estates*, rendered by a Federal Court, then having authority to reverse, annul or alter our decisions:

". . . the United States by continuing Section 1957 in force sanctioned the acquisition of a prescriptive title against it."

*Miranda* v. *Mun. of Aguadilla*, 39 P.R.R. 422 (1929), dealt with "a proceeding to establish . . . title to a certain house and lot in the municipality of Aguadilla." The latter objected alleging that the lot in question was a part of a larger parcel ceded to the municipality by an Act approved August 3, 1923.

The opinion clearly stated that it was not a question of waste lands:

"The Act describes a strip of land bounded on the west by the maritime zone and on the south by a *'cañito.' Such a description does not prove that the land is submerged at high tide or that it is a mangrove marsh, or that it has been reclaimed."* P. 425. (Italics ours.)

It was also stated in Mr. Justice Hutchison's opinion:

"Petitioner established a prima facie case of ownership by adverse possession extending over a period of more than thirty years, and by like possession in good faith and under just title for the greater part of that time. His title by prescription under section 1858 of the Civil Code had been perfected before the municipality acquired any interest whatever in the larger parcel now claimed by it. The Act of the Legislature, authorizing the Commissioner of the Interior to convey a parcel of land not shown to be the property of The People of Porto Rico at the time of such authorization, neither interrupted the running of the unexpired statutory period nor divested petitioner of his title already acquired." Pp. 425–26.

The decision appealed from was reversed. At page 425 reference is made to the *"theory of the trial judge"* in a paragraph which states:

"The court below dismissed the proceeding upon the ground that title to real estate cannot be acquired by adverse possession as against the United States or The People of Porto Rico. The theory of the trial judge was that the property in question had passed from the crown of Spain to the United States by the Treaty of Paris and from the United States to The People of Porto Rico under the various acts of Congress referred to in *People* v. *Dimas*, 18 P.R.R. 1019, and *People* v. *Mun. of San Juan*, 19 P.R.R. 625. This theory assumed that the crown of Spain at the time of the change of sovereignty had never parted with its title to the parcel of land now in controversy. But there is no satisfactory basis for such a conclusion in the instant case."

*People* v. *Rojas*, 53 P.R.R. 115 (1938). This case deals with an action of revendication of "certain *waste lands almost entirely covered by forests*, and listed according to

the records existing in the files of the Civil Secretaryship in March 1900." (Italics ours.) P. 119.

The evidence showed that those waste lands appeared in Record No. 10 of the Department of Interior, entitled

"Inventory of the *public forests* and *waste lands* in the Island belonging to the State." (Italics ours.) P. 125.

". . . and that these lands, together with other lands had been surveyed and its boundaries determined by the Crown of Spain by the years 1879 to 1883, declared forest reservations uninterruptedly occupied and possessed by the State; that the boundaries of the land in litigation had been determined in 1923 and that it was included in the forests 'De la Vaca Muerta' and 'Pelado Ridge.' " P. 128.

The trial court supported the action of revendication and we affirmed its decision. The prescription alleged therein found an insurmountable legal obstacle in the last sentence of § 9 of the Political Code, concerning waste lands. In that aspect what was said in *The People* v. *Dimas et al.*, was applicable.

In *Jiménez* v. *Municipality*, 70 P.R.R. 491 (1949), this Court set aside partly the exaggerated Americanizing tendency which flourished in the first two decades of this century in our decisions, by the mere adaptation of Anglo-American maxims and statutes, and the decisions of judges which formed part of the "efforts to Americanize the island," to which the Law Commission of 1901 refers in its Report to Congress. See p. 27, vol. 1, parts I, II, and III.

As it had been already decided in *The Capital of P. R.* v. *Casino Español*, 56 P.R.R. 758 (1940), decision of Chief Justice Del Toro, we decided in *Jiménez* v. *Municipality*, *supra*, that the common property which is property privately owned by the municipalities can be acquired by adverse possession.

We also stated there that the rights of a public nature,

property held for public use or by virtue of a trust, on the contrary, were not subject to usucapio.

Since a long time ago this should have been decided with respect to the property of the government of Puerto Rico, as it was said particularly with respect to the property privately owned by the Government of the United States, by the Circuit Court of Appeals, First Circuit. There is no valid reason here to establish that antijuridic distinction.

As we have seen, the rule in the *Casino Español* and *Jiménez* cases is the same one established in almost all the States of the Union, notwithstanding the constitutional and statutory provisions on the contrary, as in Louisiana.

The law permits usucapio of the property privately owned by the State, placing in the same footing, without abominable privileges, the citizen and the State. We do not refer to the usucapio of property which is not the object of commerce, as the streets, plazas, public parks, hospitals, city halls, jails, and other properties devoted to public use. It is a question of the usucapio of the private property of the State, acquired and possessed in the same manner as the particular or private property of any citizen, and which, by reason of not being waste lands they can be devoted to social purposes.

The thing of the State subject to usucapio, we hold, is its private property usable, good for agriculture, industry, trade, and commerce. Hence, the State has excluded from usucapio, by exception, those properties belonging to the same, which can barely be used for social purposes, which may be comprised in the classification of waste lands, like swamps, mangrove swamps, State forest reservations, and unappropriated properties which never have had a private owner.

If said property privately owned, of social and personal benefit under the possession of the citizen, has been possessed as owner during the period fixed by law, under the conditions thereby provided, good sense commends that said possessory status should not be disturbed, that it be acknowledged as

transformed by the absorbing juridic reality in a perfect state of law.

Public opinion seems to repudiate even the limitation over waste lands imposed on the general limitation statute. In the past 5th session of the Legislative Assembly, Senator Ortiz Toro, former Solicitor General of Puerto Rico, presented Senate Bill No. 755, to amend § 9 of the Political Code "in order that the statutes of limitation for the acquisition of ownership of personal and real property be applied to the Commonwealth to *the same extent* [thus eliminating the nonprescription of waste lands] as to particular persons." (Italics ours.) This bill, presented by a minority lawmaker, could not possibly be considered then; it could not attract the legislative juridic interest in a year like 1968, saturated by election worries.

The bill proposed the amendment of § 9 of the Political Code of Puerto Rico, to read as follows:

"Section 9.—If any person, under any pretense of any claim inconsistent with the jurisdiction of the Commonwealth of Puerto Rico intrudes upon any property or lands belonging to Puerto Rico, the Secretary of Justice shall take the necessary measures to remove the intruder; provided, however, that the limitation statutes relative to the acquisitive prescription of ownership over personal and real property shall be applicable to the Commonwealth of Puerto Rico *to the same extent* as to particular persons." (Italics ours.)

### Present Position of the State

But there still remains something more to be said. In another appeal for review, No. R-65-110, *José Ángel Rubert Armstrong*, plaintiff-appellee, v. *The Commonwealth of Puerto Rico*,* concerning revendication, decided today, defendant-appellant, the Commonwealth, states in its brief:

"These properties belonging to the nation were ceded by Spain, by virtue of the Treaty of Paris of 1898, Art. VIII.

---

* COMPILER'S NOTE: 97 P.R.R. 573 (1969).

After said cession, the property of the Government cannot be acquired by particular persons by acquisitive prescription, *unless it is property privately owned,* which obviously does not happen in this case, since the land-maritime zone is held for the public use. This being so, plaintiff could not have acquired said property by prescription." (Italics ours.)

In this *Rubert* case, The People adheres to the true and authentic doctrine of the *Dimas* case, that is to say, that prescription runs against property privately owned by the State, except when waste lands are involved, and, of course, when lands for the common use or which are not the object of commerce, are involved.

The principal defect of the case law subsequent to the case of *The People* v. *Dimas et al.,* we repeat, with few exceptions, is having attributed a juridic scope to its doctrine, which it never had nor should have had, by reason of its peculiar and distinctive facts and circumstances. We cannot take advantage of our own errors or perpetuate them consciously. Privileges cannot and should not survive.

Our Legislative Assembly of 1902, *after July 1 of said year*—not precisely after the change of sovereignty—legislated *in a special, categoric, clear and explicit manner,* on the problem of usucapio against the State, and did it positively and generally, with respect to its privately owned property, through the Civil Code, in its institute on prescription, and in a negative, very limited, and exceptional manner, concerning waste lands exclusively, by means of the second sentence of § 9 of the Political Code, whose (Spanish) text is:

"*No podrá adquirirse títulos a terrenos baldíos insulares por posesión adversa, o contraria al título de otra u otras personas.*"*

The only rule which should govern here, with respect to this matter, was thus prescribed. The least we can do, in view

---

*EDITOR'S NOTE: The English text is as follows:

"Title to *insular lands* shall not be acquired by adverse possession." (Italics ours.)

of a provision so clear and free from ambiguity, is to honor it, accept it, and apply it "just as its words sound to us."

### Historical Remark

It would be salutary, once in a while, to remember that in the famous case of *Giménez et al.* v. *Brenes*, 10 P.R.R. 124, 163 (1906), the illustrious Judge MacLeary, at the end of his unforgettable dissent, stated the following:

"If it is necessary to modify the opinions of this court heretofore rendered in order to reach a correct decision of this case, *by all means let them be modified,* or if necessary overruled. *Error can never become truth* by being persisted in; if the wrong path has been followed let us retrace our steps, *before we are lost in the labyrinth of fallacy; let us dare to do right.*" (Italics ours.)